**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SHERWIN ALUMINA COMPANY, LLC, *et al.*,[1] | § | Case No. 16-20012 (___) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

**DECLARATION OF KENT BRITTON,**
**CHIEF FINANCIAL OFFICER OF SHERWIN ALUMINA**
**COMPANY, LLC, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sherwin Alumina Company, LLC (2376) and Sherwin Pipeline, Inc. (9047). The debtors' service address is: 4633 Highway 361, Gregory, Texas 78359.

I, Kent Britton, the Chief Financial Officer of Sherwin Alumina Company, LLC ("**Sherwin**"), a limited liability company formed under the laws of the State of Delaware and one of the above-captioned debtors and debtors in possession, hereby declare under penalty of perjury:

<u>**Introduction**</u>

1.      Sherwin operates an alumina plant in Gregory, Texas that produces aluminum oxide (or alumina), which is the primary component of aluminum, from bauxite.  Sherwin produces alumina through the "Bayer Process," a refining technique that produces alumina from bauxite ore by dissolving the bauxite in a caustic solution.  Sherwin's facility is capable of producing approximately 1.65 million metric tons of smelter grade alumina per year.  Sherwin operates one of the few alumina plants in the world that can refine Jamaican bauxite, which because of its low quality (and cheaper price), must be refined using higher temperatures and more energy than higher quality bauxite.

2.      Sherwin is an indirect wholly owned subsidiary of Glencore plc ("**Glencore**"), a multinational commodity trading and mining enterprise.  Glencore subsidiary Commodity Funding, LLC, is Sherwin's prepetition secured lender and proposed postpetition debtor-in-possession lender.

3.      Due to a confluence of factors beyond its control, including the precipitous decline in the alumina market, labor disputes, and recent power outages, Sherwin has suffered substantially decreased margins and cash flows.  Alumina prices have also declined by nearly 44 percent in the past year alone, dropping from approximately $354.50 per metric ton as of January 1, 2015, to $199 per metric ton as of January 1, 2016.  At the same time, Sherwin remains embroiled in an ongoing 15-month "lockout" of its unionized employees, which has substantially disrupted Sherwin's operations and viability.

4.      In addition, Sherwin has been confronted with significant difficulties with respect to two critical contracts.  Sherwin is party to an uneconomic "take-or-pay" energy supply agreement with Gregory Power Partners L.P. that requires Sherwin to take steam and electricity produced by Gregory Power Partners L.P.  Sherwin must also contend with the viability of its key bauxite supplier, Noranda Bauxite Limited, which supplies nearly two-thirds of all bauxite consumed by Sherwin.  Using bauxite from an alternative supplier could only be implemented after a costly and time-consuming engineering study and reconfiguration of Sherwin's facilities.  Moreover, it is impossible for Sherwin to source such a significant amount of comparable bauxite from any other supplier on an expedited basis.

5.      Sherwin, however, has not stood by idly in the face of these challenges.  Instead, through a series of decisions and negotiations over the last several months, Sherwin has taken steps in an attempt to maintain viability.  In July 2015, Sherwin negotiated an increase of its availability under its existing secured revolving credit facility with Commodity Funding, LLC providing Sherwin with access to liquidity on an interim basis and permitting it to take key steps necessary to effectuate a restructuring.  On October 22, 2015, Sherwin appointed restructuring professional Alan J. Carr—who has more than two decades of experience negotiating, structuring, and documenting complex restructuring transactions as an attorney, investor, and director—as its independent manager to oversee and assess restructuring alternatives.  Mr. Carr and Sherwin, in turn, retained Kirkland & Ellis LLP and Huron Consulting Group to help define the path forward.

6.      Recognizing that any potential restructuring alternative involving Glencore, its 100-percent equity owner and sole lender, could be subject to scrutiny, K&E—at Mr. Carr's direction—undertook an independent investigation into the relationship between Sherwin and

Glencore.   K&E interviewed a total of ten individuals—four Sherwin executives and six Glencore executives—and received over 200,000 potentially relevant documents.

7.      The investigation—which was conducted at Mr. Carr's direction and which consisted of significant time spent on document review, witness interviews, and legal research and analysis—culminated in a 71-page report that focused on all material transactions and interactions among Sherwin and various Glencore affiliates.   It is my understanding that both Sherwin and Glencore voluntarily cooperated with the investigation, making documents and witnesses available as requested by the investigators.

8.      Simultaneous with its investigation, and in an effort to ensure that a going concern transaction could be realized, Sherwin entered into discussions with Commodity Funding, LLC and Glencore.   Throughout these negotiations, Sherwin's strategy has been to effectuate a restructuring in a holistic manner.    This included obtaining necessary financing to fund a chapter 11 restructuring, ensuring an appropriate market check to maximize stakeholder value, and agreeing up front on a path to get the company in and out of chapter 11 on an expedited basis.

