## **Exhibit A**

**Evidentiary Support for First Day Motion**

**Evidentiary Support for First-Day Motions[1]**

---

## Administrative First-Day Motions

**A.** **Emergency Motion of Sherwin Alumina Company, LLC,** ***et al.*,** **for Entry of an Order Establishing Certain Hearing Dates and Implementing Certain Notice Procedures (the "Hearing Schedule and Notice Procedures Motion").**

1.      It is my understanding that the Debtors have identified more than 2,500 parties-in-interest to whom notice must be given under the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules.  I expect there will be numerous parties in interest in these chapter 11 cases and anticipate that a significant number of parties will file requests for service of filings.  I also expect that numerous motions and applications will be filed in these chapter 11 cases.  The costs and burdens that might arise absent adoption of the proposed procedures—such as, for example, those associated with multiple hearings per month, plus the costs associated with copying, mailing, delivering, or otherwise serving paper copies of all such documents—could impose significant economic and administrative burdens on our estates and the Court.

2.      Given the size and scope of the chapter 11 cases, I believe that the proposed Hearing Schedule and Notice Procedures Motion will facilitate service of court papers in a manner that will be less burdensome and costly than serving such pleadings on every potentially interested party, which, in turn, will maximize the efficiency and orderly administration of these chapter 11 cases.

3.      I believe that the relief requested in the Hearing Schedule and Notice Procedures Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

disruption.   Accordingly, on behalf of the Debtors, I respectfully submit that the Hearing

Schedule and Notice Procedures Motion should be approved

**B.      Emergency Motion of Sherwin Alumina Company, LLC, *et al.*, for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "<u>Joint Administration Motion</u>").**

4.      The Debtors seek entry of an order directing joint administration and procedural

consolidation of their related chapter 11 cases.  Specifically, the Debtors request that the Court

maintain one file and one docket for all of the jointly administered cases under the case of

Sherwin Alumina Company, LLC, and that the Court administer the cases under a consolidated

caption.  Further, the Debtors request that entry be made on the docket of Sherwin Pipeline, Inc.

to reflect the joint administration of these chapter 11 cases.

5.      Given the integrated nature of the Debtors' operations, joint administration of

these chapter 11 cases will provide significant administrative convenience.  Many of the

motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.

The entry of an order directing joint administration of these chapter 11 cases will reduce fees and

costs by avoiding duplicative filings and objections.  Joint administration will also allow the

Office of the United States Trustee for the Southern District of Texas, the Court, and all parties

in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, joint

administration will not adversely affect the Debtors' respective constituencies because the Joint

Administration Motion seeks only administrative, not substantive, consolidation of the Debtors'

estates.  The relief requested will benefit, and not harm, parties in interest through the cost

reductions associated with the joint administration of these chapter 11 cases.

6.      I believe that the relief requested in the Joint Administration Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest and will enable

the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I respectfully believe that the Court should approve the Joint Administration Motion.

**C.  Emergency Application of Sherwin Alumina Company, LLC, *et al.*, for Entry of an Order Authorizing the Debtors to Employ and Retain Kurtzman Carson Consultants LLC as Noticing, Claims, and Balloting Agent, Effective *Nunc Pro Tunc* to the Petition Date (the "KCC Application").**

7.      The Debtors seek entry of an order appointing Kurtzman Carson Consultants LLC ("**KCC**") as the Debtors' noticing, claims, and balloting agent in connection with these chapter 11 cases, in accordance with the terms and conditions set forth in that certain Agreement for Services, dated as of December 15, 2015, between KCC and the Debtors (the "**Services Agreement**").

8.      The Debtors have in excess of 2,500 creditors and parties-in-interest to whom the Debtors must provide notice of developments related to these chapter 11 cases.  With such a significant number of parties involved in these chapter 11 cases, it is likely that heavy administrative burdens will be imposed upon the Court and the Clerk of the United States Bankruptcy Court for the Southern District of Texas (the "**Clerk's Office**").

