**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SHERWIN ALUMINA COMPANY, LLC, *et al.*,[1] | § | Case No. 16-20012 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

**MOTION OF SHERWIN ALUMINA COMPANY, LLC, *ET AL.*, FOR
ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO ENTER
INTO AND PERFORM UNDER THE STALKING HORSE PURCHASE
AGREEMENT, (B) APPROVING BIDDING PROCEDURES, (C) APPROVING
CONTRACT ASSIGNMENT PROCEDURES, (D) APPROVING BID
PROTECTIONS, (E) SCHEDULING BID DEADLINES AND AN AUCTION,
AND (F) APPROVING THE FORM AND MANNER OF NOTICE THEREOF**

A HEARING WILL BE CONDUCTED ON THIS MATTER BEFORE THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS AT A HEARING SCHEDULED IN ACCORDANCE WITH TITLE 11 OF THE UNITED STATES CODE, THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND THE BANKRUPTCY LOCAL RULES OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS.

IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-THREE (23) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sherwin Alumina Company, LLC (2376); and Sherwin Pipeline, Inc. (9047). The debtors' service address is: 4633 Highway 361, Gregory, Texas 78359.

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") respectfully state the following in support of this motion (this "**Motion**").

<u>**Introduction**</u>[2]

1.      Following extensive arm's-length discussions between the Debtors and their prepetition senior secured lender, Commodity Funding, LLC (the "**Prepetition Secured Lender**" or "**DIP Lender**," as applicable), the Debtors have secured its commitment to fund a $40 million debtor-in-possession facility (the "**DIP Facility**") to underwrite the costs of a comprehensive chapter 11 restructuring.  In connection with this restructuring, Corpus Christi Alumina LLC, an affiliate of Commodity Funding, LLC (the "**Stalking Horse Bidder**") proposes to purchase substantially all of the Debtors' assets for consideration consisting of a credit bid and cash, pursuant to a chapter 11 plan (the "**Plan**").[3]

2.      The proposed Sale Transaction, if approved, would generate significant value for the Debtors' stakeholders because it would, among other things:

- *   *preserve more than 2,000 good jobs* along the Texas Gulf Coast (including approximately 560 jobs directly supported by the Debtors' operations and approximately 1,500 additional jobs in the Corpus Christi region that are indirectly supported by the Debtors' operations);

- *   *enable the continued operation of the Debtors' alumina production facility* that has served as a pillar of the Corpus Christi economy for more than 60 years;

- *   *provide a cash recovery to the Debtors' general unsecured creditors* if the Debtors' general unsecured creditors vote to accept the Plan;

- *   *satisfy all of the Debtors' obligations under their prepetition secured credit facility*; and

- *   clear the way for *confirmation of a chapter 11 plan* that will satisfy priority and

---

[2]   Capitalized terms used but not defined in the Introduction shall have the meanings ascribed to such terms in this Motion.

[3]   To the extent the Plan is not confirmed but all other conditions to the sale are satisfied, the Stalking Horse Purchase Agreement contemplates consummation of the sale pursuant to section 363 of the Bankruptcy Code.

KE 38861589

administrative claims and fund an orderly wind down of these chapter 11 cases.

3.       In late 2015, the Debtors entered into discussions with the Prepetition Secured Lender regarding a possible restructuring.   In connection with these efforts, the Debtors recognized that any potential restructuring alternative involving the Prepetition Secured Lender—a subsidiary of Glencore plc ("**Glencore**"), the Debtors' ultimate equity owner—could be subject to scrutiny as a consequence of the relationship between the Prepetition Secured Lender, Glencore, and the Debtors.   Accordingly, the Debtors appointed restructuring professional Alan J. Carr—who has more than two decades of experience negotiating, structuring, and documenting complex restructuring transactions as an attorney, investor, and independent director—as independent manager to oversee and assess restructuring alternatives. Mr. Carr also directed the Debtors' independent counsel to undertake an independent investigation into the relationships between the Debtors and Glencore (including the Prepetition Secured Lender).