9.      After nearly three months of extensive negotiations, Sherwin has locked in the framework to achieve these objectives.   In addition to committing $40 million on a junior basis to fund Sherwin's chapter 11 restructuring, Commodity Funding, LLC's affiliate, Corpus Christi Alumina LLC, has entered into an agreement with Sherwin to serve as the stalking horse purchaser of substantially all of Sherwin's assets, which sale will be effectuated through a pre-negotiated chapter 11 plan filed today.   To the extent the Plan is not confirmed but all other conditions to the sale are satisfied, the Stalking Horse Purchase Agreement contemplates consummation of the sale pursuant to section 363 of the Bankruptcy Code.

10.     The proposed stalking horse bid, if approved, would allow Sherwin to sell substantially all of its assets and complete this chapter 11 restructuring in approximately four months as a stronger business.  In addition to satisfying all priority and administrative claims against the estates, including all of Sherwin's obligations under the Prepetition Secured Credit Agreement, the Stalking Horse Purchase Agreement provides a $250,000-cash pool to fund distributions for Sherwin's general unsecured creditors if they vote to accept the Plan.[2]

11.     The stalking horse transaction is, however, subject to certain closing conditions that must be satisfied before the transaction can be consummated.  Some of the key conditions include:

- ***Noranda Agreement***.  The Stalking Horse Purchase Agreement includes conditions precedent to closing the proposed Stalking Horse Sale Transaction that require Sherwin to assume and assign the Noranda Agreement (subject to certain modifications) to the Stalking Horse Bidder, which necessitates Sherwin preserving the Noranda Agreement during the pendency of these chapter 11 cases.[3]

- ***Energy Supply Agreement***.  Sherwin purchases steam, spray water, and electricity necessary to operate the Facility under an uneconomical take-or-pay contract that, among other things, does not adequately compensate Sherwin for the costs associated with periodic outages that have damaged equipment and delayed production at the Facility in recent years.  The Stalking Horse Sale Transaction effectively requires Sherwin to assume and assign this contract, but only if the contract is amended in a manner acceptable to the Stalking Horse

---

[2]     If Sherwin's general unsecured creditors do not vote to accept the Plan, or Sherwin is not otherwise able to consummate the sale transaction pursuant to a chapter 11 plan, the Stalking Horse Sale Agreement permits Sherwin to seek Court approval of the Stalking Horse Sale Transaction on a standalone basis under section 363(b) of the Bankruptcy Code.  As described herein, under the credit bid incorporated in the Stalking Horse Sale Transaction, there is no distributable value for general unsecured creditors unless Sherwin consummates the Stalking Horse Sale Transaction under the Plan, in which case the Stalking Horse Bidder has agreed to fund a cash distribution to general unsecured creditors.

[3]     Because the Stalking Horse Sale Transaction requires Sherwin to assume and assign the Noranda Agreement (subject to certain modifications) to the Stalking Horse Bidder, and because there is no conceivable business plan under which Sherwin can operate without the Noranda Agreement, Sherwin has filed a motion in connection herewith seeking authority to assume the Noranda Agreement, effective *nunc pro tunc* to the Petition Date, and for the Court to set a briefing schedule to allow Sherwin to resolve this significant contingency on an expedited basis.  Sherwin also requests authority to pay any accrued prepetition claims under or related to the Noranda Agreement, which Sherwin estimates total approximately $1.97 million as of the Petition Date.

Bidder.  If the parties cannot reach a mutually acceptable agreement, the contract will be rejected.

- ***Free and Clear Finding***.  Finally, the Stalking Horse Sale Transaction is subject to entry of a Court order authorizing the Stalking Horse Bidder to purchase Sherwin's assets free and clear of any and all claims, interests, and encumbrances (other than those specifically identified in the Stalking Horse Purchase Agreement).

12.     To ensure that value is maximized, the Stalking Horse Sale Transaction expressly contemplates a marketing and overbid process to allow any strategic or financial investor to "top" the Stalking Horse Sale Bid.  To facilitate the overbid process, Sherwin intends to seek approval of certain bidding procedures that will set the framework and timeline for the submission of overbids.  And, given Sherwin's limited liquidity and desire to complete these chapter 11 cases as quickly as possible, Sherwin is requesting that the Court establish a hearing date for approval of the bidding procedures no later than February 10, 2016.

13.     To effectuate this restructuring, on the date hereof (the "**Petition Date**"), Sherwin and its wholly-owned subsidiary Sherwin Pipeline, Inc. (together with Sherwin,  the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").  To minimize the possible adverse effects on Sherwin's businesses, the Debtors have filed motions and pleadings seeking various types of standard and customary "first day" relief (collectively, the "**First Day Motions**").  The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to transition smoothly into, and operate in, chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful restructuring of the Debtors, and best serves these estates and

creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.