9.      I understand that KCC is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services including noticing, claims processing, solicitation, balloting, and other related services critical to the effective administration of chapter 11 cases.  KCC has developed efficient and cost-effective methods to properly handle the voluminous mailings associated with the noticing, claims processing, solicitation, and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders, and all parties in interest.

10.      Further, KCC will work with the Clerk's Office to ensure that such methodology conforms to all of the Court's procedures, the Bankruptcy Local Rules, and the provisions of any

3

Court orders. I believe that such assistance will expedite the distribution of notices and the processing of claims and relieve the Clerk's Office of administrative burdens.

11.     I believe that the proposed retention of KCC is the most effective and efficient manner of noticing the thousands of creditors and parties in interest of the commencement of these chapter 11 cases and other developments in these chapter 11 cases. Thus, I believe that the relief requested in the KCC Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors and their professionals to focus on key aspects of the Debtors' reorganization efforts. Accordingly, I believe that the Court should approve the KCC Application.

**D.      Emergency Motion of Sherwin Alumina Company, LLC, _et al._, for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, and (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information (the "Creditor Matrix Motion").**

12.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, (b) authorizing the Debtors to redact certain personal identification information for individual creditors, and (c) approving the form and manner of notice of commencement of these chapter 11 cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

13.     Because requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings, I believe that the permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will

KE 39305455

maximize the value of the Debtors' estates and is in the interests of all of the Debtors'

stakeholders.

**E.** **Emergency Motion of Sherwin Alumina Company, LLC, *et al.*, for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "<u>Schedules Motion</u>").**

14.     The Debtors seek entry of an order extending the deadline by which the Debtors

must file their schedules of assets and liabilities, schedules of current income and expenditures,

schedules of executory contracts and unexpired leases, and statements of financial affairs

(collectively, the "**<u>Schedules and Statements</u>**") by 14 days, for a total of 28 days from the

Petition Date, through and including February 8, 2016, without prejudice to the Debtors' ability

to request additional extensions for cause shown

15.     I believe that the Court's grant of an extension of time to file the Schedules and

Statements through and including February 8, 2016, is appropriate under the circumstances of

these chapter 11 cases.  ***First***, to prepare their Statements and Schedules, the Debtors will have to

compile information from books, records, and documents relating to a large number of claims,

assets, and contracts.  This information is voluminous and not centrally located in the Debtors'

organization.  Accordingly, collecting the necessary information would require an enormous

expenditure of time and effort on the part of the Debtors, their employees, and their professional

advisors.  ***Second***, no party in interest will experience prejudice by the Court granting the

Debtors' request for an extension through and including February 8, 2016.

16.     I therefore believe that the relief requested in the Schedules Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest, and will preserve

the assets of the Debtors' estates during the chapter 11 process without prejudice to any party in

interest.  Accordingly, I believe that the Court should approve the Schedules Motion.

## Operational First-Day Motions

**A. Emergency Motion of Sherwin Alumina Company, LLC, *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate the Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Continue to Perform Intercompany Transactions (the "Cash Management Motion").**

17.     The Debtors seek entry of interim and final orders (a) continue to operate the Cash Management System (as defined below), (b) honor certain prepetition obligations related thereto, (c) maintain their existing business forms, and (d) continue to perform Intercompany Transactions.

18.     To facilitate the efficient operation of their business, the Debtors maintain one integrated cash management system (the "**Cash Management System**").   The Cash Management System is comparable to the centralized cash management systems used by similar companies to manage the cash of multiple operating units in a cost-effective, efficient manner. The Debtors use their Cash Management System to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' financial personnel and members of their accounting department manage the Cash Management System, which the Debtors designed to, among other things:  meet their operating needs; enable management to centrally control and monitor corporate funds; ensure cash availability and liquidity; reduce administrative expenses by facilitating the movement of funds; and enhance the development of accurate account balances.  These controls are crucial given the volume of cash transactions processed through the Cash Management System each day. Importantly, the Debtors' business requires prompt access to cash to operate, and any disruption to the Cash Management System would be detrimental to the Debtors' operations.