4.       Following the completion of the Debtors' independent investigation, as well as diligence by the Prepetition Secured Lender and its advisors, the Debtors and the Stalking Horse Bidder entered into the Asset Purchase Agreement, dated as of January 11, 2016 (including all exhibits and schedules related thereto, the "**Stalking Horse Purchase Agreement**").[4]   The Stalking Horse Purchase Agreement provides that the Stalking Horse Bidder will provide consideration of $92.25 million (the "**Purchase Price**") consisting of a credit bid of $95 million on account of the Prepetition Secured Lender's secured claims, and if the Debtors' general unsecured creditors vote to accept the Plan, cash in the amount of $250,000 (the "**Closing Cash Payment**").   Furthermore, pursuant to the terms of the Stalking Horse Purchase Agreement, the

---

[4]     A copy of the Stalking Horse Purchase Agreement, with certain exhibits, schedules, annexes, and other attachments related thereto, is attached as **Exhibit 1** to the Order.

3

Stalking Horse Bidder will pay all Cure Amounts and assume substantial liabilities of the Debtors, including certain pension liabilities.

5.     The Debtors now seek authority to market test the transactions contemplated by the Stalking Horse Purchase Agreement (collectively, the "**Stalking Horse Bid**") to ensure that the Debtors obtain the highest or otherwise best offer or combination of offers for the Debtors' assets.  If approved, the proposed bidding procedures attached as **Exhibit 2** to the order attached hereto as **Exhibit A** (the "**Bidding Procedures**") will enable the Debtors to expeditiously complete their chapter 11 restructuring.  As set forth in further detail below, the Stalking Horse Purchase Agreement, the Bidding Procedures, and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant this Motion.

### Jurisdiction, Venue, and Procedural Background

6.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

7.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     On the date hereof (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), commencing the above-captioned chapter 11 cases.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in greater detail in the *Declaration of Kent Britton in Support of Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), filed contemporaneously with this Motion.

9.     The bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code, rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy

4

Procedure (the "**Bankruptcy Rules**"), and rule 1075-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), pursuant to which the Court has adopted the *Procedures for Complex Chapter 11 Bankruptcy Cases* (the "**Complex Case Procedures**").

10.     The Debtors continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of this Motion, the Office of the United States Trustee has not appointed an official committee of unsecured creditors.

## Relief Requested

11.     By this Motion, the Debtors respectfully seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Order**"):  (a) authorizing the Debtors to enter into and perform under the Stalking Horse Purchase Agreement; (b) approving the Bidding Procedures; (c) approving procedures for assuming and assigning executory contracts and unexpired leases and certain related notices; (d) the Bid Protections (as defined below); (e) scheduling submission deadlines for any bids and an Auction (as defined below), if necessary; and (f) approving the form and manner of notice thereof.[5]

---

[5]   The Debtors reserve the right to file and serve any supplemental pleading or declaration, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of his request for entry of the Sale Order before the Sale Hearing, as appropriate and necessary in the Debtors' reasonable business judgment.

**Background**[6]

## I.      Summary of Key Terms of Stalking Horse Purchase Agreement.

12.      The pertinent terms of the Stalking Horse Purchase Agreement are summarized in

the table below.[7]

| Term | Summary Description |
|------|---------------------|
| **Purchase Consideration** | The Stalking Horse Bidder has agreed to provide a total Purchase Price of $92.25 million and to assume certain liabilities, all upon the terms and subject to the conditions set forth in the Stalking Horse Purchase Agreement.  The Purchase Price will be paid by Stalking Horse Bidder by (i) paying the Closing Cash Payment (in the amount of $250,000), if the Debtors' general unsecured creditors vote to accept the Plan and (ii) paying the difference between the Purchase Price and the Closing Cash Payment, by a credit bid of a corresponding amount of the debt owing under the Debtors' revolving credit facility pursuant to the Credit Agreement dated as of July 1, 2009 (the "**Prepetition Secured Credit Facility**"). |
| **Assets to be Acquired** | The Stalking Horse Bidder proposes to acquire acquire all of the Debtors' right, title, and interest in, to and under assets more particularly described in Article II of the Stalking Horse Purchase Agreement (such assets, collectively, the "**Acquired Assets**"), which consist of substantially all of the Debtors' assets (including avoidance actions and other causes of action under the Bankruptcy Code) and the Debtors' rights under certain executory contracts and unexpired leases, other than those assets, executory contracts, and unexpired leases that are excluded by the Stalking Horse Bidder in accordance with the Stalking Horse Purchase Agreement. |
| **Sale of Assets Free and Clear of Interests** | Because the Debtors have determined in their sound business judgment that the Sale Transaction is in the best interest of their estates and the Debtors will market test the Stalking Horse Bid through an auction), the Debtors request the Court to approve the proposed sale of the Acquired Assets to the Stalking Horse Bidder free and clear of claims, liens, encumbrances, and other interests, except as expressly set forth in the |

---

6    Capitalized terms used in the following summary shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement.  All references to schedules or sections in the following summary shall refer to schedules or sections of the Stalking Horse Purchase Agreement.