14.     I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records and have served as Sherwin's Chief Financial Officer since September 2012.  I have over 23 years of experience in financial management, planning, and reporting for numerous complex aluminum and other commodities businesses.  I hold a bachelor's of science degree in industrial management from Georgia Tech College of Management at Georgia Institute of Technology and hold a current Certified Public Accountant designation.

15.     Except as otherwise indicated herein, all facts set forth in this declaration are based upon:  my personal knowledge of Sherwin's employees, operations, and finances; information learned from my review of relevant documents; information supplied to me by other members of Sherwin's management and its third-party advisors; or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

16.     This declaration is organized as follows.  The *first* section provides background information on Sherwin, the commodities space in which it operates, and detailed information on Sherwin's operations and prepetition capital structure.[4]  The *second* section describes Sherwin's prepetition restructuring efforts and recent negotiations that led to the proposed DIP Facility, the

---

[4]     Many of the financial figures presented in this declaration, which reflect Sherwin's most recent review of its businesses, are unaudited and potentially subject to change.  Sherwin reserves all rights to revise and supplement the figures presented herein.

Stalking Horse Sale Transaction, and the Plan.  The *final* section and **Exhibit A** summarize the relief requested in, and the factual basis supporting, the First Day Motions.

**The Alumina Market and Sherwin's Business**

17.     Sherwin's facility, which is located in Gregory, Texas, a suburb of Corpus Christi, is capable of producing approximately 1.65 million metric tons of smelter-grade alumina per year (the "**Facility**").  Alumina is used to produce aluminum, which is utilized in an array of commercial, military, industrial, and consumer products and applications that are critical to the nation's economy and national defense.  As of the Petition Date, Sherwin directly or indirectly employs approximately 575 individuals and its operations support an estimated additional 1,500 jobs along the Texas Gulf Coast.

I.      **Alumina and the Aluminum Production Process**.

18.     The process for producing aluminum has three major phases:  *first*, bauxite—a brick-red-colored mineral made up of aluminum oxide and certain other materials that is typically found in tropical and subtropical regions—is extracted from the ground; *second*, businesses such as Sherwin process bauxite ore into aluminum oxide, or alumina; and *finally*, electric currents are used to break down the chemical bonds between the aluminum and oxygen in alumina, which allows for the isolation of aluminum.   It typically requires approximately four to five metric tons of bauxite to produce approximately two metric tons of alumina, which is typically sufficient to produce approximately one metric ton of aluminum.

19.     During the second phase, which is the focus of Sherwin's business, bauxite is processed into aluminum oxide, or alumina, through the "Bayer Process," a 100-year-old process during which businesses such as Sherwin crush bauxite and mix it with caustic soda before using high pressure and heat to dissolve the alumina within bauxite to form sodium aluminate.  Sodium aluminate, once cooled and further processed, is mixed with aluminum hydroxide crystals, which

form larger crystals.  Those crystals are then heated at temperatures in excess of 1,800 degrees Fahrenheit to remove water within the crystals, which causes the crystals to calcify into a fine white powder known as alumina.

20.  Aluminum is a critical component in applications that include:

- *transportation*, where aluminum is used in a wide range of consumer, commercial, and military applications such as automobiles, watercraft, aircraft, and spacecraft;

- *communications*, including mobile telephones, personal computers, and satellites;

- *construction*, including single-family homes, office skyscrapers, and entertainment and sports complexes;

- *energy infrastructure*, including the construction of electric transmission systems; and

- *consumer goods*, including tablet computers, flat-screen televisions, sporting equipment, furniture, mirrors, and home appliances.

II.  **Sherwin's History**.

A.  **Sherwin's Founding and Early Operations and Growth**.

21.  Sherwin is the successor in interest to the Reynolds Metals Company ("**Reynolds**") of Richmond, Virginia.  In 1950, Reynolds began to lay the groundwork for a new alumina refinery in Texas to secure better access to Jamaica and other Caribbean bauxite producers than was available in Virginia.  Reynolds ultimately selected a site near Gregory, Texas that combined access to a deep-water port, the capacity for industrial expansion along the Gulf Coast, and convenient access to abundant supplies of low-priced natural gas.

22.  Reynolds ultimately purchased 1,660 acres in Gregory, Texas, known as the Taft Ranch, as well as the neighboring San Patricio Reduction Plant, and commenced construction on the Facility.  During the construction process, Reynolds laid the groundwork for Sherwin's future success and growth by, among other things, entering into agreements with the Port of Corpus Christi for the location and construction of the new La Quinta Channel serving the

Facility and with the City of Corpus Christi, Texas, for a long-term water supply. Reynolds also commenced construction of a 35-mile pipeline from the Nueces River to the Facility, providing the foundation for a new public water supply that would eventually serve Gregory, Texas, and neighboring communities and that spurred the industrialization of eastern San Patricio County.