6

19.     The Cash Management System includes five (5) bank accounts (collectively, the "**Bank Accounts**") maintained by Bank of America and Bank of America/Merrill Lynch (collectively, the "**Banks**").  Specifically, the Bank Accounts include:

- one master concentration account (the "**Master Concentration Account**");

- one primary operating account (the "**Operating Account**");

- one secondary operating account (the "**Farm Operating Account**");

- one payroll disbursement account (the "**Payroll Account**"); and

- one money market investment account (the "**Investment Account**").

20.     The Cash Management System runs through the Master Concentration Account, the Debtors' primary operating account.  Operating revenue and other cash generated by operations is wired, electronically transferred, or deposited remotely by third parties directly into the Master Concentration Account.  The Debtors, in turn, electronically transfer funds on a daily basis from the Master Concentration Account to the Operating Account and from the Operating Account to the Payroll Account and the Farm Operating Account to satisfy, among other things, payroll obligations and operating expenses.  In addition, when the Debtors have excess cash, the Debtors electronically transfer funds from the Master Concentration Account to the Investment Account to earn short-term interest on that excess cash.

21.     Each Bank Account that is a depository account is maintained at a bank that is insured by the Federal Deposit Insurance Corporation (the "**FDIC**").  As part of the Cash Management System, the Debtors maintain their excess cash in conservative investments that satisfy certain prudent investment guidelines (including the Debtors' practices thereunder, the "**Investment Practices**"), which have a primary goal of protecting principal and a secondary goal of maximizing yield and liquidity.  More specifically, the Debtors periodically invest their surplus cash pursuant to the Investment Practices in the Investment Account, an investment-

grade money market fund with Bank of America/Merrill Lynch that invests such cash only in assets, securities, or other instruments insured, guaranteed, or collateralized by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States.

22.    The Debtors maintain the Bank Accounts at Bank of America, N.A., which is not an authorized depository institution in the Southern District of Texas.  However, I believe that Bank of America, N.A. is a well-capitalized financial institution that is among the largest financial institutions in the world.

23.    In the ordinary course of business, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses related to the Cash Management System (collectively, the "**Bank Fees**"). Historically, the Debtors estimate that they pay approximately $3,000 in Bank Fees each month, depending on transaction volume.  The Debtors estimate that there is approximately $5,000 in prepetition Bank Fees outstanding as of the Petition Date (collectively, the "**Prepetition Bank Fees**").

24.    The Debtors utilize numerous preprinted business forms and digitally generated and bank-certified graphic overlays (the "**Business Forms**") in the ordinary course of their business.  The Debtors also maintain books and records to document, among other things, their profits and expenses.

25.    The Debtors maintain business relationships with each other (collectively, the "**Intercompany Transactions**") that may periodically result in intercompany receivables and payables in the ordinary course of business (the "**Intercompany Claims**").  The Intercompany

Transactions (if any) are all entered into the ordinary course of business, and are on standard and customary market terms.

26.     In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted among the Debtors, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor.  As of the Petition Date, Intercompany Claims were historically reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.

27.     The Debtors track all fund transfers in their respective accounting system and can ascertain, trace, and account for all Intercompany Transactions.   The Debtors have also established monitoring systems to be able to track postpetition intercompany transfers.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors and their creditors and other stakeholders.

28.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption.   Accordingly, I believe that the Court should approve the Cash Management Motion.

**B.      Emergency Motion of Sherwin Alumina Company, LLC, *et al.*, for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Wages, Salaries, and Other Compensation and Reimbursable Employee Expenses and Continue Employee Benefits Programs in the Ordinary Course of Business, Including Payment of Certain Prepetition Obligations Related Thereto and (II) Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and Electronic Payment Requests Related Thereto (the "Wages and Benefits Motion").**

29.     The Debtors seek entry of interim and final orders to (a) pay certain prepetition wages, salaries, and other compensation and reimbursable employee expenses and continue

employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (collectively, the "**Salaried Employee Compensation and Benefits**") , and (b) directing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests related thereto.