7    To the extent any of the terms described below are inconsistent with the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall control in all respects.

| Term | Summary Description |
|------|---------------------|
| | Stalking Horse Purchase Agreement. |
| **Conditions Precedent to Closing** | Customary conditions to closing, including: accuracy of representations and warranties; compliance with covenants in the Stalking Horse Purchase Agreement; no suit, action, or other proceeding being pending or threatened before any court or arbitration tribunal or any governmental authority seeking to enjoin the transactions contemplated in the Stalking Horse Purchase Agreement; no order being entered by any court, tribunal, or governmental authority against the Debtors or the Stalking Horse Bidder that enjoins the transactions contemplated in the Stalking Horse Purchase Agreement; the Order and the order approving the Stalking Horse Bid being Final Orders; entry of an order authorizing the sale of the Acquired Assets free and clear of all claims, liens, and other encumbrances (including, for the avoidance of doubt, any claims, liens, or encumbrances related in any way to any collective bargaining or similar agreement) other than expressly set forth in the Stalking Horse Purchase Agreement and the approval of the assignment of the Assigned Contracts; the Stalking Horse Bidder having provided the Debtors evidence reasonably satisfactory to the Debtors that Stalking Horse Bidder has obtained all registrations, qualifications and approvals required applicable governmental authorities; the Stalking Horse Bidder shall have received acceptance of employment terms by specified employees; the Stalking Horse Bidder shall have received a survey, title commitment and title policies with respect to Owned Real Property; material contracts involving power, energy, water, steam, gas, and bauxite will be available on terms satisfactory to the Stalking Horse Bidder; the right to credit bid contemplated by the Stalking Horse Purchase Agreement shall have been approved; no Material Adverse Effect shall have occurred; and the Stalking Horse Bidder having funded the cash consideration contemplated by the Stalking Horse Purchase Agreement. |
| **Summary of Key Termination Events** | The Debtors or the Stalking Horse Bidder may terminate the Stalking Horse Purchase Agreement if: (a) mutually agreed to by the parties; (b) any conditions precedent are not satisfied by May 10, 2016 (unless the party seeking to terminate is in material breach of its material obligations under the Stalking Horse Purchase Agreement); (c) the closing does not occur on or prior to May 10, 2016 (unless the party seeking to terminate is in material breach of its material obligations under the Stalking Horse Purchase Agreement if such breach has been a principal cause or resulted in the failure of the closing to occur on or prior to such date); and/or (d) if the Court approves an Alternative Transaction.<br><br>The Debtors may terminate the Stalking Horse Purchase Agreement if |

KE 38861589

| Term | Summary Description |
|------|---------------------|
| | they determine based upon consultation with outside legal counsel that proceeding with the proposed Stalking Horse Bid would be inconsistent with their fiduciary duties under applicable Law.<br><br>The Stalking Horse Bidder may terminate the Stalking Horse Purchase Agreement if, among other things:  (a) the Order is not entered on or before February 15, 2016; (b) the Court does not enter an order approving the Stalking Horse Bid on or before May 10, 2016; (c) the Debtors move to voluntarily dismiss any of these chapter 11 cases, conversion of any of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, or for appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Bankruptcy Cases; (d) a trustee or an examiner with expanded powers is appointed in any of these chapter 11 cases or any of these chapter 11 cases is dismissed or converted to a case under chapter 7 of the Bankruptcy Code; (e) any court of competent jurisdiction shall enter a final, non-appealable judgment or order declaring any material term or condition of the Stalking Horse Purchase Agreement to be unenforceable; (f) any Event of Default under the DIP Facility occurs, subject to any applicable cure period under the DIP Facility or the Debtors' obligations under the DIP Facility are terminated; (g) the Debtors seek approval of any Alternative Transaction; (h) a Material Adverse Effect occurs; (i) the Debtors breach the Senior Secured Credit Agreement or DIP Financing Order; (j) certain key suppliers default in any material respects or validly terminate their supply agreements with the Debtors or commence their own bankruptcy or insolvency proceedings in the United States or elsewhere; (k) the Court does not enter an order unconditionally allowing the Stalking Horse Bidder to credit bid. |
| **Expense Reimbursement** | If the Stalking Horse Purchase Agreement is terminated by the Debtors under certain circumstances for a reason other than a material breach by the Stalking Horse Bidder, the Debtors will pay to the Stalking Horse Bidder the Expense Reimbursement Amount. |
| **Good Faith Sale** | The transactions contemplated by the Stalking Horse Purchase Agreement were the result of extensive arm's-length, good-faith negotiations between the Debtors and the Stalking Horse Bidder. Likewise, the Debtors submit that any successful bidder (if not the Stalking Horse Bidder) will have participated in a good faith manner in the auction in accordance with the Bidding Procedures. Therefore, the Debtors request that this Court find that the Stalking Horse Bidder or Successful Bidder (if not the Stalking Horse Bidder) are good-faith purchasers entitled to the full protections afforded pursuant to |