23. Reynolds completed construction of the Facility in 1953. The Facility was subsequently expanded five times: (a) in 1957, a second pier was added to the Facility; (b) in 1965, the Facility's daily alumina production capacity was increased from approximately 1,000 metric tons to approximately 4,000 metric tons; (c) in 1973, the Facility's daily alumina production was again increased, to its present capacity of approximately 4,400 metric tons; (d) in 1988, additional equipment was installed to allow the production of approximately 250,000 tons per year of mid-stream chemical grade alumina hydrate products; and (e) in 1991, the Facility underwent an extensive modernization.

   **B.    The Glencore Acquisition**.

24. In 2000, global aluminum conglomerate Alcoa Inc. acquired Reynolds. In connection with this transaction, the U.S. Department of Justice required Alcoa Inc. to sell certain of Reynolds' assets to satisfy certain antitrust approvals. In 2001, Reynolds sold its interests in the Facility and certain related assets to BPU Reynolds Inc. In 2007, Glencore completed a series of transactions that resulted in Glencore acquiring the Facility and related assets.

25. Since 2007, Glencore has provided significant financial, operational, and managerial support to Sherwin. Non-Debtor affiliate Glencore Ltd. purchases substantially all of Sherwin's alumina production, which accounts for 98 percent of Sherwin's annual operating revenue. Glencore Ltd. also supplies Sherwin with approximately one-third of the Facility's bauxite supply. Glencore has also made significant direct capital contributions to Sherwin since

2007.  Commodity Funding, LLC, has extended nearly $95 million in credit to Sherwin, which has allowed Sherwin to make substantial investments in the Facility despite significant operating losses and a challenging pricing environment (in such capacity, the "**Prepetition Secured Lender**").  In connection with these chapter 11 cases, Commodity Funding, LLC, has also committed to fund the $40-million DIP Facility, on a junior basis (the "**DIP Facility**" and, in its capacity as lender under the DIP Facility, the "**DIP Lender**").  In addition, a Commodity Funding, LLC affiliate has agreed to serve as the stalking horse for substantially all of Sherwin's assets pursuant to a chapter 11 plan, which will preserve the going-concern value of Sherwin's business, protect jobs, and preserve business opportunities and important relationships with Sherwin's key vendors (the "**Stalking Horse Bid**").  Furthermore, Glencore Ltd. provides various shared services to Sherwin, which has allowed Sherwin to take certain advantage of operational synergies.  Finally, Sherwin's association with Glencore allows Sherwin to leverage Glencore's institutional relationships with financial institutions, vendors, and other contract counterparties.

### III.  Sherwin's Current Assets and Operations.

#### A.  Sherwin's Corporate Structure.

26.    Sherwin is a wholly-owned subsidiary of Allied Alumina, LLC, which is a wholly-owned subsidiary of Glencore Ltd., a corporation formed under the laws of Switzerland and a Glencore subsidiary.  Debtor Sherwin Pipeline, Inc. is a wholly-owned subsidiary of Sherwin.

#### B.  Overview of Sherwin's Operations and Recent Financial Performance.

27.    During the fiscal year ending December 31, 2015, Sherwin generated projected gross revenue of approximately $348 million, approximately 98 percent of which was derived from alumina sales to Glencore Ltd.  Sherwin also generates cash through interest payments

from Noranda, the borrower under a $20-million secured credit facility for which Sherwin is the lender.  Sherwin further generates cash under a $10-million note from Nashtec LLC, a joint venture that is co-owned by non-Debtor affiliate Allied Alumina, LLC, and Nabaltec AG, a supplier of mineral-based flame retardants and raw materials for technical ceramics.  Sherwin projects a net operating loss of at least $42.13 million for the fiscal year ending December 31, 2015.

        **C.**       **The Noranda Agreement**.

28.    Approximately 65 percent of the bauxite utilized by Sherwin is supplied by Noranda Bauxite Limited ("**Noranda**") under the Bauxite Sales Agreement, dated as of December 29, 2012 (as amended, modified, or supplemented, the "**Noranda Agreement**").  The Noranda Agreement is immensely valuable to these estates and preserving the Noranda Agreement is essential to Sherwin's viability.

29.    Bauxite is critical to Sherwin's business enterprise and the success of this restructuring, and there is no conceivable business plan under which Sherwin can operate without the Noranda Agreement.  Thus, a successful outcome in these chapter 11 cases (and beyond) is contingent upon the continued and steady supply of bauxite provided under the Noranda Agreement.  The stalking horse bidder has made preservation of the Noranda Agreement during the pendency of these chapter 11 cases, as well as the assignment (subject to certain modifications) of the Noranda Agreement, conditions precedent to the proposed sale transaction.