30.     As of the Petition Date, the Debtors employ approximately 160 full-time salaried employees (collectively, the "**Salaried Employees**") at their Gregory, Texas, alumina facility (the "**Facility**").  In addition, until October 2014, Debtor Sherwin Alumina Company, LLC, was party to the collective bargaining agreement, with a stated term of February 9, 2011, through July 31, 2014, extended by mutual agreement to September 30, 2014 (the "**Expired CBA**"), with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial, and Service Workers International Union, on behalf of its Local Union 235A (the "**USW**").[2]

31.     During the lockout, the Debtors have continued to operate the Facility utilizing approximately 400 temporary contract workers (collectively, the "**Contract Workers**") provided by third-party staffing agencies.[3]  The Contract Workers have significant institutional knowledge regarding the Debtors' operations, are highly skilled, and are a critical supplement to the continued operation of the Facility.

32.     The Salaried Employees, many of whom cannot be easily replaced, perform a variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring.  Their skills, knowledge, and understanding of the Debtors' Facility, operations, and infrastructure are essential to preserving the Debtors' operational stability and efficiency.

---

[2]     Upon the expiration of the Expired CBA, the Debtors commenced a "lock out" with respect to approximately 455 hourly employees represented by the USW (collectively, the "**Unionized Employees**") at the time of the lockout.

[3]     The Debtors are not seeking any relief with respect to the Contract Workers pursuant to this Motion.

KE 39305455

Without the continued, uninterrupted services of the Salaried Employees, the effective restructuring of the Debtors will be materially impaired.

33.     The vast majority of the Salaried Employees rely exclusively on compensation and benefits paid for by the Debtors to pay their daily living expenses and support their households.  The Salaried Employees (and their families) would be exposed to significant financial consequences and constraints if the Debtors were not permitted to continue to pay the Salaried Employees' compensation (including obligations related to benefits) and maintain other benefits programs.  In light of the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

34.     To minimize the personal hardship the Salaried Employees would suffer if prepetition compensation and benefit obligations are not paid when due or as expected, and to maintain morale and stability in the Debtors' workforce at this critical time, the Debtors seek authority to pay and honor certain prepetition wages, salaries, and other compensation and reimbursable employee expenses and to continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

35.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I believe that the Court should approve the Wages and Benefits Motion.

C.     **Emergency Motion of Sherwin Alumina Company, LLC, *et al.*, for Entry of Interim and Final Orders Authorizing the Payment of Certain Taxes and Fees (the "Taxes and Fees Motion").**

36.     The Debtors seek entry of interim and final orders authorizing the Debtors to remit and pay (or use tax credits to offset) certain Taxes and Fees in the ordinary course of

business, without regard to whether such obligations accrued or arose before or after the Petition Date.

37.     In the ordinary course of business, the Debtors collect, withhold, and incur sales, use, franchise, business, and property taxes, as well as other taxes and fees and assessments described in this Motion (collectively, the "**Taxes and Fees**").[4]  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "**Authorities**").  Taxes and Fees are remitted and paid by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions or service providers.  The Debtors pay the Taxes and Fees to the Authorities as they accrue or on a periodic basis, remitting them monthly, quarterly, semiannually, or annually depending on the nature and incurrence of each of the Taxes and Fees.

38.     It is my understanding that any failure by the Debtors to pay the Taxes and Fees as and when due could have a material adverse impact on their ability to operate.  As of the Petition Date, the Debtors estimate that approximately $1.595 million in accrued Taxes and Fees remain unpaid.[5]

39.     I believe that the relief requested is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, I believe that the Court should approve the Taxes and Fees Motion.

---

[4]     The Debtors do not seek the authority to collect and remit state and federal employee-related withholding taxes. Such relief is instead requested in the Wages and Benefits Motion.

[5]     This estimate includes the non-finalized Assessments against the Debtors that may result pursuant to the current Audits.

**D.    Emergency Motion of Sherwin Alumina Company, LLC,** *et al.***, for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Their Prepetition Insurance Coverage, Satisfy Payment of Prepetition Obligations Related Thereto, and (II) Renew, Supplement, or Enter Into New Insurance Coverage in the Ordinary Course of Business (the "<u>Insurance Motion</u>").**

40.    The Debtors request an entry of an order authorizing the Debtors to (a) continue prepetition practices regarding the Insurance Policies (as defined below), satisfy payment of prepetition obligations related thereto, and (b) renew, supplement, or enter into new insurance coverage in the ordinary course of business.