KE 38861589

| Term | Summary Description |
|------|---------------------|
| | section 363(m) of the Bankruptcy Code. |
| **Representations and Warranties** | Customary representations and warranties, including representations of the Debtors regarding:  due organization, due authorizations, enforceability, non-contravention, seller's litigation, governmental approvals, preferential rights, required consents, other restrictions on transferability, taxes, compliance with laws, permits, environmental matters, assigned contracts, prepayments, brokers, labor matters, employee benefits, non-consent operations, and title matters. |
| **Certain Covenants** | The Stalking Horse Purchase Agreement contains covenants regarding operations, casualty events, publicity, solicitation, compliance with conditions, operations, Court approval, certain material bankruptcy filings, assumption and rejection of executory contracts and leases, bidding procedures, and labor and employee matters. |

## II.    The Bidding Procedures.

13.    The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Debtors' assets, consistent with the timeline of these chapter 11 cases, to confirm that the Stalking Horse Bid is the highest or otherwise best offer or to promptly identify the alternative bid or bids that will provide the Debtors with higher or otherwise better consideration.

14.    The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence to submit binding bids in advance of a Confirmation Hearing or Sale Hearing (defined below), as applicable.  In fact, the Stalking Horse Purchase Agreement does not provide any limitation on the Debtors' ability to market their assets prior to the entry of the Bidding Procedures Order, and the Debtors intend to immediately commence the marketing and sale process.  In creating the Bidding Procedures, the Debtors are seeking to balance their interest in consummating a Sale Transaction on a timeline that ensures the Stalking Horse Bidder's willingness to provide a floor offer with committed funding while at the same time

preserving the opportunity to attract the highest or otherwise best offer.  The Bidding Procedures are designed to encourage all prospective bidders to put their best bids forward, bring finality to the Debtors' restructuring process, and create a path towards confirmation of a Plan that embodies the highest or otherwise best available recoveries to the Debtors' stakeholders.

15.     As described above, the Debtors' intend to consummate the sale through a Plan. However, in the event the Debtors cannot confirm a Plan (a "**363 Sale Toggle Even**t"), the Debtors will seek entry of an order approving the Stalking Horse Purchase Agreement pursuant to sections 105(a), 363(b), and 365 of the Bankruptcy Code (the "**Sale Order**," and, the hearing to consider entry of the Sale Order, the "**Sale Hearing**").

16.     Because the Bidding Procedures are attached as **Exhibit 2** to the proposed Order, they are not restated fully herein.  Generally speaking, however, the Bidding Procedures establish, among other things:

- the Debtors will provide the Auction Notice and Bidding Procedures to interested parties within three days of entry of the Order;

- the requirements that potential bidders must satisfy to participate in the bidding process and become "**Acceptable Bidders**";

- the availability of, access to, and conduct during due diligence by Acceptable Bidders;

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "**Qualified Bids**" sufficient to trigger the Auction and participate in the Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and the deadline that must be met, for any Acceptable Bidder (other than the Stalking Horse Bidder) to be considered a "**Qualified Bidder**," which shall all be determined by the Debtors;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the Starting Bid(s) (as defined below) for the Auction;

- the conditions for having an Auction and procedures for conducting the Auction, if any;

- the criteria by which the "**Successful Bidder**" will be selected by the Debtors; and

- various other matters relating to the sale process generally, including regarding designation of the Back-Up Bid, payment of the Expense Reimbursement Amount, return of any good faith deposits, and certain reservations of rights.