30.    To this end, Sherwin has filed a motion contemporaneously herewith to assume the Noranda Agreement upon closing of the sale transaction.  Under the facts and circumstances of these chapter 11 cases, Sherwin's decision to assume the Noranda Agreement on a prospective

basis is a sound exercise of its business judgment that will benefit the estates.  Sherwin's alumina production business depends on a stable, cost-efficient supply of bauxite.

31.     Securing alternative bauxite on better terms would not be possible.  Because Noranda's facilities are located closer to Sherwin's operations than all other bauxite suppliers, it is unlikely that Sherwin would be able to secure an alternative source of bauxite without incurring additional transportation costs.  Furthermore, using bauxite from an alternative supplier could only be implemented after a costly and time-consuming engineering study and reconfiguration of the Facility.  The Facility utilizes certain production techniques and processes specifically designed to process Jamaican bauxite, which has unique physical and chemical characteristics.

32.     If Sherwin were forced to find an alternative source of bauxite, it would likely have to purchase a higher-quality form of bauxite that is vastly more expensive.  Moreover, it would not be possible for Sherwin to secure alternative bauxite from another source on an expedited basis.  The process to identify a possible bauxite supplier and negotiate a bauxite supply agreement between sophisticated counterparties such as Sherwin and Noranda takes months to conclude.  Without the ability to use bauxite while a new supply agreement is being negotiated, Sherwin's operations would be severely disrupted and may be required to shut down altogether.  And, given the short duration of these chapter 11 cases, it is likely that even a temporary shutdown would prevent Sherwin from successfully using the chapter 11 process to remain a viable enterprise.

33.     In sum, Sherwin's assets cannot operate under *any* conceivable alternative configuration—in chapter 11 or otherwise—without the Noranda Agreement.  Consequently, unless Sherwin is able to assume the Noranda Agreement, Sherwin may not be able to sell its

business as a going concern.  Preventing Sherwin from being able to sell its business as a going concern, in turn, will significantly diminish the value of these estates to the detriment of all stakeholders.  Sherwin therefore submits that assuming the Noranda Agreement is a sound exercise of its business judgment because it will prevent such harm and will instead benefit the estates.

34.     However, to gain leverage over Sherwin and potentially attempt to renegotiate contract terms, Sherwin believes that Noranda may take steps to terminate the Noranda Agreement based on the Bankruptcy Code's safe harbors before this Court has an opportunity to consider the merits of the underlying motion to assume.  Sherwin does not believe there is any basis under the law for Noranda to terminate the Noranda Agreement.  And since assumption is necessary to Sherwin's viability, Sherwin is seeking entry of an order authorizing it to assume the Noranda Agreement effective upon a closing of the sale transaction.  Moreover, to the extent Noranda believes that is maintains the ability to terminate the Noranda Agreement under the safe harbor provisions of the Bankruptcy Code or otherwise, Sherwin also seeks an order from this Court expediting any litigation with Noranda concerning assumption of the Noranda Agreement.

35.     Sherwin plans to seek approval of an appropriate briefing schedule to permit the Court to consider Sherwin's request on an expedited basis in a manner that is fair and equitable to both Sherwin and Noranda.

**D.     The Glencore Supply and Sales Agreement**.

36.     The remaining bauxite utilized by Sherwin is supplied by non-Debtor affiliate Glencore Ltd. under the Bauxite and Alumina Supply Agreement, dated as of January 1, 2014 (as amended, modified, or supplemented in accordance with the terms of thereof, the "**Glencore Supply and Sales Agreement**").

37.     Under the Glencore Supply and Sales Agreement, Sherwin also sells substantially all of its alumina production each month to Glencore Ltd. at a price equal to the average monthly price of free on board Australia alumina, known as the Alumina Price Index and published in *Platts Metals Daily*, an alumina industry trade publication, less an administration charge of $5 per metric ton.

**E.     Sherwin's Capital Expenditure Program**.

38.     Sherwin has made significant investments in the Facility, which because of its age requires significant maintenance and improvements to remain competitive with other alumina generating businesses.  In 2015 alone, Sherwin spent more than $37 million on various capital expenditure projects.   Capital expenditure projects completed by Sherwin since the 2013 acquisition total nearly $95 million in the aggregate and include an upgrade the Facility's port on the Gulf of Mexico, installation of state-of-the-art equipment, and implementation of environmental initiatives to reduce the Facility's carbon footprint.

**F.     Sherwin's Workforce**.

39.     As of the Petition Date, Sherwin employs approximately 160 full-time salaried employees.  Approximately 455 individuals were previously subject to a collective bargaining agreement between Sherwin and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union on behalf of its Local Union No. 235A (the "**United Steelworkers**"), which  expired as of October 11, 2014.  Following the lockout, as to which the General Counsel of the National Labor Relations Board (the "**NLRB**") dismissed the United Steelworkers' unfair labor practice charges with respect thereto, which dismissal was affirmed and then reaffirmed by the General Counsel, Sherwin engaged certain third-party service providers on a temporary basis to operate the Facility.