41.    In the ordinary course of business, the Debtors maintain approximately seven insurance policies that are administered by multiple third-party insurance carriers (collectively, the "<u>**Insurance Carriers**</u>").    These policies provide coverage for, among other things, the Debtors' property, equipment, excess, foreign, marine cargo, accident/health, employment practices, commercial crime, fiduciary, cyber, special crime, and director and officer liability (collectively, the "<u>**Insurance Policies**</u>").

42.    Over the past twelve months, the Debtors have paid an aggregate amount of approximately $1.27 million on account of annual premiums under the Insurance Policies.    Most Insurance Policies renew annually.    The Debtors currently do not finance any of their premium obligations through a premium financing agreement.    As of the Petition Date, the Debtors do not believe there are any accrued but unpaid obligations, including premium obligations, on account of the Insurance Policies.    Continuation of the Insurance Policies and entry into new Insurance Policies are essential to preserving the value of the Debtors' businesses, properties, and assets. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the Office of the United States Trustee.

43.     The Debtors typically obtain the Insurance Policies through their insurance brokers, Willis of Tennessee, Inc. and AmWINS Brokerage of Georgia (collectively, the "**Insurance Brokers**").  The Insurance Brokers assist the Debtors with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain Insurance Policies on advantageous terms at competitive rates and in a cost-effective manner.  In connection with the Insurance Policies, the Insurance Brokers are compensated through commissions from insurers (collectively,  the "**Brokerage Fees**") as a flat annual fee or part of the premiums on the Insurance Policies.  The Brokerage Fees are typically paid at the time of placement or renewal of an Insurance Policy.  As of the Petition Date, the Debtors do not believe that there are any unpaid obligations due and owing to the Insurance Brokers on account of Brokerage Fees or any other prepetition obligations.

44.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I believe that the Court should approve the Insurance Motion.

**E.     Emergency Motion of Sherwin Alumina Company, LLC, *et al.*, for Entry of Interim and Final Orders (I) Approving the Debtors Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests (the "Utilities Motion").**

45.     The Debtors request the entry of an order (a) approving the Proposed Adequate Assurance of payment for future utility services, (b) prohibiting Utility Companies from altering, refusing, or discontinuing services, and (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests.

46.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, telecommunications, data service, water, waste disposal, and other similar services (collectively, "**Utility Services**") from approximately seven utility companies (collectively, the "**Utility Companies**").

47.     I believe that the uninterrupted provision of Utility Services is essential to the Debtors' ongoing operations and, therefore, the overall success of these chapter 11 cases.  The Debtors' alumina production facility and related operations, which produce approximately 1.65 million metric tons of alumina each year, require an array of utility services, including electricity, natural gas, heating, and air conditioning, as well as telephone, internet, water, and waste disposal services to operate.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their restructuring efforts. Accordingly, it is essential that the Debtors maintain uninterrupted access to Utility Services during these chapter 11 cases.

48.     To the best of the Debtors' knowledge, the Debtors do not have a history of defaults with respect to their Utility Services, and there are no defaults with respect to the Debtors' undisputed invoices for prepetition Utility Services.  The Debtors have historically made payments on a regular and timely basis to the Utility Companies.  On average, the Debtors pay approximately $4.98 million each month for Utility Services, calculated as a historical average over a twelve-month period from December 1, 2014, through November 30, 2015.  The Debtors estimate that their cost for Utility Services during the 30 days following the Petition Date, exclusive of any deposits to be paid, will total approximately $5 million.

49.     The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner.  The Debtors expect that cash generated from operations, together with the Debtors' cash collateral and proposed debtor-in-possession financing, will provide sufficient liquidity to pay obligations related to Utility Services in accordance with prepetition practice.