17.     Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize the value of their estates and, as such, do not impair the Debtors' ability to consider all qualified bid proposals, and preserve the Debtors' right to modify the Bidding Procedures as appropriate to maximize value for their estates.

**III.    Form and Manner of Sale Notice.**

18.     Within three business days of entry of the Order, the Debtors will serve the Auction Notice, substantially in the form attached as **Exhibit 3** to the Order, to provide notice of the auction and related dates and times upon the following parties (collectively, the "**Notice Parties**"): (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Prepetition Secured Lender and Stalking Horse Bidder; (d) the Internal Revenue Service; (e) any parties who have expressed written interest in purchasing the Debtors' assets; (f) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Debtors' assets offered for sale; (g) all non-Debtor parties to any executory contract or unexpired contract to which a Debtor is a party; (h) all applicable state and local taxing authorities; (i) each governmental agency that is an interested party with respect to the proposed Auction and the transactions proposed thereunder; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Environmental Protection Agency; (l) the office of the attorneys general for the states in which the Debtors operate; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In addition, within three business days of

entry of the Order, the Debtors will publish the Auction Notice, with any modifications necessary for ease of publication, once in *The Houston Chronicle* and *The Wall Street Journal* (National Edition) to provide notice to any other potential interested parties.

19.     The Debtors submit that the Auction Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto.  Accordingly, the Debtors request that the form and manner of the Auction Notice be approved and that the Court determine that no other or further notice of the Auction is required.

**IV.     Contract and Lease Assumption and Assignment Procedures.**

20.     In addition to those procedures set forth above, the Debtors also are seeking approval of certain procedures to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Debtors' executory contracts and unexpired leases (each, as applicable, a "**Executory Contract**" or "**Unexpired Lease**," and, collectively, the "**Executory Contracts and Unexpired Leases**"), as may be designated in the Stalking Horse Purchase Agreement or any other Successful Bid (the "**Assumption Procedures**").   The proposed Assumption Procedures are as follows:

    a.    **Cure Notice**. Within three business days of entry of the Order, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery the notice annexed as **Exhibit 4** to the Order (the "**Cure Notice**") on all non-Debtor Contract and Lease counterparties (collectively, the "**Contract Parties**," and each, a "**Contract Party**").

    b.    **Content of Cure Notice**. The Cure Notice shall notify the applicable Contract Parties that the Executory Contracts and Unexpired Leases may be subject to assumption and assignment in connection with the proposed Sale Transaction and contain the following information: (i) identification of the applicable Executory Contracts and Unexpired Leases; (ii) the applicable Contract Parties; (iii) the Debtors' good faith estimates of the corresponding cure amounts required to cure any and all outstanding

defaults under the Executory Contracts and Unexpired Leases (the "**Cure Amount**"); and (iv) the deadline by which any Contract Party to an Executory Contract or Unexpired Lease may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto; *provided* that service of a Cure Notice does not constitute an admission that such Executory Contract or Unexpired Lease is an executory contract or unexpired lease or that such Executory Contract or Unexpired Lease will be assumed at any point by the Debtors or assumed and assigned pursuant to the Stalking Horse Purchase Agreement or any other Successful Bid.

c.      **Objections**. Objections, if any, to a Cure Notice must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, state the cure amount alleged to be owed to the objecting Contract Party, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served so as to be **actually received** by counsel to the Debtors and counsel to Stalking Horse Bidder by Tuesday, March 15, 2016 (i.e., within three business days of the Bid Deadline of Friday, March 18, 2016.

d.      **Effects of Filing an Objection to a Cure Notice**.  A properly filed and served objection to a Cure Notice will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Executory Contract or Unexpired Lease, at issue, and/or objection to the accompanying Cure Amount, as set forth in the objection, but will not constitute an objection to the remaining relief requested in this Motion.

e.      **Dispute Resolution**.  Any objection to the proposed assumption and assignment of a Executory Contract or Unexpired Lease or Cure Amount that remains unresolved as of the Confirmation Hearing or Sale Hearing, as applicable, shall be heard at the Confirmation Hearing or Sale Hearing, as applicable, (or at such later date as may be fixed by the Court).