**IV.      Sherwin's Capital Structure**.

40.      Sherwin is the borrower and the Prepetition Secured Lender is the lender under a revolving credit facility pursuant to the Credit Agreement, dated as of July 1, 2009 (as modified, amended, waived, or supplemented, the "**Prepetition Secured Credit Agreement**").  Pursuant to various amendments to the Prepetition Secured Credit Agreement, the Prepetition Secured Lender has increased the total availability to $95 million as of the Petition Date.  As of the Petition Date, Sherwin does not have any further availability under the Prepetition Secured Credit Agreement.  The obligations under the Prepetition Secured Credit Agreement bear interest at a floating rate equal to 130 percent of the applicable federal rate and mature in July 2016.  The Prepetition Secured Credit Agreement is secured by a first-priority lien on and security interest in substantially all of Sherwin's real and personal property.

**Events Leading Up to the Restructuring**

**I.      Commodity Price Decline and Widespread Industry Distress**.

41.      Since 2014, a perfect storm has devastated pricing for alumina, which is highly correlated to pricing for aluminum:  (a) *aluminum supply* has substantially outpaced demand causing downward pricing pressure on aluminum due to state subsidies and other market failures; (b) *demand for aluminum* has declined due to sluggish economic growth in China and reduced real estate development; and (c) *regulatory uncertainty* related to U.S. monetary policy and interest rates has further softened demand for aluminum and alumina.

42.      State subsidies and other market failures have resulted in a global oversupply of aluminum.  While many responsible global aluminum smelters made significant capacity cuts to rationalize the supply demand curve, Chinese smelters—aided by state subsidies and lower-cost smelting facilities—have not curtailed production despite a contraction in overall aluminum demand.

43.     Demand for aluminum remained depressed through much of 2014, before deteriorating further in 2015, due to, among other things, a slowdown in economic growth in China, economic retrenchment in Russia, uneven growth in global commercial real estate, and uncertainty regarding the Federal Reserve's interest rate strategy.   This price deterioration, together with certain issues unique to Sherwin described below, have materially affected Sherwin's performance and operating revenues, which are projected to decline by approximately 24.4 percent this year.   This, in turn, has exhausted Sherwin's liquidity.

## II.      The Expired Collective Bargaining Agreement.

44.     The effect of the collapse of global aluminum prices on Sherwin's business has been further exacerbated by Sherwin's labor costs and the United Steelworkers leadership's refusal to accept the fundamental economic realities facing Sherwin and other global alumina producers.   This resulted in a lockout of Sherwin's talented, hard-working unionized employees since October 11, 2014.

45.     More specifically, on February 9, 2011, Sherwin and the United Steelworkers entered into a collective bargaining agreement (the "**CBA**") with a stated term through July 31, 2014, which term was subsequently extended with the consent of the parties.   During the CBA's term, global alumina prices underwent a fundamental shift.   The significant deterioration of alumina prices presented Sherwin's management team with limited options for contract extension negotiations with the United Steelworkers.   Sherwin's management team determined that, absent a labor agreement that reflected economic terms more aligned with market circumstances, Sherwin's business enterprise likely lacked long-term viability.

46.     In April 2014, in an effort to provide the parties sufficient time to reach a new mutually acceptable labor agreement, Sherwin extended the CBA's expiration date by two months, from July 31, 2014, to September 30, 2014.   Sherwin's management team and lead labor

negotiator, Marshall Babson, a former member of the NLRB with more than 40 years of management-side experience in labor contract negotiations, spent several months developing a labor proposal that balanced the interests of Sherwin with those of its unionized workers.

47.     On July 8, 2014, the parties commenced discussions regarding a new labor agreement.  Management made significant efforts to reach an acceptable labor agreement with its labor union during this time period:

- management participated in more than 30 in-person bargaining sessions between July 8, 2014, and October 11, 2014 (an average of nearly once every three days);

- management presented nine economic and benefit proposals, while the United Steelworkers presented four economic and benefit proposals;

- management proposed to implement modest across-the-board wage increases that exceeded proposed increases in healthcare contributions as well as to continue post-retirement medical and other welfare benefits for all current unionized employees as well as those employees hired prior to January 1, 2015; and

- management extended the deadline to reach an acceptable labor agreement from August 1, 2014, to September 30, 2014, at which time management made an unconditional commitment to continue discussions with the United Steelworkers until the parties reached an acceptable labor agreement.

48.     After negotiating past midnight on October 1, 2014, management presented its best and final labor agreement proposals and set 7:00 a.m. on October 2, 2014, as the deadline to accept the proposals.   Management subsequently extended that deadline to midnight on October 10, 2014, to permit its unionized employees sufficient time to review, assess, and vote on management's proposals.  Unfortunately, on October 11, 2014, the union's leadership notified Sherwin's management that its members had rejected its latest proposal.