50.     Nevertheless, to provide additional assurance of payment, the Debtors propose to deposit approximately $303,000 (the "**Adequate Assurance Deposit**") into a segregated account (the "**Adequate Assurance Account**") within 20 days of the Petition Date for the benefit of the Utility Companies, pending further order of the Court.  The amount of the Adequate Assurance Deposit equals approximately one-half of the Debtors' average monthly cost of Utility Services during a 12-month period from December 1, 2014, to November 30, 2015, which is prior to the Petition Date, excluding approximately $4.3 million that the Debtors historically prepaid for gas as of the Petition Date.  The Adequate Assurance Deposit will be held in the segregated account for the duration of these chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Companies.

51.     I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance with prepetition practice, provides more than adequate assurance of payment to the Utility Companies.  I further believe that the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm, is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I believe that the Court should approve the Utilities Motion.

16

**F.**     **Emergency Motion of Sherwin Alumina Company, LLC, *et al.*, for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors (the "Critical Vendors Motion").**

52.      The Debtors seek entry of (a) an interim order authorizing the Debtors to engage in discussions with certain counterparties that may qualify as Critical Vendors (as defined below) regarding the validity and amount of their respective claims to determine whether any such counterparties qualify for Critical Vendor status (the "**Critical Vendor Claim**") and (b) a final order authorizing the Debtors to pay the Critical Vendor Claims.  To the extent that the Debtors identify any counterparties qualify as Critical Vendors pending entry of the Final Order, the Debtors will supplement this Motion and seek authority to pay prepetition claims held by such Critical Vendors (the "**Critical Vendor Claims**") in accordance with the *Procedures for Complex Chapter 11 Cases* promulgated by this Court.

53.      The Facility located in Gregory, Texas, outside of Corpus Christi, is capable of producing approximately 1.65 million metric tons of smelter-grade alumina, a key component of aluminum, per year through the "Bayer Process," a refining technique that produces pure aluminum oxide from bauxite ore by dissolving the alumina in a caustic solution).

54.      The global aluminum market requires producers of alumina (the central ingredient in aluminum) to satisfy certain specific requirements and standards that require the Debtors to obtain a variety of specialty chemicals, gas, metals, plastics, and other raw materials.   The Debtors obtain such materials and services from a limited number of highly specialized vendors, service providers, and other businesses (collectively, the "**Critical Vendors**"), often on an order-by-order basis and without long-term contracts, that would likely be impossible to replace and/or would result in substantially higher costs for the Debtors at this early, critical juncture in these chapter 11 cases.  Finally, the Debtors currently enjoy favorable trade terms with many of their Critical Vendors.  I believe many of these vendors may be unfamiliar with the chapter 11

17

process and unwilling to do business on existing terms—even assuming such parties will continue to supply the Debtors.  Loss of trade terms (whether on account of demands for cash in advance, cash on delivery, or otherwise) would materially impair the value of the Debtors' estates.

55.    At this time, the Debtors estimate that the Critical Vendors may hold claims in excess of $3 million that are not entitled to priority under section 503(b)(9) of the Bankruptcy Code.  I believe that the requested relief will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise while also providing the Debtors with flexibility to engage in settlement discussions with such parties regarding the validity, amount, and extent of their claims.  Furthermore, to the extent that the Debtors determine that any such parties qualify for Critical Vendor status, the Debtors plan to supplement this pleading with the identities and amounts of claims held by any such parties prior to the Final Hearing and to seek approval of further relief in accordance with the Bankruptcy Code and the Bankruptcy Rules.

56.    I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I believe that the Court should approve the Critical Vendors Motion.

**G.    Emergency Motion of Sherwin Alumina Company, LLC, _et al._, for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Claims of Certain Lien Claimants and Section 503(b)(9) Claims and (II) Confirming Administrative Expense Priority of Outstanding Order (the "Shippers, Lienholders, and 503(b)(9) Motion").**

57.    The Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay certain undisputed, liquidated, prepetition claims of certain domestic and foreign common carries, movers, shippers, truckers, and logistics management companies (collectively,

the "**Shippers**"), warehousemen (collectively, the "**Warehousemen**"), third-party contractors, repairmen, and manufacturers (collectively, the "**Third Party Contractors**," and together with Shippers and Warehousemen, the "**Lien Claimants**"), in each case who may assert or may seek to assert mechanics' and other possessory liens against the Debtors' property, as well as claims arising under section 503(b)(9) of the Bankruptcy Code and (b) confirming the administrative expense priority status of the Debtors' undisputed obligations for the postpetition delivery of goods and services and authorizing payment of such obligations in the ordinary course of business.