## Basis for Relief

**I.      The Relief Sought in the Proposed Order Is in the Best Interests of the Debtors' Estates and Should be Approved.**

21.      Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  In addition, section 105(a) of the Bankruptcy

Code provides that the "court may issue any order, process, or judgment that is necessary to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).

22.     Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business upon a finding that such use is supported by sound business reasons.   *See, e.g., Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also see also In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park Partnership*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).  In reviewing a proposed sale of assets, a bankruptcy court should give deference to the business judgment of a debtor in possession when it deems the sale to be appropriate. *See Esposito v. Title Ins. Co. (In re Fernwood Mkts.)*, 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).

23.     Here, the Debtors carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, produce maximum recoveries, and result in a successful restructuring of their estates.   This process includes the Bidding Procedures, which will seek to maximize the purchase price for the Debtors' assets.  The Bidding Procedures will therefore provide a mechanism to solicit additional offers from financially capable and interested potential purchasers.

24.     The Debtors submit that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this district and other districts in complex chapter 11 cases, are consistent with the Complex Case Procedures, and in the best interest of the Debtors' estates.   The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the purchase price for the sale or sales of the Debtors' assets.   In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with ample time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.   The Bidding Procedures are also structured to allow for bids on one or more assets, in addition to all of the Debtors' assets.

25.     At the same time, while permitting the Debtors to honor their contractual obligations, the Bidding Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offer to effectuate the Sale Transaction. As such, the Debtors and their creditors can be assured that the value obtained will be fair and reasonable and at or above market.   In the Debtors' business judgment, the Bidding Procedures will therefore ensure that they can effectively manage the proposal already received, maximize recoveries for all stakeholders, and provide the Debtors a path to a successful restructuring.

## II.     The Bid Protections Have a Sound Business Purpose and Should be Approved.

26.     The Debtors also request approval of certain bid protections, including the approval of the Expense Reimbursement Amount, for the Stalking Horse Bidder in its role as the stalking horse bidder (the "**Bid Protections**").   Specifically, the Debtors request approval of the requirement that any cash overbid exceed the aggregate sum of the Stalking Horse Bid (which includes, for the avoidance of doubt, all obligations under the Prepetition Secured Credit Facility (including accrued and unpaid interest at the default rate, fees and expenses, and other charges), **plus** the amount of the Expense Reimbursement Amount, **plus** the initial overbid amount

15

($500,000).  For purposes of calculating the Expense Reimbursement Amount component of an initial overbid, no less than two (2) business days prior to the Bid Deadline, the Stalking Horse Bidder shall provide the Debtors with a good faith estimate of the Expense Reimbursement Amount, including all unbilled fees and expenses; *provided* that such estimate shall not be binding on the Stalking Horse Bidder with respect to the reimbursement of the Expense Reimbursement Amount.

27.     Bankruptcy courts in the Fifth Circuit analyze the appropriateness of bidding incentives such as the Expense Reimbursement Amount under the "business judgment rule" standard, and the law is well established in this district that courts consider whether the incentive hampers, rather than encourages, bidding, and the amount of the incentive is unreasonable relative to the proposed purchase price.  *See In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992) (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment).

28.     The Debtors submit that the Expense Reimbursement Amount pass muster under each of the three foregoing factors.  ***First***, the Expense Reimbursement is the product of extensive good-faith, arm's-length negotiations, without collusion, between the parties and their advisors, including the Debtors who were acting not in their own self-interest but, rather, in the

interest of the bankruptcy estates consistent with their fiduciaries duties.  Further, the Stalking Horse Purchase Agreement provisions relating to the Expense Reimbursement Amount (as well as the other Stalking Horse Purchase Agreement provisions) were scrutinized by the Debtors' professionals and approved by the Debtors' independent manager.

29.     **Second**, the Debtors believe, based on their reasoned business judgment, that the presence of the Expense Reimbursement Amount enhances their ability to maximize value without chilling bidding.  The Expense Reimbursement Amount was a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse Purchase Agreement.  Indeed, granting the Expense Reimbursement Amount convinced the Stalking Horse Bidder to enter into the Stalking Horse Purchase Agreement, which assures the Debtors of a Sale Transaction with a contractually committed bidder at a price they believe is fair and reasonable and provides the upside opportunity that the Debtors could potentially receive a higher or otherwise better offer at the Auction which, absent such a bid floor, might otherwise never have been realized.  *See, e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.").