49.     The United Steelworkers' position left Sherwin with no alternative other than to institute a lockout as of October 11, 2014, and to engage independent contractors to operate the Facility pending resolution on a replacement labor agreement.   Since that time, the United Steelworkers' leadership has focused its attention on a series of unsuccessful legal challenges to

the lockout, rather than developing an acceptable labor agreement that reflects the current economic challenges facing the alumina industry or otherwise engaging in good-faith discussions with management for the benefit of Sherwin's unionized workers and other stakeholders.

50.     On January 6, 2015, the United Steelworkers filed unfair labor practice charges against Sherwin with the Regional Director of the NLRB's Regional Office in Fort Worth, Texas related to the ongoing lockout and other disputes.  On May 20, 2015, the Regional Director for Region 16, who investigates unfair labor practice charges and makes initial determinations with respect to such charges on behalf of the NLRB's General Counsel,[5] denied the unfair labor practice charge related to the lockout's legality.  On May 28, 2015, the United Steelworkers filed a Notice of Appeal with the NLRB General Counsel's Office of Appeals challenging the Regional Director's ruling dismissing the United Steelworkers' unfair labor practice challenge to the lockout.  On October 2, 2015, the the NLRB's Office of Appeals, on behalf of the NLRB's General Counsel, denied the United Steelworkers' appeal.  On October 27, 2015, the United Steelworkers filed a Motion to Reconsider with the NLRB's Office of Appeals requesting reconsideration of its dismissal of its October 2, 2015 decision, which Office of Appeals denied on behalf of the NLRB's General Counsel on November 20, 2015.

### III.     The GPP Energy Supply Agreement.

51.     Gregory Power Partners L.P. ("**GPP**") provides steam and electricity to the Facility under a long-term energy supply agreement originally executed on June 30, 1998, by the respective predecessors in interest to Sherwin and GPP, and most recently amended and restated as of August 7, 2013 (as amended, modified, or supplemented, the "**Energy Supply Agreement**").  The Energy Supply Agreement is a long-term take-or-pay agreement under

---

[5]     The NLRB's General Counsel has final authority with respect to investigating unfair labor charges and determining whether to issue a Complaint or dismiss the charges.

which GPP provides steam and electricity necessary to operate the Facility to Sherwin. Sherwin's Energy Supply Agreement obligations are guaranteed by Reynolds (as assignor of the Energy Supply Agreement), and GPP's obligations under the Energy Supply Agreement are guaranteed by equity sponsor NRG Energy, Inc. (up to a cap of $80 million).  GPP's obligations under the Energy Supply Agreement are also secured by a lien in favor of Sherwin on substantially all of GPP's assets.

52.     The Energy Supply Agreement requires Sherwin to purchase steam on uneconomic and unreasonable terms. The Energy Supply Agreement also does not adequately compensate Sherwin for the diminished revenues and high equipment repair costs associated with the prolonged outages that regularly delay production at the Facility.

53.     In an effort to explore a possible solution, GPP and Sherwin have engaged in discussions, including in-person meetings on November 20, 2015, and December 29, 2015, regarding possible modifications to the Energy Supply Agreement.  These discussions have not yet resulted in an agreement.  Consummation of the Stalking Horse Sale Transaction requires Sherwin and GPP to amend the Energy Supply Agreement in a manner that is acceptable to the Stalking Horse Bidder.  There is no guaranty that the parties will reach a modified energy supply agreement that is acceptable to the parties and the Stalking Horse Bidder.

**IV.     Restructuring Discussions**.

54.     Following the July 2015 amendment to the Prepetition Secured Credit Agreement, Sherwin determined that it needed to restructure its business enterprise to more appropriately align its cost structure with the new alumina pricing environment and the possibility that a consensual resolution with the United Steelworkers and/or GPP was not achievable absent Court intervention.

55.     Thereafter, Sherwin appointed Mr. Carr as its independent manager to oversee and assess restructuring alternatives.  Sherwin and Mr. Carr subsequently retained restructuring advisors Kirkland & Ellis LLP ("**K&E**") and Huron Consulting Services, LLC ("**Huron**").  In October 2015, Sherwin and the Prepetition Secured Lender commenced restructuring discussions.  The parties' preliminary discussions initially focused on possible solutions that satisfied the following parameters:

- de-leveraging Sherwin's debt obligations;

- facilitating the availability of new capital to fund ongoing improvements and maintenance at the Facility, which is over 60 years old and requires substantial capital expenditure investments;

- providing sufficient runway to a restructuring transaction should the parties not reach a mutually acceptable labor agreement and should pricing improvements not materialize in the short term; and

- maximizing enterprise value for the benefit of all stakeholders, including employees.