58.     In the ordinary course of their business, the Debtors depend on the Shippers to transport or deliver goods, materials, equipment, and other property related to the Debtors' operations (collectively, the "**Materials**").  Furthermore, while the Debtors store most of their materials at their production facility, they periodically rely on certain Warehousemen in the ordinary course of business to store Materials and equipment from time to time.

59.     The Debtors pay the Shippers and the Warehousemen in arrears and, therefore, may be liable to the Shippers and Warehousemen, as applicable, for certain prepetition amounts. The Debtors' possible failure to pay any such fees may entitle the Shippers to assert a lien, attempt to maintain possession of the Debtors' property, and/or fail to deliver  the Debtors' property as and when due in the ordinary course of business.  Likewise, the Debtors' possible failure to pay any such amounts may entitle the Warehousemen to assert a lien, attempt to take possession of the Debtors' property, and/or bar the Debtors' access to Materials and equipment stored by the Warehousemen.  Furthermore, applicable non-bankruptcy law may permit a Shipper or a Warehouseman to attach a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods.  As

19

a result, certain Shippers and Warehousemen may refuse to deliver or release property in their possession or control before the prepetition amounts owed to them by the Debtors (collectively, the "**Shipping and Warehousing Claims**") have been satisfied and their liens redeemed.

60.     During the twelve months prior to the Petition Date, the Debtors paid approximately $31 million in Shipping and Warehousing Claims.  As of the Petition Date, the Debtors estimate that approximately $1.5 million in prepetition Shipping and Warehousing Claims remain outstanding and that approximately $250,000 of such claims will become payable within the first 21 days of these chapter 11 cases.

61.     The Debtors routinely transact business with a number of Third-Party Contractors in the ordinary course of business.  As of the Petition Date, the Debtors estimate that approximately $6.4 million in prepetition Third-Party Contractor claims (the "**Third Party Contractor Claims**," and together with the Shipping and Warehousing Claims, the "**Lien Claims**") remain outstanding and that approximately $1.7 million of such claims will become payable within the first 21 days after the Petition Date.  It is my understanding that the Third-Party Contractors may have a right to assert and perfect certain liens on account of such unpaid goods or services, including mechanics' liens, against the Debtors' relevant equipment or goods, notwithstanding the automatic stay under section 362 of the Bankruptcy Code.  I am advised that these statutory liens often allow such parties to retain possession of equipment, machinery, supplies, and other materials (or impair title to the equipment, machinery, supplies, and other materials, by filing a security interest) until the debtor satisfies the outstanding amounts owed.  Accordingly, absent payment of any outstanding prepetition amounts, I believe that Third-Party Contractors may refuse to provide services for, and/or honor obligations under their existing agreements with, the Debtors on a going-forward basis, including essential installation,

KE 39305455

maintenance, and warranty obligations, or may refuse to release certain goods in their possession.

62.     The Debtors may have received certain goods or materials from various vendors (collectively, the "**503(b)(9) Claimants**") within the 20 days before the Petition Date.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis.   As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

63.     The Debtors also believe certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' limited liquidity.  I believe that as of the Petition Date, they owe approximately $1 million on account of goods delivered within the 20 days prior to the Petition Date, the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  The Debtors do not seek to accelerate or modify existing payment terms with respect to the 503(b)(9) Claims.  Rather, the Debtors will pay the 503(b)(9) Claims as they come payable in the ordinary course of business.

64.     Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "**Outstanding Orders**").  I believe that, to avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.

65.     In light of the foregoing, I believe that the relief requested in the Shippers, Lienholders, and 503(b)(9) Motion is in the best interests of the Debtors' estates, their creditors,

and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption.   Accordingly, I believe that the Court should approve the Shippers, Lienholders, and 503(b)(9) Motion.

*       *       *       *       *