30.     **Third**, the Debtors believe, based on their reasoned business judgment, that the Expense Reimbursement Amount is reasonable and appropriate relative to the size, nature and complexity of this transaction and the commitments made and resources expended by the Stalking Horse Bidder in connection therewith in view of:    (a) the floor established by the Stalking Horse Purchase Agreement for competitive bidding; (b) the substantial benefits already received by the Debtors and their estates from having the Stalking Horse Bid serve as a catalyst for other potential or actual bidders to confirm that the Debtors receive the highest and best offer

by subjecting the Stalking Horse Bid to an open auction and competitive bidding; (c) the need of

the Debtors to move forward with a transaction with a high likelihood of closure assured by a

contractually committed party at a fair and reasonable price consistent with the timeline of these

chapter 11 cases; (d) the extensive analysis and negotiations undertaken by the Stalking Horse

Bidder in connection with the Stalking Horse Bid; and (e) the risks borne by the Stalking Horse

Bidder for being the stalking horse in this transaction and any opportunity costs incurred as a

result thereof.

31.     The Debtors further believe, and are advised, that the amount of the Expense

Reimbursement Amount is comparable to market and bid protections approved by bankruptcy

courts considering similar transactions. *See, e.g.*, *In re Relativity Fashion, LLC*, Case No. 15-

11989 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2015) (approving expense reimbursement of up to

$1,000,000 as a bid protection in connection with a credit bid by a stalking horse bidder); *In re

GMX Resources Inc.*, Case No. 13-11456 (SAH) (Bankr. W.D. Ok. June 11, 2013) (approving an

uncapped expense reimbursement as a bid protection in connection with a credit bid by a stalking

horse bidder); *In re Ormet Corp.*, Case No. 13-10334 (MFW) (Bankr. D. Del. Mar. 21, 2013)

(approving expense reimbursement of up to $1,000,000 as a bid protection in connection with a

credit bid by a stalking horse bidder); *In re Friendly Ice Cream Corp.*, Case No. 11-13167 (KG)

(Bankr. D. Del. Nov. 3, 2011) (same); *In re Universal Building Products, Inc.*, Case

No. 10-12453 (MFW) (Bankr. D. Del. Aug. 27, 2010) (approving expense reimbursement of up

to $850,000 as a bid protection in connection with a credit bid by a stalking horse bidder).

32.     Accordingly, the Debtors submit that the Bid Protections reflect sound business

purposes, are fair and appropriate under the circumstances, and, because the standard used by

courts in this district in approving similar protections and incentives has been satisfied here, the Debtors respectfully submit that the Bid Protections should be approved.

III.     **The Form and Manner of the Auction Notice Should be Approved.**

33.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  While the Debtors will provide no less than 21-days' notice of the Confirmation Hearing, after a hearing at which the Court enters an order approving the Debtors' disclosure statement and permitting the Debtors to solicit votes on the Plan, the Debtors seek approval of the Auction Notice as proper notice of the Auction.  The Debtors submit that notice of this Motion and the related hearing to consider entry of the Order coupled with service of the Auction Notice as provided for herein constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and in satisfaction of, the applicable requirements of Bankruptcy Rule 2002, Bankruptcy Local Rule 2002-1, and the Complex Case Procedures.  Accordingly, the Debtors request that this Court approve the form and manner of the Auction Notice proposed herein.

IV.     **The Procedures for the Assumption and Assignment of Contracts Should be Approved.**

A.     **The Assumption and Assignment of the Executory Contracts and Unexpired Leases Reflects the Debtors' Reasonable Business Judgment.**

34.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The debtor's decision to assume or reject an executory contract or unexpired lease

must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage."); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard . . . .").

35.     Here, the Court should approve the decision to assume and assign the Executory Contracts and Unexpired Leases in connection with the Sale Transaction as a sound exercise of the Debtors' business judgment.

- *First*, the Executory Contracts and Unexpired Leases are necessary to the Debtors' operations, and as such, they are essential to inducing the best offer for the Debtors' assets.