56.     In November and December 2015, Sherwin engaged in discussions with the Prepetition Secured Lender regarding possible postpetition financing to fund a chapter 11 restructuring.  In December 2015, the Prepetition Secured Lender provided Sherwin with a proposal to finance a chapter 11 restructuring process as well as a proposal pursuant to which Corpus Christi Alumina LLC (the "**Stalking Horse Bidder**") would agree to purchase substantially all of the Sherwin's assets pursuant to a chapter 11 plan (the "**Plan**") or as otherwise approved by the Court (such agreement, the "**Stalking Horse Purchase Agreement**") and such transactions, collectively, the "**Stalking Horse Sale Transaction**").  After extensive, good-faith negotiations with the advisors for the Prepetition Secured Lender, Sherwin and the Prepetition Secured Lender have agreed on the terms of these restructuring transactions.  More specifically, the Stalking Horse Sale Transaction provides for a standalone restructuring that contemplates the following:

- **DIP Facility**.  The DIP Lender will commit approximately $40 million in additional liquidity, on a junior basis, to Sherwin to fund an orderly chapter 11 sale process (and will provide funding for certain budgeted restructuring and wind-down expenses at the closing of the Stalking Horse Sale Transaction, thereby providing additional liquidity to fund the administration of the estates).  The DIP facility will have an attractive eight-percent interest rate, and no commitment fees.

- **Credit Bid**.  The Stalking Horse Sale Transaction incorporates a $95-million credit bid by the Stalking Horse Bidder, as assignee of the Prepetition Secured Lender's claims under the Prepetition Secured Credit Agreement.

- **Free and Clear**.  The Stalking Horse Sale Transaction provides for the sale of substantially all of Sherwin's assets free and clear of liens, claims, and encumbrances (other than those specifically identified in the purchase agreement), including all liens, claims, liabilities, obligations, and encumbrances under any collective bargaining agreement.

57.     The Stalking Horse Sale Transaction reflects the reality that Sherwin's enterprise value may be less than the amount of Commodity Funding, LLC's secured claims.  To provide for an orderly resolution of these chapter 11 cases, Sherwin has secured the support of the Prepetition Secured Lender to structure the Stalking Horse Sale Transaction as an asset sale under the Plan and to provide a cash recovery to holders of general unsecured claims to incentivize creditors to support the Plan.  If general unsecured creditors do not vote for the Plan, however, Sherwin will seek Court approval of the Stalking Horse Sale Transaction under section 363(b) of the Bankruptcy Code.

58.     To ensure that value is maximized, Sherwin seeks approval of a marketing and overbid process.  To facilitate the overbid process, Sherwin intends to seek approval of certain bidding procedures filed in connection herewith that will set the framework and timeline for the submission of bids.

59.     Sherwin believes that the Stalking Horse Sale Transaction is in the best interests of all stakeholders.  It provides for a comprehensive restructuring of Sherwin's prepetition

obligations, maintains the going-concern value of Sherwin's business, protects jobs, and preserves business opportunities and important relationships with Sherwin's key vendors.

60.     Sherwin filed these chapter 11 cases to effectuate this proposed restructuring, and expects to expeditiously complete its chapter 11 sale process.  Sherwin is cognizant of the costs associated with these chapter 11 cases and the need to restructure its business.  It is imperative that Sherwin expeditiously complete these chapter 11 cases.

61.     Toward this end, Sherwin has filed a motion seeking, among other things, approval of the proposed case timeline, which—subject to the Court's availability— contemplates a bid deadline of March 18, 2016 (the "**Qualified Bid Deadline**").  If Sherwin does not receive any qualified bids prior to the Qualified Bid Deadline, Sherwin requests that the Court authorize Sherwin to proceed with confirmation on the proposed schedule below.

| Proposed Sale and Confirmation Timeline | | |
|---|---|---|
| *Event* | *Date* | *Days After Petition Date* |
| Petition Date | Monday, January 11, 2016 | N/A |
| Bidding Procedures Hearing | Wednesday, February 10, 2016 | 30 Days |
| Noranda Assumption Hearing | Wednesday, February 17, 2016 | 37 Days |
| Disclosure Statement Hearing | Wednesday, February 24, 2016 | 44 Days |
| Qualified Bid Deadline | Friday, March 18, 2016 | 67 Days |
| Auction (If Necessary) | Wednesday, March 23, 2016 | 72 Days |
| Voting Deadline | Monday, March 28, 2016 | 77 Days |
| Confirmation or Sale Hearing | Thursday, March 31, 2016 | 80 Days |

**First Day Motions**

62.     The Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize Sherwin's business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of Sherwin's balance sheet.  I have reviewed each of the First Day Motions.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal

disruption during the pendency of these chapter 11 cases.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **<u>Exhibit A</u>**.


[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: January 11, 2016                    */s/ Kent Britton*
                                           Kent Britton
                                           Chief Financial Officer
                                           Sherwin Alumina Company, LLC