- *Second*, it is unlikely that any purchaser would want to acquire any company on a going-concern basis unless a significant number of the Executory Contracts and Unexpired Leases needed to conduct the business and manage the day-to-day operations were included in the transaction.

- *Third*, the Stalking Horse Purchase Agreement provides that the assumption and assignment of the Executory Contracts and Unexpired Leases is integral to, and inextricably integrated in, the sale.

- *Finally*, the Executory Contracts and Unexpired Leases will be assumed and assigned though the process approved by the Court pursuant and, thus, will be reviewed by key constituents in these chapter 11 cases.

36.     Accordingly, the Debtors submit that the assumption and assignment of the Executory Contracts and Unexpired Leases by way of the assumption procedures should be approved as an exercise of their business judgment.

### B.     Defaults Under the Assumed Contracts Will Be Cured Through the Sale Transaction.

37.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate

whether the assumption meets the requirements of section 365(b) and section 1123 of the Bankruptcy Code, as applicable:   (a) that a debtor cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract; (b) compensate parties for pecuniary losses arising therefrom; and (c) provide adequate assurance of future performance thereunder.   This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."   *Matter of Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

38.   The Debtors submit that the statutory requirements of sections 365(b)(1)(A) and 1123(b)(2) of the Bankruptcy Code, as applicable, will be satisfied (and promptly) because the Stalking Horse Purchase Agreement requires the Stalking Horse Bidder to represent that it is capable of curing all defaults associated with, or that are required to properly assume, the Executory Contracts and Unexpired Leases.   (*See* Stalking Horse Purchase Agreement § 4.02(k).)   Because the Order provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of Contract Parties.

### C.   Non-Debtor Parties Will be Adequately Assured of Future Performance.

39.   Similarly, the Debtors submit that the third requirement of section 365(b)(1)(C) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.   "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."   *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).   Although no single solution

will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

40.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Executory Contracts and Unexpired Leases to the Successful Bidder will be satisfied. Section 2.06(d) of the Stalking Horse Purchase Agreement requires the Stalking Horse Bidder to provide adequate assurance of future performance to the extent required as to any Executory Contract or Unexpired Lease that is to be assumed and assigned. Section 4.02(k) also requires the Stalking Horse Bidder to represent that it is capable of curing any such defaults. The Debtors believe that the Stalking Horse Bidder (as well as any other Successful Bidder) has the financial wherewithal, willingness, and ability to perform under the Executory Contracts and Unexpired Leases proposed to be assigned. Further, the proposed Assumption Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder (as well as any other Successful Bidder) to provide adequate assurance of future performance and object to the assumption of the Executory Contracts and Unexpired Leases on such basis. The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the

Executory Contracts and Unexpired Leases, as set forth in the Stalking Horse Purchase Agreement.

**V.      Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

41.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtors request that the Confirmation Order or Sale Order, as applicable, be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

42.      The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.   *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).   Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier* suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."   10 *Collier on Bankruptcy* ¶ 6004.11 (15 rev. ed. 2006).   Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay should also be reduced to the amount of time actually necessary to file such appeal.  *Id.*

43.      To maximize the value received for the Debtors' assets, the request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

KE 38861589

## Notice

44.     The Debtors will provide notice of this Motion to the following parties or their respective counsel (if known):  (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Prepetition Secured Lender and Stalking Horse Bidder; (d) the Internal Revenue Service; (e) any parties who have expressed written interest in purchasing the Debtors' assets; (f) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Debtors' assets offered for sale; (g) all non-Debtor parties to any executory contract or unexpired contract to which a Debtor is a party; (h) all applicable state and local taxing authorities; (i) each governmental agency that is an interested party with respect to the proposed Auction and the transactions proposed thereunder; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Environmental Protection Agency; (l) the office of the attorneys general for the states in which the Debtors operate; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

45.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Order and grant the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Respectfully Submitted,

*/s/ Zack A. Clement*

Dated:  January 11, 2016

Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond
Houston, Texas 77025
Telephone:     (832) 274-7629
Email:          zack.clement@icloud.com

- and -

Joshua A. Sussberg, P.C.  (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com

- and -

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Gregory F. Pesce (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
               gregory.pesce@kirkland.com

*Proposed Counsel for the*
*Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

       I certify that on January 11, 2016, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Zack A. Clement*
_____

One of Counsel
