**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SHERWIN ALUMINA COMPANY, LLC, *et al.*,[1] | § | Case No. 16-20012 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

### DISCLOSURE STATEMENT FOR THE JOINT PLAN OF SHERWIN ALUMINA COMPANY, LLC AND SHERWIN PIPELINE, INC. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022

- and -

James H.M. Sprayregen, P.C.
Gregory F. Pesce
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654

*Proposed Counsel for the Debtors and Debtors in Possession*

Dated:  January 13, 2016

Zack A. Clement (TX Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond
Houston, Texas 77025

*Proposed Co- Counsel for the Debtors and Debtors in Possession*

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are:  Sherwin Alumina Company, LLC (2376); and Sherwin Pipeline, Inc. (9047).  The debtors' service address is:  4633 Highway 361, Gregory, Texas 78359.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PLAN OF SHERWIN ALUMINA COMPANY, LLC AND SHERWIN PIPELINE, INC. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE*.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, THE STALKING HORSE BIDDER, THE DIP LENDER, AND THE PREPETITION SECURED LENDER, AND ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  .

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

**TABLE OF CONTENTS**

Page

**ARTICLE I. INTRODUCTION**................................................................................................**4**

**ARTICLE II. OVERVIEW OF THE PLAN**.........................................................................**4**

**ARTICLE III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT** ...............**5**
    A.     What is Chapter 11?.................................................................................................5
    B.     Why are the Debtors sending me this Disclosure Statement?........................................5
    C.     Am I entitled to vote on the Plan?.................................................................................5
    D.     What will I receive from the Debtors if the Plan is consummated?..................................6
    E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim or a
          Priority Tax Claim?...................................................................................................7
    F.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
          Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
          "Consummation?"......................................................................................................7
    G.     What are the sources of cash and other consideration required to fund the Plan? ...........7
    H.     Who is the Stalking Horse Bidder?................................................................................7
    I.     Will the final amount of Allowed General Unsecured Claims affect my recovery under
          the Plan?...................................................................................................................7
    J.     Will there be releases and exculpation granted to parties in interest as part of the Plan? ...............8
    K.     What is the deadline to vote on the Plan? ....................................................................8
    L.     How do I vote for or against the Plan?..........................................................................8
    M.     Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the
          Confirmation Hearing set to occur?..............................................................................8
    N.     What is the purpose of the Confirmation Hearing?.........................................................8
    O.     What is the effect of the Plan on the Debtors' ongoing business?....................................9
    P.     Who do I contact if I have additional questions with respect to this Disclosure Statement
          or the Plan? .............................................................................................................9
    Q.     Do the Debtors recommend voting in favor of the Plan?................................................9
    R.     Who Supports the Plan?..............................................................................................9
    S.     Has Any Party Raised an Objection with Respect to the Plan?.......................................9

**ARTICLE IV. BACKGROUND TO THESE CHAPTER 11 CASES** ................................................**10**
    A.     The Debtors' Business. ..............................................................................................10
    B.     Sherwin Alumina's History. ......................................................................................10
    C.     Sherwin Alumina's Current Assets and Operations.....................................................11
    D.     Sherwin Alumina's Capital Structure. .......................................................................13

**ARTICLE V. EVENTS LEADING UP TO THESE CHAPTER 11 CASES** ......................................**13**
    A.     Commodity Price Decline and Widespread Industry Distress. ......................................13
    B.     The Expired Collective Bargaining Agreement. ...........................................................14
    C.     The GPP Energy Supply Agreement............................................................................15
    D.     Restructuring Discussions...........................................................................................15

**ARTICLE VI. ADMINISTRATION OF THE CHAPTER 11 CASES** ............................................**17**
    A.     First Day Pleadings and Other Case Matters. ..............................................................17
    B.     The Debtors' Sale Process............................................................................................19

**ARTICLE VII. SUMMARY OF KEY TERMS AND CONDITIONS OF THE PLAN**.......................**20**
    A.     Settlement, Release, Injunction, and Related Provisions ...............................................20

**ARTICLE VIII. SOLICITATION AND VOTING PROCEDURES**................................................**22**

K&E 23662324

   A.     Voting Record Date. ..................................................................................................22
   B.     Voting on the Plan. ....................................................................................................22
   C.     Ballots Not Counted. .................................................................................................23

**ARTICLE IX. CONFIRMATION OF THE PLAN** ......................................................................**23**
   A.     Confirmation Hearing. ...............................................................................................23
   B.     Confirmation Standards. ............................................................................................24
   C.     Acceptance by Impaired Classes. ..............................................................................26
   D.     Confirmation without Acceptance by All Impaired Classes. .....................................26

**ARTICLE X. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING** .................**27**
   A.     Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims
          Under the Plan. ..........................................................................................................27
   B.     Certain Bankruptcy Law Considerations. ..................................................................28
   C.     Risks Associated with Forward Looking Statements. .................................................30
   D.     Disclosure Statement Disclaimer. .............................................................................31
   E.     Liquidation Under Chapter 7. ....................................................................................32

**ARTICLE XI. MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ....**32**
   A.     Consequences to the Debtors. ....................................................................................33
   B.     Consequences to Holders of Class 3 Prepetition Secured Credit Facility Claims, Class 4A
          and 4B General Unsecured Claims. ............................................................................34
   C.     Information Reporting and Withholding ......................................................................35

**ARTICLE XII. RECOMMENDATION OF THE DEBTORS** ....................................................**36**

K&E 23662324

## **EXHIBITS**

EXHIBIT A       Joint Plan of Sherwin Alumina Company, LLC and Sherwin Pipeline, Inc. Pursuant to Chapter 11
                of the Bankruptcy Code

EXHIBIT B       Executed Stalking Horse Purchase Agreement

EXHIBIT C       Signed Disclosure Statement Order (To Be Attached After Entry by the Bankruptcy Court)

## ARTICLE I.
## INTRODUCTION

Sherwin Alumina Company, LLC and Sherwin Pipeline, Inc., as debtors and debtors in possession (each, a "**Debtor**" and, collectively, the "**Debtors**"), submit this disclosure statement (this "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Plan of Sherwin Alumina Company, LLC and Sherwin Pipeline, Inc. Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**"), dated January 11, 2016.[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS.  AT THIS TIME, THE DEBTORS BELIEVE THAT THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## ARTICLE II.
## OVERVIEW OF THE PLAN

The Plan provides for a sale of substantially all of the Debtors' assets (the "**Sale Transaction**") to Corpus Christi Alumina LLC (the "**Stalking Horse Bidder**"), an affiliate of Commodity Funding, LLC (the "**Prepetition Secured Lender**" or the "**DIP Lender**",[2] as applicable).  Upon the effective date of the Sale Transaction, the Stalking Horse Bidder will pay $250,000 in cash to Holders of Allowed Claims in Class 4B (which consists of General Unsecured Claims that are Excluded Liabilities), if Class 4B votes to accept the Plan and the Plan is confirmed (the "**Closing Cash Payment**"), which amount shall be distributed in accordance with the Plan.

More specifically, Holders of Claims are expected to receive the following recoveries upon the effective date of the Plan:

- Each holder of an Allowed Other Priority Claim will receive payment in full, in Cash, except to the extent the Holder of such Claim agrees to less favorable treatment or the pro rata portion of Retained Cash (as defined in the Purchase Agreement) allocable to Allowed Other Priority Claims is not sufficient to pay them in full;

- Each Holder of an Allowed Other Secured Claim will receive (a) payment in full, in Cash (unless the pro rata portion of Retained Cash allocable to Allowed Other Secured Claims is not sufficient to pay them in full), (b) reinstatement of such Claim, or (c) other treatment rendering such Claim Unimpaired;

- Each Holder of an Allowed Class 4A General Unsecured Claim shall receive its pro rata share of the Stalking Horse Bidder Liability Amount, except to the extent the Holder of such Claim agrees to less favorable treatment; and

- Each Holder of an Allowed Class 4B General Unsecured Claim shall receive its pro rata share of the Closing Cash Payment, if Class 4B votes to accept the Plan and the Plan is confirmed.  If Class 4B does not vote to accept the Plan, Holders of such Claims shall receive no distribution on account of their Claims.

---

[2]   Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

K&E 23662324

The Plan contemplates that, as a general matter, Holders of Intercompany Claims and Subordinated Claims shall receive no distribution on account of their Claims. The Plan also addresses the treatment of Interests in Sherwin Pipeline. The Plan provides that Interests in Sherwin Alumina will be cancelled on the Effective Date.

In addition to the foregoing, the Plan includes the following salient terms:

- If the Stalking Horse Bidder is the Successful Bidder, the Stalking Horse Bidder shall credit bid the Stalking Horse Credit Bid Amount in accordance with the Purchase Agreement and Bid Procedures Order;

- On the Effective Date, the Stalking Horse Bidder shall make all payments on account of Assumed Liabilities pursuant to and in accordance with the Purchase Agreement;

- On the Effective Date, the Stalking Horse Bidder shall pay all Cure Amounts pursuant to sections 365 or 1123 of the Bankruptcy Code and in accordance with the Purchase Agreement; and

- On and after the Effective Date, the Plan Administrator will wind down, dissolve and liquidate the Debtors' estates.

## ARTICLE III.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT

A.    *What is Chapter 11?*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. The Plan contemplates a sale of the Debtors' assets to the Stalking Horse Bidder, and this Disclosure Statement is being submitted to provide information about this transaction and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.    *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any). Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "**Class**." Each Class's respective voting status is set forth below.

5

1.   Summary of Classification

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Prepetition Secured Credit Facility Claims | Impaired | Entitled to Vote |
| Class 4A | General Unsecured Claims (Assumed Liabilities) | Impaired | Entitled to Vote |
| Class 4B | General Unsecured Claims (Excluded Liabilities) | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Interests in Sherwin Alumina | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Interests Sherwin Pipeline | Impaired | Not Entitled to Vote (Deemed to Reject) |

D.    *What will I receive from the Debtors if the Plan is consummated?*

The following table provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| Class | Claim/Interest | Estimated Amount of Allowed Claims | Anticipated Recovery for Holders of Allowed Claims |
|-------|----------------|-----------------------------------|---------------------------------------------------|
| 1 | Other Priority Claims | $0 | 100% |
| 2 | Other Secured Claims | $2.9 million[3] | 100% |
| 3 | Prepetition Secured Credit Facility Claims | $95 million | 100% |
| 4A | General Unsecured Claims[4] (Assumed Liabilities) | TBD | TBD |

---

[3]   One creditor has asserted a lien against the Debtors' assets in the amount of $2,972,160 on account of labor and materials that the creditor asserts it supplied to the Debtors for the construction of certain facilities owned or operated by the Debtors. The Disclosure Statement includes the asserted amount of this claim solely for informational purposes, and the Debtors dispute this creditor's purported lien and fully reserve and preserve any and all rights with respect thereto.

[4]   The Purchase Agreement allows the Stalking Horse Bidder to determine which General Unsecured Claims it will assume pursuant to the Purchase Agreement during a period following execution of the Purchase Agreement.  The Debtors plan to supplement the estimated amount of Allowed Class 4A General Unsecured Claims and the anticipated recovery for Holders of such Claims prior to the hearing on approval of the Disclosure Statement.

6

| Class | Claim/Interest | Estimated Amount of Allowed Claims | Anticipated Recovery for Holders of Allowed Claims |
|---|---|---|---|
| 4B | General Unsecured Claims (Excluded Liabilities) | $17.4 million | 1.4% |
| 5 | Intercompany Claims | $0 | N/A |
| 6 | Subordinated Claims | $0 | N/A |
| 7 | Interests in Sherwin Alumina | N/A | N/A |
| 8 | Interests Sherwin Pipeline | N/A | N/A |

E. *What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. Administrative Claims and Priority Tax Claims will be satisfied as set forth in Article II of the Plan.

F. *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"*

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. *See* "Confirmation of the Plan," for a discussion of the conditions to Consummation of the Plan.

G. *What are the sources of cash and other consideration required to fund the Plan?*

The Plan will be funded by the following sources of cash and consideration: (1) Retained Cash of the Debtors, subject to the terms of the Purchase Agreement and DIP Orders; (2) payment of the Sale Proceeds by the Stalking Horse Bidder as and to the extent provided under the Purchase Agreement; (3) payments made directly by the Stalking Horse Bidder on account of Assumed Liabilities as and to the extent provided under the Purchase Agreement; (4) payment made directly by the Stalking Horse Bidder of the Closing Cash Payment (if any); (5) payments of Cure Amounts (if any) made by the Stalking Horse Bidder pursuant to the Purchase Agreement and sections 365 or 1123 of the Bankruptcy Code; and (6) release and distribution of the Utility Deposits.

H. *Who is the Stalking Horse Bidder?*

The Stalking Horse Bidder is the proposed purchaser of the Debtors' assets under the Plan. The Stalking Horse Bidder for the Debtors' assets is Corpus Christi Alumina LLC, an affiliate of Commodity Funding, LLC.

I. *Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?*

Class 4B (Excluded Liabilities) will be paid on a pro rata basis out of the Closing Cash Payment, if and only if Class 4B votes to accept the Plan. As such, an increase in the amount of Allowed Claims for such Class will result in a decrease in individual distributions on account of Claims in this Class.

J.     *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, the Plan provides for releases and exculpation of the Debtors and other parties in interest as set forth in Article VIII of the Plan including the DIP Lender, the Prepetition Secured Lender, the Stalking Horse Bidder, Allied Alumina, LLC (the owner of Sherwin Alumina) and their respective Affiliates and representatives.   In addition to the releases in favor of the Released Parties, there is an injunction against claims and causes of action that were released against the Released Parties.

Under the Plan and the Purchase Agreement, Excluded Liabilities of the Debtors shall be permanently released and enjoined, and Claims for such Excluded Liabilities shall be classified and, if Allowed, paid or treated pursuant to the terms of the Plan.

K.     *What is the deadline to vote on the Plan?*

The Voting Deadline is [March 28], 2016, at 5:00 p.m., prevailing Central Time.

L.     *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.   For your vote to be counted, your ballot must be completed and signed so that it is ***actually received*** by [March 28], 2016, at 5:00 p.m., prevailing Central Time, at the following address:   Sherwin Alumina Company, LLC, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

M.     *Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for [March 31], 2016, at [___] a.m., prevailing Central Time.   The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [March 25,] 2016, at 4:00 p.m., prevailing Central Time, in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit C** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The New York Times* to provide notification to those persons who may not receive notice by mail.   The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

N.     *What is the purpose of the Confirmation Hearing?*

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.   Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of the chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

O.    *What is the effect of the Plan on the Debtors' ongoing business?*

Upon consummation of the Plan, substantially all of the Debtors' assets will be transferred to the Stalking Horse Bidder as going concerns.  The Plan does not provide for a shut down or decommissioning of any of the Debtors' facilities.

P.    *Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' notice, claims and solicitation agent, Kurtzman Carson Consultants LLC:

> *By mail, hand delivery or overnight mail at:*
> Sherwin Alumina Company, LLC
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue, El Segundo, California 90245
>
> *By electronic mail at:*
> SherwinAluminaInfo@kccllc.com
>
> *By telephone at:*
> (866) 927-7091  (U.S. and Canada)
> (310) 751-2657 (International)

Copies of the Plan, this Disclosure Statement and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' notice and claims agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims and solicitation agent at www.kccllc.net/sherwin (free of charge) or the Bankruptcy Court's website at www.txs.uscourts.gov (for a fee).

Q.    *Do the Debtors recommend voting in favor of the Plan?*

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a sale of the Debtors' operating businesses to the Stalking Horse Bidder, is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.  If Sherwin's general unsecured creditors do not vote to accept the Plan, or Sherwin is not otherwise able to consummate the Sale Transaction pursuant to a chapter 11 plan, the stalking horse bid contemplated by the Sale Transaction permits Sherwin to seek Court approval of the stalking horse sale transaction under section 363(b) of the Bankruptcy Code.  As described herein and the Plan, under the credit bid incorporated in the stalking horse sale transaction, there is no distributable value for general unsecured creditors unless Sherwin consummates the transaction under the Plan.

R.    *Who Supports the Plan?*

The Plan is supported by the Debtors, the Stalking Horse Bidder, the DIP Lender, and the Prepetition Secured Lender.

S.    *Has Any Party Raised an Objection with Respect to the Plan?*

[As of the Petition Date, no party has raised an objection to the Plan].

**ARTICLE IV.**
**BACKGROUND TO THESE CHAPTER 11 CASES**

A.      *The Debtors' Business.*

Sherwin Alumina operates an alumina plant in Gregory, Texas that produces aluminum oxide (or alumina), which is the primary component of aluminum, from bauxite. Alumina is used to produce aluminum, which is utilized in an array of commercial, military, industrial, and consumer products and applications that are critical to the nation's economy and national defense. Sherwin Alumina produces alumina through the "Bayer Process," a refining technique that produces alumina from bauxite ore by dissolving the bauxite in a caustic solution. Sherwin Alumina's facility is capable of producing approximately 1.65 million metric tons of smelter grade alumina per year. Sherwin Alumina operates one of the few alumina plants in the world that can refine Jamaican bauxite, which because of its low quality (and cheaper price), must be refined using higher temperatures and more energy than higher quality bauxite.

The process for producing aluminum has three major phases: *first*, bauxite—a brick-red-colored mineral made up of aluminum oxide and certain other materials that is typically found in tropical and subtropical regions—is extracted from the ground; *second*, businesses such as Sherwin Alumina process bauxite ore into aluminum oxide, or alumina; and *finally*, electric currents are used to break down the chemical bonds between the aluminum and oxygen in alumina, which allows for the isolation of aluminum. It typically requires approximately four to five metric tons of bauxite to produce approximately two metric tons of alumina, which is typically sufficient to produce approximately one metric ton of aluminum.

During the second phase, which is the focus of Sherwin Alumina's business, bauxite is processed into aluminum oxide, or alumina, through the "Bayer Process," a 100-year-old process during which businesses such as Sherwin Alumina crush bauxite and mix it with caustic soda before using high pressure and heat to dissolve the alumina within bauxite to form sodium aluminate. Sodium aluminate, once cooled and further processed, is mixed with aluminum hydroxide crystals, which form larger crystals. Those crystals are then heated at temperatures in excess of 1,800 degrees Fahrenheit to remove water within the crystals, which causes the crystals to calcify into a fine white powder known as alumina.

B.      *Sherwin Alumina's History.*

        1.      Sherwin Alumina's Founding and Early Operations and Growth.

Sherwin Alumina is the successor in interest to the Reynolds Metals Company ("**Reynolds**") of Richmond, Virginia. In 1950, Reynolds began to lay the groundwork for a new alumina refinery in Texas to secure better access to Jamaica and other Caribbean bauxite producers than was available in Virginia. Reynolds ultimately selected a site near Gregory, Texas that combined access to a deep-water port, the capacity for industrial expansion along the Gulf Coast, and convenient access to abundant supplies of low-priced natural gas.

Reynolds ultimately purchased 1,660 acres in Gregory, Texas (the "**Facility**"), known as the Taft Ranch, as well as the neighboring San Patricio Reduction Plant, and commenced construction on the Facility. During the construction process, Reynolds laid the groundwork for Sherwin Alumina's future success and growth by, among other things, entering into agreements with the Port of Corpus Christi for the location and construction of the new La Quinta Channel serving the Facility and with the City of Corpus Christi, Texas, for a long-term water supply. Reynolds also commenced construction of a 35-mile pipeline from the Nueces River to the Facility, providing the foundation for a new public water supply that would eventually serve Gregory, Texas, and neighboring communities and that spurred the industrialization of eastern San Patricio County.

Reynolds completed construction of the Facility in 1953. The Facility was subsequently expanded five times: (a) in 1957, a second pier was added to the Facility; (b) in 1965, the Facility's daily alumina production capacity was increased from approximately 1,000 metric tons to approximately 4,000 metric tons; (c) in 1973, the Facility's daily alumina production was again increased, to its present capacity of approximately 4,400 metric tons; (d) in 1988, additional equipment was installed to allow the production of approximately 250,000 tons per year of

mid-stream chemical grade alumina hydrate products; and (e) in 1991, the Facility underwent an extensive modernization.

      2.   The Glencore Acquisition.

In 2000, global aluminum conglomerate Alcoa Inc. acquired Reynolds.  In connection with this transaction, the U.S. Department of Justice required Alcoa Inc. to sell certain of Reynolds' assets to satisfy certain antitrust approvals.  In 2001, Reynolds sold its interests in the Facility and certain related assets to BPU Reynolds Inc.  In 2007, Glencore completed a series of transactions that resulted in Glencore acquiring the Facility and related assets.

Since 2007, Glencore has provided significant financial, operational, and managerial support to Sherwin Alumina.  Non-Debtor affiliate Glencore Ltd. purchases substantially all of Sherwin Alumina's alumina production, which accounts for 98 percent of Sherwin Alumina's annual operating revenue.  Glencore Ltd. also supplies Sherwin Alumina with approximately one-third of the Facility's bauxite supply.  Glencore has also made significant direct capital contributions to Sherwin Alumina since 2007.  Commodity Funding, LLC, has extended nearly $95 million in credit to Sherwin Alumina, which has allowed Sherwin Alumina to make substantial investments in the Facility despite significant operating losses and a challenging pricing environment.  In connection with these chapter 11 cases, Commodity Funding, LLC, has also committed to fund the $40-million DIP Facility, on a junior secured basis.  In addition, a Commodity Funding, LLC affiliate has agreed to serve as the stalking horse for substantially all of Sherwin Alumina's assets pursuant to a chapter 11 plan, which will preserve the going-concern value of Sherwin Alumina's business, protect jobs, and preserve business opportunities and important relationships with Sherwin Alumina's key vendors (the "**Stalking Horse Bid**").  Furthermore, Glencore Ltd. provides various shared services to Sherwin Alumina, which has allowed Sherwin Alumina to take advantage of certain operational synergies.  Finally, Sherwin Alumina's association with Glencore allows Sherwin Alumina to leverage Glencore's institutional relationships with financial institutions, vendors, and other contract counterparties.

C.     *Sherwin Alumina's Current Assets and Operations.*

      1.   Sherwin Alumina's Corporate Structure.

Sherwin Alumina is a wholly-owned subsidiary of Allied Alumina, LLC, which is a wholly-owned subsidiary of Glencore Ltd., a corporation formed under the laws of Switzerland.  Debtor Sherwin Pipeline, Inc. is a wholly-owned subsidiary of Sherwin Alumina.

      2.   Overview of Sherwin Alumina's Operations and Recent Financial Performance.

During the fiscal year ending December 31, 2015, Sherwin Alumina generated projected gross revenue of approximately $348 million, approximately 98 percent of which was derived from alumina sales to Glencore Ltd.  Sherwin Alumina also generates cash through interest payments from Noranda Bauxite Limited ("**Noranda**"), the borrower under a $20-million secured credit facility for which Sherwin Alumina is the lender.  Sherwin Alumina further generates cash under a $10-million note from Nashtec LLC, a joint venture that is co-owned by non-Debtor affiliate Allied Alumina, LLC, and Nabaltec AG, a supplier of mineral-based flame retardants and raw materials for technical ceramics.  Sherwin Alumina projects a net operating loss of at least $42.13 million for the fiscal year ending December 31, 2015.

      3.   The Noranda Agreement.

Approximately 65 percent of the bauxite utilized by Sherwin Alumina is supplied by Noranda under the Bauxite Sales Agreement, dated as of December 29, 2012 (as amended, modified, or supplemented, the "**Noranda Agreement**").  The Noranda Agreement is immensely valuable to these estates and preserving the Noranda Agreement is essential to Sherwin Alumina's viability.

Bauxite is critical to Sherwin Alumina's business enterprise and the success of this restructuring, and there is no conceivable business plan under which Sherwin Alumina can operate without the Noranda Agreement.  Thus, a successful outcome in these chapter 11 cases (and beyond) is contingent upon the continued and steady supply of

11

bauxite provided under the Noranda Agreement.  The Stalking Horse Bidder has made preservation of the Noranda Agreement during the pendency of these chapter 11 cases, as well as the assignment (subject to certain modifications) of the Noranda Agreement, conditions precedent to the stalking horse sale transaction.

To this end, Sherwin Alumina has filed a motion contemporaneously herewith to assume the Noranda Agreement upon closing of the stalking horse sale transaction.  Under the facts and circumstances of these chapter 11 cases, Sherwin Alumina's decision to assume the Noranda Agreement on a prospective basis is a sound exercise of its business judgment that will benefit the estates.  Sherwin Alumina's alumina production business depends on a stable, cost-efficient supply of bauxite.

Securing alternative bauxite on better terms would not be possible.  Because Noranda's facilities are located closer to Sherwin Alumina's operations than all other bauxite suppliers, it is unlikely that Sherwin Alumina would be able to secure an alternative source of bauxite without incurring additional transportation costs.  Furthermore, using bauxite from an alternative supplier could only be implemented after a costly and time-consuming engineering study and reconfiguration of the Facility.  The Facility utilizes certain production techniques and processes specifically designed to process Jamaican bauxite, which has unique physical and chemical characteristics.

If Sherwin Alumina were forced to find an alternative source of bauxite, it would likely have to purchase a higher-quality form of bauxite that is vastly more expensive.  Moreover, it would not be possible for Sherwin Alumina to secure alternative bauxite from another source on an expedited basis.  The process to identify a possible bauxite supplier and negotiate a bauxite supply agreement between sophisticated counterparties such as Sherwin Alumina and Noranda takes months to conclude.  Without the ability to use bauxite while a new supply agreement is being negotiated, Sherwin Alumina's operations may be severely disrupted and may be required to shut down altogether.  And, given the short duration of these chapter 11 cases, it is likely that even a temporary shutdown would prevent Sherwin Alumina from successfully using the chapter 11 process to remain a viable enterprise.

In sum, Sherwin Alumina's assets cannot operate under any conceivable alternative configuration—in chapter 11 or otherwise—without the Noranda Agreement.  Consequently, unless Sherwin Alumina is able to assume the Noranda Agreement, Sherwin Alumina may not be able to sell its business as a going concern.  Preventing Sherwin Alumina from being able to sell its business as a going concern, in turn, will significantly diminish the value of these estates to the detriment of all stakeholders.  Sherwin Alumina therefore submits that assuming the Noranda Agreement is a sound exercise of its business judgment because it will prevent such harm and will instead benefit the estates.

However, to gain leverage over Sherwin Alumina and potentially attempt to renegotiate contract terms, Sherwin Alumina believes that Noranda may take steps to terminate the Noranda Agreement based on the Bankruptcy Code's safe harbors before this Court has an opportunity to consider the merits of the underlying motion to assume.  Sherwin Alumina does not believe there is any basis under the law for Noranda to terminate the Noranda Agreement.  And since assumption is necessary to Sherwin Alumina's viability, Sherwin Alumina is seeking entry of an order authorizing it to assume the Noranda Agreement effective upon a closing of the stalking horse sale transaction.  Moreover, to the extent Noranda believes that is maintains the ability to terminate the Noranda Agreement under the safe harbor provisions of the Bankruptcy Code or otherwise, Sherwin Alumina also seeks an order from this Court expediting any litigation with Noranda concerning assumption of the Noranda Agreement.

Sherwin Alumina plans to seek approval of an appropriate briefing schedule to permit the Bankruptcy Court to consider Sherwin Alumina's request on an expedited basis in a manner that is fair and equitable to both Sherwin Alumina and Noranda.

4.    The Glencore Supply and Sales Agreement.

The remaining bauxite utilized by Sherwin Alumina is supplied by non-Debtor affiliate Glencore Ltd. under the Bauxite and Alumina Supply Agreement, dated as of January 1, 2014 (as amended, modified, or supplemented in accordance with the terms of thereof, the "**Glencore Supply and Sales Agreement**").

Under the Glencore Supply and Sales Agreement, Sherwin Alumina also sells substantially all of its alumina production each month to Glencore Ltd. at a price equal to the average monthly price of free on board Australia alumina, known as the Alumina Price Index and published in *Platts Metals Daily*, an alumina industry trade publication, less an administration charge of $5 per metric ton.

     5.   <u>Sherwin Alumina's Capital Expenditure Program.</u>

Sherwin Alumina has made significant investments in the Facility, which because of its age requires significant maintenance and improvements to remain competitive with other alumina generating businesses.  In 2015 alone, Sherwin Alumina spent more than $37 million on various capital expenditure projects.  Capital expenditure projects completed by Sherwin Alumina since the 2013 acquisition total nearly $95 million in the aggregate and include an upgrade the Facility's port on the Gulf of Mexico, installation of state-of-the-art equipment, and implementation of environmental initiatives to reduce the Facility's carbon footprint.

     6.   <u>Sherwin Alumina's Workforce.</u>

As of the Petition Date, Sherwin Alumina employs approximately 160 full-time salaried employees. Approximately 455 individuals were previously subject to a collective bargaining agreement between Sherwin Alumina and the United Steelworkers, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union on behalf of its Local Union No. 235A (the "**United Steelworkers**"), which expired as of October 11, 2014.  Following the lockout, as to which the General Counsel of the National Labor Relations Board (the "**NLRB**") dismissed the United Steelworkers' unfair labor practice charges with respect thereto, which dismissal was affirmed and then reaffirmed by the General Counsel, Sherwin Alumina engaged certain third-party service providers on a temporary basis to operate the Facility.

D.    *Sherwin Alumina's Capital Structure.*

Sherwin Alumina is the borrower and the Prepetition Secured Lender is the lender under the Prepetition Secured Credit Facility pursuant to the Prepetition Secured Credit Agreement.  Pursuant to various amendments to the Prepetition Secured Credit Agreement, the Prepetition Secured Lender has increased the total availability to $95 million as of the Petition Date.  As of the Petition Date, Sherwin Alumina does not have any further availability under the Prepetition Secured Credit Agreement.  The obligations under the Prepetition Secured Credit Agreement bear interest at a floating rate equal to 130 percent of the applicable federal rate and mature in July 2016.  The Prepetition Secured Credit Agreement is secured by a first-priority lien on and security interest in substantially all of Sherwin Alumina's real and personal property.

## ARTICLE V.
## EVENTS LEADING UP TO THESE CHAPTER 11 CASES

A.    *Commodity Price Decline and Widespread Industry Distress.*

Since 2014, a perfect storm has devastated pricing for alumina, which is highly correlated to pricing for aluminum:  (a) *aluminum supply* has substantially outpaced demand causing downward pricing pressure on aluminum due to state subsidies and other market failures; (b) *demand for aluminum* has declined due to sluggish economic growth in China and reduced real estate development; and (c) *regulatory uncertainty* related to U.S. monetary policy and interest rates has further softened demand for aluminum and alumina.

State subsidies and other market failures have resulted in a global oversupply of aluminum.  While many responsible global aluminum smelters made significant capacity cuts to rationalize the supply demand curve, Chinese smelters—aided by state subsidies and lower-cost smelting facilities—have not curtailed production despite a contraction in overall aluminum demand.

Demand for aluminum remained depressed through much of 2014, before deteriorating further in 2015, due to, among other things, a slowdown in economic growth in China, economic retrenchment in Russia, uneven growth in global commercial real estate, and uncertainty regarding the Federal Reserve's interest rate strategy.  This price

13

deterioration, together with certain issues unique to Sherwin Alumina described below, have materially affected Sherwin Alumina's performance and operating revenues, which are projected to decline by approximately 24.4 percent this year.  This, in turn, has exhausted Sherwin Alumina's liquidity.

B.      *The Expired Collective Bargaining Agreement.*

The effect of the collapse of global aluminum prices on Sherwin Alumina's business has been further exacerbated by Sherwin Alumina's labor costs and the United Steelworkers leadership's refusal to accept the fundamental economic realities facing Sherwin Alumina and other global alumina producers.  This resulted in a lockout of Sherwin Alumina's talented, hard-working unionized employees since October 11, 2014.

More specifically, on February 9, 2011, Sherwin Alumina and the United Steelworkers entered into a collective bargaining agreement (the "**Expired CBA**") with a stated term through July 31, 2014, which term was subsequently extended with the consent of the parties.  During the Expired CBA's term, global alumina prices underwent a fundamental shift.  The significant deterioration of alumina prices presented Sherwin Alumina's management team with limited options for contract extension negotiations with the United Steelworkers.  Sherwin Alumina's management team determined that, absent a labor agreement that reflected economic terms more aligned with market circumstances, Sherwin Alumina's business enterprise likely lacked long-term viability.

In April 2014, in an effort to provide the parties sufficient time to reach a new mutually acceptable labor agreement, Sherwin Alumina extended the Expired CBA's expiration date by two months, from July 31, 2014, to September 30, 2014.  Sherwin Alumina's management team and lead labor negotiator, Marshall Babson, a former member of the NLRB with more than 40 years of management-side experience in labor contract negotiations, spent several months developing a labor proposal that balanced the interests of Sherwin Alumina with those of its unionized workers.

On July 8, 2014, the parties commenced discussions regarding a new labor agreement.  Management made significant efforts to reach an acceptable labor agreement with its labor union during this time period:

- management participated in more than 30 in-person bargaining sessions between July 8, 2014, and October 11, 2014 (an average of nearly once every three days);

- management presented nine economic and benefit proposals, while the United Steelworkers presented four economic and benefit proposals;

- management proposed to implement modest across-the-board wage increases that exceeded proposed increases in healthcare contributions as well as to continue post-retirement medical and other welfare benefits for all current unionized employees as well as those employees hired prior to January 1, 2015; and

- management extended the deadline to reach an acceptable labor agreement from August 1, 2014, to September 30, 2014, at which time management made an unconditional commitment to continue discussions with the United Steelworkers until the parties reached an acceptable labor agreement.

After negotiating past midnight on October 1, 2014, management presented its best and final labor agreement proposals and set 7:00 a.m. on October 2, 2014, as the deadline to accept the proposals.  Management subsequently extended that deadline to midnight on October 10, 2014, to permit its unionized employees sufficient time to review, assess, and vote on management's proposals.  Unfortunately, on October 11, 2014, the union's leadership notified Sherwin Alumina's management that its members had rejected its latest proposal.

The United Steelworkers' position left Sherwin Alumina with no alternative other than to institute a lockout as of October 11, 2014, and to engage independent contractors to operate the Facility pending resolution on a replacement labor agreement.  Since that time, the United Steelworkers' leadership has focused its attention on a series of unsuccessful legal challenges to the lockout, rather than developing an acceptable labor agreement that

reflects the current economic challenges facing the alumina industry or otherwise engaging in good-faith discussions with management for the benefit of Sherwin Alumina's unionized workers and other stakeholders.

On January 6, 2015, the United Steelworkers filed unfair labor practice charges against Sherwin Alumina with the Regional Director of the NLRB's Regional Office in Fort Worth, Texas related to the ongoing lockout and other disputes.  On May 20, 2015, the Regional Director for Region 16, who investigates unfair labor practice charges and makes initial determinations with respect to such charges on behalf of the NLRB's General Counsel,[5] denied the unfair labor practice charge related to the lockout's legality.  On May 28, 2015, the United Steelworkers filed a Notice of Appeal with the NLRB General Counsel's Office of Appeals challenging the Regional Director's ruling dismissing the United Steelworkers' unfair labor practice challenge to the lockout.  On October 2, 2015, the NLRB's Office of Appeals, on behalf of the NLRB's General Counsel, denied the United Steelworkers' appeal.  On October 27, 2015, the United Steelworkers filed a Motion to Reconsider with the NLRB's Office of Appeals requesting reconsideration of its dismissal of its October 2, 2015 decision, which Office of Appeals denied on behalf of the NLRB's General Counsel on November 20, 2015.

C.      *The GPP Energy Supply Agreement.*

Gregory Power Partners L.P. ("**GPP**") provides steam and electricity to the Facility under a long-term energy supply agreement originally executed on June 30, 1998, by the respective predecessors in interest to Sherwin Alumina and GPP, and most recently amended and restated as of August 7, 2013 (as amended, modified, or supplemented, the "**Energy Supply Agreement**").  The Energy Supply Agreement is a long-term take-or-pay agreement under which GPP provides steam and electricity necessary to operate the Facility to Sherwin Alumina. Sherwin Alumina's Energy Supply Agreement obligations are guaranteed by Reynolds (as assignor of the Energy Supply Agreement), and GPP's obligations under the Energy Supply Agreement are guaranteed by equity sponsor NRG Energy, Inc. (up to a cap of $80 million).  GPP's obligations under the Energy Supply Agreement are also secured by a lien in favor of Sherwin Alumina on substantially all of GPP's assets.

The Energy Supply Agreement requires Sherwin Alumina to purchase steam on uneconomic and unreasonable terms. The Energy Supply Agreement also does not adequately compensate Sherwin Alumina for the diminished revenues and high equipment repair costs associated with the prolonged outages that regularly delay production at the Facility.

In an effort to explore a possible solution, GPP and Sherwin Alumina have engaged in discussions, including in-person meetings on November 20, 2015, and December 29, 2015, regarding possible modifications to the Energy Supply Agreement.  These discussions have not yet resulted in an agreement.  Consummation of the stalking horse sale transaction requires Sherwin Alumina and GPP to amend the Energy Supply Agreement in a manner that is acceptable to the Stalking Horse Bidder.  There is no guaranty that the parties will reach a modified energy supply agreement that is acceptable to the parties and the Stalking Horse Bidder.

D.      *Restructuring Discussions.*

Following the July 2015 amendment to the Prepetition Secured Credit Agreement, Sherwin Alumina determined that it needed to restructure its business enterprise to more appropriately align its cost structure with the new alumina pricing environment and the possibility that a consensual resolution with the United Steelworkers and/or GPP was not achievable absent Court intervention.

Thereafter, Sherwin Alumina appointed Alan J. Carr as its independent manager to oversee and assess restructuring alternatives.  Sherwin Alumina and Mr. Carr subsequently retained restructuring advisors Kirkland & Ellis LLP ("**K&E**") and Huron Consulting Services, LLC ("**Huron**").  In October 2015, Sherwin Alumina and the Prepetition Secured Lender commenced restructuring discussions.  The parties' preliminary discussions initially focused on possible solutions that satisfied the following parameters:

---

[5]      The NLRB's General Counsel has final authority with respect to investigating unfair labor charges and determining whether to issue a Complaint or dismiss the charges.

- de-leveraging Sherwin Alumina's debt obligations;

- facilitating the availability of new capital to fund ongoing improvements and maintenance at the Facility, which is over 60 years old and requires substantial capital expenditure investments;

- providing sufficient runway to a restructuring transaction should the parties not reach a mutually acceptable labor agreement and should pricing improvements not materialize in the short term; and

- maximizing enterprise value for the benefit of all stakeholders, including employees.

In November and December 2015, Sherwin Alumina engaged in discussions with the Prepetition Secured Lender regarding possible postpetition financing to fund a chapter 11 restructuring. In December 2015, the Prepetition Secured Lender provided Sherwin Alumina with a proposal to finance a chapter 11 restructuring process as well as a proposal pursuant to which the Stalking Horse Bidder would agree to purchase substantially all of the Sherwin Alumina's assets pursuant to the Plan or as otherwise approved by the Bankruptcy Court. After extensive, good-faith negotiations with the advisors for the Prepetition Secured Lender, Sherwin Alumina and the Prepetition Secured Lender have agreed on the terms of these restructuring transactions. More specifically, the stalking horse sale transaction contemplates the following:

- **DIP Facility**. The DIP Lender will commit approximately $40 million in additional liquidity, on a junior secured basis, to Sherwin Alumina to fund an orderly chapter 11 sale process (and will, subject to the terms of the Purchase Agreement, provide funding for certain budgeted restructuring and wind-down expenses at the closing of the stalking horse sale transaction, thereby providing additional liquidity to fund the administration of the estates). The DIP Facility will have an attractive eight-percent interest rate, and no commitment fees.

- **Credit Bid**. The stalking horse sale transaction incorporates a $95-million credit bid by the Stalking Horse Bidder, as assignee of the Prepetition Secured Lender's claims under the Prepetition Secured Credit Agreement. The Purchase Agreement also permits the Stalking Horse Bidder to credit bid up to the full amount of the DIP Facility.

- **Free and Clear**. The stalking horse sale transaction provides for the sale of substantially all of Sherwin Alumina's assets free and clear of specified liens, claims, and encumbrances (other than those specifically identified in the Purchase Agreement).

The stalking horse sale transaction reflects the reality that Sherwin Alumina's enterprise value may be less than the amount of Commodity Funding, LLC's secured claims. In light of the foregoing, on the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code to effectuate this proposed restructuring. The Debtors expect to expeditiously complete the chapter 11 sale process.

To provide for an orderly resolution of these chapter 11 cases, Sherwin Alumina has secured the support of the Prepetition Secured Lender to structure the stalking horse sale transaction as an asset sale under the Plan and to provide a cash recovery to holders of general unsecured claims to incentivize creditors to support the Plan. If general unsecured creditors do not vote for the Plan or the Plan is not confirmed, however, Sherwin Alumina will seek Court approval of the stalking horse sale transaction under section 363(b) of the Bankruptcy Code.

Sherwin Alumina believes that the stalking horse sale transaction is in the best interests of all stakeholders. It provides for a comprehensive restructuring of Sherwin Alumina's prepetition obligations, maintains the going-concern value of Sherwin Alumina's business, protects jobs, and preserves business opportunities and important relationships with Sherwin Alumina's key vendors. To ensure that value is maximized, Sherwin Alumina seeks approval of a marketing and overbid process. To facilitate the overbid process, Sherwin Alumina intends to seek approval of certain bidding procedures filed in connection herewith that will set the framework and timeline for the submission of bids.

# ARTICLE VI.
## ADMINISTRATION OF THE CHAPTER 11 CASES

A.      *First Day Pleadings and Other Case Matters.*

The Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with vendors, customers, employees, landlords and utility providers that had been impacted by the commencement of these Chapter 11 Cases.  As a result of these initial efforts, the Debtors minimized the negative impacts resulting from the commencement of these Chapter 11 Cases.

On the Petition Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of first day motions and applications (collectively, the "**First Day Motions**") with the Bankruptcy Court.  Within a few days, the Bankruptcy Court entered several orders to, among other things:  (a) prevent interruptions to the Debtors' businesses; (b) ease the strain on the Debtors' relationships with certain essential constituents; (c) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases (each, a "**First Day Order**"):

1.      Administrative Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered the following procedural First Day Orders: (a) approving the notice, case management and administrative procedures to govern these Chapter 11 Cases [Docket No. [__]]; (b) authorizing the joint administration of the Debtors' Chapter 11 Cases [Docket No. 40]; and (c) granting the Debtors an extension of time to file their schedules [Docket No. [__]].

2.      Employment and Compensation of Advisors

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered Final Orders, authorizing the Debtors to retain and employ the following advisors:  (a) Kurtzman Carson Consultants, LLC, as Notice and Claims Agent to the Debtors [Docket No. [__]]; (b) Kirkland & Ellis LLP as counsel to the Debtors [Docket No. [__]]; (c) Zack A. Clement, PLLC as co-counsel to the Debtors [Docket No. [__]]; and (d) Huron Consulting Group as financial advisor to the Debtors [Docket No. [__]].   On [__], 2016, the Bankruptcy Court entered an order approving procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases [Docket No. [__]].

3.      Stabilizing Operations

Recognizing that any interruption of the Debtors' business, even for a brief period, would negatively affect customer and supplier relationships, revenues, and profits, the Debtors filed a number of First Day Motions to minimize the adverse effects of the commencement of the Chapter 11 Cases on their ongoing business operations. Thereafter, the Bankruptcy Court entered a number of First Day Orders granting the Debtors authority to, among other things, pay certain prepetition claims and obligations and continue certain existing programs.  Indeed, the relief granted by the First Day Orders helped facilitate the Debtors' smooth transition into the Chapter 11 Cases, allowed the Debtors to continue their operations without interruption, and prevented a decrease in confidence among suppliers, customers, and creditors as to the likelihood of the Debtors' successful emergence from the Chapter 11 Cases.

(a)      *Employee Wages and Benefits*

The Debtors believed that absent the ability (i) to honor certain prepetition claims relating to, among other things, wages, salaries, and other compensation and certain employee benefit obligations (collectively, the "**Employee Compensation and Benefits**") and (ii) to pay all costs incident to the foregoing, their employees might have suffered undue hardship and sought alternative employment opportunities, perhaps with the Debtors' competitors.  The loss of valuable employees would have been distracting at a critical time when the Debtors were focused on stabilizing their operations.  Accordingly, the Bankruptcy Court entered orders authorizing the Debtors

17

to pay and continue to pay the Employee Compensation and Benefits and authorizing and directing banks and financial institutions to honor all checks and electronic payment requests made by the Debtors related to the Employee Compensation and Benefits.

### (b)    Cash Management System

As part of a smooth transition into these Chapter 11 Cases, the Debtors sought and the Bankruptcy Court entered certain orders authorizing the Debtors to continue using the Debtors' existing cash management system, maintain existing bank accounts and business forms, and continue to perform intercompany transactions [Docket No. [__]].

### (c)    Critical Vendors

The Debtors rely on their vendors to, among other things, assist the Debtors in complying with applicable governmental laws and regulations, supply essential raw materials, specialized replacement parts and supplies, operations consumables, and certain other goods required to operate the Facility and ensure continuous business operations, and ensure the wide range of specialized equipment the Debtors utilize for alumina production in an effective, safe, and efficient manner.  The Bankruptcy Court entered a First Day Order authorizing the Debtors to pay prepetition claims of certain critical vendors and to implement procedures to address any vendors that repudiate or otherwise refuse to honor contractual obligations to the Debtors [Docket No. [__]].  The Debtors obtained a Final Order authorizing them to pay their critical vendors on [__], 2016 [Docket No. [__]].  The Debtors believe this critical vendor authority was necessary and served to limit disruptions to the Debtors' business and operations.

### (d)    Lien Claimants

Before the Petition Date, and in the ordinary course of business, the Debtors contracted with certain domestic common carriers, shippers, truckers, and logistics management companies to ship, transport, and deliver raw materials, parts, and components to the Debtors.  Furthermore, while the Debtors store most of their materials at their production facility, they periodically rely on certain warehousemen in the ordinary course of business to store materials and equipment from time to time.  The Debtors were concerned that unless these claimants were paid outstanding prepetition amounts, many of these claimants would refuse to perform their ongoing obligations under their existing agreements with the Debtors or may refuse to release goods in their possession, which would have had a material adverse effect on the Debtors' businesses.  The Bankruptcy Court entered a First Day Order approving this relief on on [__], 2016 [Docket No. ___] and a Final Order approving this relief on [__], 2016 [Docket No. ___].

### (e)    Taxes and Fees

The Debtors believed that, in some cases, certain taxing, regulatory, and governmental authorities had the ability to exercise rights and remedies if the Debtors failed to remit certain taxes and fees.  Accordingly, the Debtors sought entry of an order authorizing the Debtors to pay any fees and taxes to avoid harm to the Debtors' business operations.  On [__], 2016, the Bankruptcy Court entered a First Day Order authorizing the Debtors to pay taxes and fees [Docket No. [__]], and on [__], 2016, the Bankruptcy Court entered a Final Order authorizing the Debtors to pay taxes and fees [Docket No. [__]].

### (f)    Utilities

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services.  To ensure uninterrupted utility service, the Debtors filed a First Day Motion seeking entry of an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court [Docket No. [__]].  On [__], 2016, the Bankruptcy Court entered a First Day Order approving the relief requested by such motion [Docket No. [__]], and on [__], 2016, the Bankruptcy Court entered a Final Order approving the relief requested by such motion [Docket No. [__]].

(g)     *Insurance*

The Debtors believed that maintenance of certain insurance policies (or entry into certain new insurance policies) was essential to preserving the value of the Debtors' businesses, properties, and assets. Moreover, in many cases, coverage provided by such policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the Office of the United States Trustee. Accordingly, the Debtors filed a First Day Motion seeking entry of an order providing authority to maintain such policies, pay prepetition obligations (if any) related thereto, and renew, supplement, or enter into new policies, in consultation with the DIP Lender, in the ordinary course of business on a postpetition basis. On [__], 2016, the Bankruptcy Court entered a First Day Order approving the relief requested by such motion [Docket No. [__]], and on [__], 2016, the Bankruptcy Court entered a Final Order approving the relief requested by such motion [Docket No. [__]].

B.     *The Debtors' Sale Process.*

On January 11, 2016, the Debtors filed a motion seeking entry of the Bid Procedures Order to establish the Bid Procedures, obtain approval of the Purchase Agreement, and market-test the Purchase Agreement to ensure that the Debtors obtain the highest or otherwise best offer or combination of offers for the Acquired Assets.

Generally speaking, the Bid Procedures provide for, among other things:

- the requirements that potential bidders must satisfy to participate in the bidding process and become "**Acceptable Bidders**";

- the availability of, access to, and conduct during due diligence by Acceptable Bidders;

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "**Qualified Bids**" sufficient to trigger the Auction and participate in the Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and the deadline that must be met, for any Acceptable Bidder (other than the Stalking Horse Bidder) to be considered a "**Qualified Bidder**," which shall all be determined by the Debtors;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the Starting Bid(s) for the Auction;

- the conditions for having an Auction and procedures for conducting the Auction, if any;

- the criteria by which the "**Successful Bidder**" will be selected by the Debtors; and

- various other matters relating to the sale process generally, including regarding designation of the Back-Up Bid, payment of the Expense Reimbursement Amount, return of any good faith deposits, and certain reservations of rights.

The Bankruptcy Court entered the Bid Procedures Order on [__], 2016. Pursuant to the Bid Procedures Order, an auction for substantially all of the Debtors' assets is scheduled for [__], 2016.

## ARTICLE VII.
## SUMMARY OF KEY TERMS AND CONDITIONS OF THE PLAN[6]

A.      *Settlement, Release, Injunction, and Related Provisions*

1.      Settlement, Compromise, and Release of Claims and Interests.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to or in connection with the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Interests subject to the Effective Date occurring.

2.      **Release of Liens**.

**Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to or in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Debtors and be assigned to the Buyer pursuant to the Purchase Agreement.**

3.      **Releases by the Debtors**.

**Pursuant to section 1123(b) of the Bankruptcy Code and to the fullest extent authorized by applicable law, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Released Party is expressly, unconditionally, generally and individually and collectively released, acquitted and discharged by the Debtors and their Estates from any and all actions, claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the**

---

[6]  This summary of key terms and conditions of the Plan is for illustrative purposes only.  To the extent that there is a discrepancy between this illustrative summary and the terms and conditions of the Plan, the Plan shall control in all respects.

holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Sale Transaction, the Restructuring Transactions, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.

       4.    **Releases by Holders of Claims and Interests**.

       As of the Effective Date, except as otherwise provided in the Plan, and to the fullest extent authorized by applicable law, the Releasing Parties expressly, unconditionally, generally and individually and collectively release, acquit and discharge the Debtors, their Estates, and the Released Parties from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the Sale Transaction, the Restructuring Transactions, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, or the Buyer, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents, or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

       5.    **Exculpation**.

       Except as otherwise specifically provided in the Plan, each Debtor and each Released Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects each Debtor and each Released Party shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, their Estates, and the Released Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the Restructuring Transactions, the Sale Transaction, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents  (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Plan, and the solicitation of the Plan and distributions pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

21

6.   **Injunction**.

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan, or Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released pursuant to Error! Reference source not found., **Article VIII.C or Article VII..A..4 of the Plan, compromised and settled pursuant to** Error! Reference source not found. **of the Plan, or are subject to exculpation pursuant to Article VII..A..5 of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such released, compromised, settled, or exculpated claim or interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such released, compromised, settled, or exculpated claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such released, compromised, settled, or exculpated claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such released, compromised, settled, or exculpated claims or interests unless such entity has timely Filed a Proof of Claim with the Bankruptcy Court preserving such right of setoff, subrogation, or recoupment; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such released, compromised, settled, or exculpated claims or interests.**

## ARTICLE VIII.
## SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

**The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan**.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING
PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE
COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

A.      *Voting Record Date.*

**The Voting Record Date is [February 10], 2016**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim.

B.      *Voting on the Plan.*

**The Voting Deadline is March [28], 2016, at 5:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal delivery) so that they are ***actually received*** on or before the Voting Deadline by Kurtzman Carson Consultants, LLC (the "**Voting and Claims Agent**") at the following address:

---

**DELIVERY OF BALLOTS**

**Sherwin Alumina Company, LLC**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue, El Segundo, California 90245**

If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a ballot before the Voting Deadline.

---

C.      *Ballots Not Counted.*

        **Except as otherwise provided by the Disclosure Statement Order, no ballot will be counted toward Confirmation if, among other things**:  (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by facsimile, email or other electronic means; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), or the Debtors' financial or legal advisors instead of the Voting and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT TOLL-FREE AT (866) 927-7091. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

**ARTICLE IX.**
**CONFIRMATION OF THE PLAN**

        The following is a brief summary of the confirmation process.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in the Disclosure Statement.

A.      *Confirmation Hearing.*

        Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  **The Bankruptcy Court has scheduled a Confirmation Hearing for [March 31], 2016, at [___] a.m., prevailing Central Time.**  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures.  Any objection to the Plan must (1) be in writing; (2) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties set forth in this Disclosure Statement no later than the Plan Objection Deadline.  Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.

23

B.       *Confirmation Standards.*

At a Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that:  (i) Holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive payment in full, in Cash, except to the extent the Holder of such Claim agrees to less favorable treatment or the pro rata portion of Retained Cash  allocable to such Claims is not sufficient to pay them in full; (ii) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims payment in full, in Cash, except to the extent the Holder of such Claim agrees to less favorable treatment or the pro rata portion of Retained Cash (as defined in the Purchase Agreement) allocable to such Claims is not sufficient to pay them in full; and (iii) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim payment in full, in Cash, except to the extent the Holder of such Claim agrees to less favorable treatment or the pro rata portion of Retained Cash (as defined in the Purchase Agreement) allocable to such Claims is not sufficient to pay them in full.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial restructuring of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or restructuring.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

1. Best Interests of Creditors Test—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

The Plan satisfies the best interest of creditors test.  The Plan provides a greater recovery to the holders of Claims than such Holders would receive under a liquidation under chapter 7 of the Bankruptcy Code, primarily because the Plan avoids additional administrative expenses and commissions associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administering the Debtors' relatively few remaining assets for the benefit of creditors.

In this case, the Debtors have disposed of substantially all of their assets.  With respect to the Debtors' remaining assets, the Plan Administrator will be in the best position to liquidate the Debtors' remaining assets, if any, resolve claims, and make distributions to Holders of Claims in accordance with the Plan.

The recovery to Holders of General Unsecured Claims under the Plan is expected to be more than such creditors' recovery in a chapter 7 liquidation.  Among other things, if the Chapter 11 Cases were converted to cases under chapter 7, the Debtors' estates would incur the costs of payment of a statutorily allowed sliding-scale commission to the chapter 7 trustee, as well as the additional costs of replacement counsel and other professionals retained by the trustee to get up to speed and assist with the liquidation.

Such amounts, together with other wind-down costs, would likely exceed the amount of costs that the Plan Administrator and its professionals and agents would be expected to incur in connection with completing the liquidation of the Estates.  Further, some residual value resulting from the Debtors' efforts prior to the chapter 7 trustee's appointment may be subsequently transferred to the Estates, and the chapter 7 trustee may be able to assert a commission for such funds although these may have primarily been the result of prior efforts.  Additionally, the Estates would likely suffer additional delays, as a chapter 7 trustee and his/her counsel needs time to complete the necessary learning curve in order to complete the administration of the Estates.

The Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals) which may constitute Allowed Claims in any chapter 7 case.  Moreover, a chapter 7 case would trigger a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. Fed. R. Bankr. P. 3002(c).

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional claims that were not asserted in the Chapter 11 Cases.  Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

2. Financial Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial restructuring, unless the plan contemplates such liquidation or restructuring.  The Debtors believe that the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all distributions required by the Plan.

K&E 23662324

Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

C.     *Acceptance by Impaired Classes.*

        The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan.  A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the Holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the Holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

        Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan.  Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of creditors or interests.

        Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and more than one-half in number actually voting cast their ballots in favor of acceptance, not counting designated votes, subject to Article III of the Plan.  Similarly, a Class of Interests will have voted to accept the Plan only if two-thirds in amount held by Holders of interests actually voting cast their ballots in favor of acceptance, not counting designated votes (and without regard to the number of such Holders of interests voting in favor of acceptance), subject to Article III of the Plan.

D.     *Confirmation without Acceptance by All Impaired Classes.*

        Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; *provided*, *however*, the plan is accepted by at least one impaired class (without regard to the votes of insiders).  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

        1.     No Unfair Discrimination.

        The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent but that such treatment be "fair."  In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

26

2.    Fair and Equitable Test.

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class receiving more than 100 percent of the amount of the allowed Claims in such Class, and no Class that is junior to a dissenting Class that will receive or retain any property on account of the Claims or Interests in such junior Class.

(a)    Secured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b)    Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) no holder of any claim or any interest that is junior to the claims of such class will receive or retain any property under the plan on account of such junior claim or junior interest.

(c)    Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (ii) no holder of any interest that is junior to the interests of such class will receive or retain any property under the plan on account of such junior interest.

### ARTICLE X.
### CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.    *Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims Under the Plan.*

1.    Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims.

The estimate of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or

amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

      2.    <u>The Debtors Could Become Administratively Insolvent</u>.

As of the Petition Date, the Debtors have limited, if any, unencumbered cash, and substantially all of their assets are collateral for the Debtors' secured loans. Therefore, among other things, if the Debtors are unable to obtain approval of their DIP Facility (as proposed by the DIP Motion) or if the Sale Transaction is never closed, or upon a default under the Debtors' DIP Facility, the Debtors will likely become administratively insolvent. Additionally, the Debtors may lack sufficient resources to satisfy all Allowed Administrative Claims in full in cash if the ultimate amount of such Allowed Claims exceeds the Debtors' estimates thereof.

      3.    <u>The Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Plan</u>.

To the extent that the Debtors are unable to satisfy the conditions precedent to Consummation of the Plan, the Debtors may be unable to consummate the Plan and parties may terminate their support, financial or otherwise, for the Plan prior to the Confirmation or Consummation of the Plan. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

      4.    <u>The Debtors Cannot Guaranty Recoveries Provided by the Plan</u>.

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims and Other Priority Claims, it is possible that the actual amount of such Allowed claims is materially higher than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. The Debtors also have limited assets available to make creditor distributions and to fund the Wind Down of these Estates. If these assets are ultimately insufficient to fund the Wind Down or to pay Administrative Claims, Priority Tax Claims and Other Priority Claims, the Debtors may be unable to make the distributions required by the Plan.

      5.    <u>Certain Tax Implications of the Debtors' Bankruptcy</u>.

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, "Certain United States Federal Tax Income Consequences" to determine the tax implications of the Plan and the Chapter 11 Cases.

B.    *Certain Bankruptcy Law Considerations.*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes:

      1.    <u>Parties in Interest May Object to the Plan's Classification of Claims</u>.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

      2.    <u>Failure to Satisfy Vote Requirements</u>.

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the

event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan. In the event the Debtors are not able to confirm a chapter 11 plan, the stalking horse bid contemplated by the Sale Transaction permits Sherwin to seek Court approval of the stalking horse sale transaction under section 363(b) of the Bankruptcy Code. As described herein and the Plan, under the credit bid incorporated in the stalking horse sale transaction, there is no distributable value for general unsecured creditors unless Sherwin consummates the transaction under the Plan.

3.   The Debtors May Not Be Able to Secure Confirmation of the Plan.

The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or restructuring is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the Debtors' proposed procedures for the solicitation of ballots from Holders of Allowed Claims, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.   Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

5.   The Debtors May Object to the Amount or Classification of a Claim.

Except as provided in the Plan, the Debtors and Stalking Horse Bidder each reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection. Any Holder of a Claim that is or may be subject to an objection, thus, may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.   Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur.

7.   Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

8.   Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release and injunction of Excluded Liabilities that could otherwise be asserted against the Stalking Horse Bidder and the Acquired Assets. These Excluded Liabilities will be paid or treated pursuant to the Plan. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

9.   The Purchase Agreement May Not Be Approved, or Terminate.

The Purchase Agreement is subject to approval of the Bankruptcy Court, which may not be obtained. Even if such approval is obtained, the Purchase Agreement contains numerous conditions to closing, including, without limitation, that (i) an order of the Bankruptcy Court is entered approving the sale of the Acquired Assets free and clear of any and all claims and liabilities unless otherwise specified in the Purchase Agreement; (ii) no Material Adverse Effect (as defined in the Purchase Agreement) has occurred, (iii) the Stalking Horse Bidder has obtained evidence satisfactory to it of the continued supply of certain goods, products and materials under key supply agreements on terms acceptable to the Stalking Horse Bidder, (iv) certain bankruptcy case milestones and the closing of the Sale Transaction have occurred within the time periods specified in the Purchase Agreement; and (v) no other event giving rise to termination of the Purchase Agreement has occurred (which events are set forth in the Purchase Agreement).

To the extent that the terms or conditions of the Purchase Agreement are not satisfied, or to the extent events giving rise to termination of the Purchase Agreement occur, the Purchase Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the inability of the Debtor to consummate the Plan.

10.   The DIP Facility May Not Be Approved, or May Terminate

The Debtors' proposed DIP Facility is subject to approval of the Bankruptcy Court, which may not be obtained. Even if such approval is obtained, the DIP Facility contains several events of default, upon the occurrence of which the Debtors could lose access to funding under the DIP Facility, in which case the Debtors could be forced to liquidate their assets and/or convert these cases to cases under chapter 7 of the Bankruptcy Code.

C.   *Risks Associated with Forward Looking Statements.*

**The financial information contained in this Disclosure Statement has not been audited**. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable

to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

D.    *Disclosure Statement Disclaimer.*

1.    Information Contained in this Disclosure Statement Is for Soliciting Votes.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

2.    This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

3.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement.

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

4.    No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Stalking Horse Bidder, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

5.    Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

6.    No Waiver of Right to Object or Right to Recover Transfers and Assets.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates or the Stalking Horse Bidder are specifically or generally identified in this Disclosure Statement.

7.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

8.   Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.   While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.   Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

9.   No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.   Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.   You should promptly report unauthorized representations or inducements to the counsel to the Debtors.

E.     *Liquidation Under Chapter 7.*

If no chapter 11 plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.   A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' liquidation analysis is set forth in Article VIIIX.B.1 of this Disclosure Statement an "Confirmation of the Plan."

## ARTICLE XI.
## MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

THERE ARE A NUMBER OF MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN.   INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN THIS SECTION OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF THE MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES AND RISKS FOR THE DEBTORS AND FOR HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN RESULTING FROM THE TRANSACTIONS OCCURRING IN CONNECTION WITH THE PLAN.

The following discussion summarizes the material federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Claims that are entitled to vote to accept or reject the Plan.   The following summary does not address the federal income tax consequences to Holders of Interests or Holders of Claims whose Claims are not Impaired or who are deemed to reject the Plan.   This summary does not apply to a Holder of a Claim or Interest that is not a "United States person" (as such phrase is defined in the Internal Revenue Code of 1986, as amended (the "**IRC**")).

The following summary is based on the IRC, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date hereof.   Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. Except as described below, the Debtors have not requested a ruling or advice from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.   Thus, no assurance can be given as to the interpretation that the IRS will adopt.   In addition, this summary generally does not address foreign, state or local tax consequences of the

32

Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, persons who received their claims in whole or in part as compensation, regulated investment companies, persons holding a Claim as part of an integrated transaction, constructive sale, straddle or as part of a conversion transaction, and investors in pass-through entities). It also does not address the federal income tax consequences to foreign taxpayers and tax-exempt organizations (including certain pension funds) or agreements among Holders of Claims.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS RECEIVING A DISTRIBUTION UNDER THE PLAN ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

A.      *Consequences to the Debtors.*

Sherwin is a limited liability company wholly owned by Allied Alumina, LLC, a non-Debtor that is in turn is wholly owned by Glencore. Sherwin and Allied Alumina, LLC are treated as disregarded entities for federal income tax purposes and thus any assets or liabilities of Sherwin are treated as the assets and liabilities of Glencore. Sherwin Pipeline is a U.S. corporation for federal income tax purposes.

If the Stalking Horse Bidder is the Successful Bidder, the Prepetition Secured Lender will assign and transfer its Prepetition Secured Credit Facility Claims to the Stalking Horse Bidder. The Stalking Horse Bidder is a limited liability company wholly owned by Glencore and will be treated as a disregarded entity for income tax purposes. **This discussion does not address any of the potential tax consequences of such assignment.**

1.      Tax consequences to Sherwin.

Whether the Stalking Horse Bidder is the Successful Bidder or the Stalking Horse Bidder is not the Successful Bidder and the Successful Bidder is instead a third-party, Sherwin is not expected to experience any federal income tax consequences due to the Sale Transaction because it is a disregarded entity for federal income tax purposes. Accordingly, it does not have any federal income tax liability and is not required to file federal income tax returns. Any federal income tax consequences of Sherwin's restructuring will flow up to Glencore.

If the Stalking Horse Bidder is the Successful Bidder, Glencore is not expected to experience any federal income tax consequences on account of consummation of the Sale Transaction, as Glencore would simply be transferring assets and liabilities between two wholly owned entities, both of which are disregarded for federal income tax purposes.

If, however, the Stalking Horse Bidder is not the Successful Bidder and the Successful Bidder is instead a third-party, the Sale Transaction is expected to result in Glencore recognizing gain or loss and potentially recognizing cancellation of indebtedness income ("**CODI**"). More specifically, Glencore would recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between the Net Sale Proceeds received in exchange for Sherwin's portion of the Acquired Assets and Sherwin's adjusted tax basis in its portion of the Acquired Assets.

Further, in the case that the Stalking Horse Bidder is not the Successful Bidder and the Successful Bidder is instead a third-party, Glencore may potentially recognize CODI for federal income tax purposes in connection with the implementation of the Sale Transaction pursuant to the Plan. CODI is the amount by which the issue price of the indebtedness discharged (reduced by any unamortized OID) exceeds the consideration given in exchange therefor, *i.e.*, the amount of any cash, the issue price of any debt and the fair market value of any other consideration paid to holders of such debt. Where the Stalking Horse Bidder is not the Successful Bidder and the Successful Bidder is instead a third-party, any Holder of the Prepetition Secured Credit Facility Claims will be entitled to receive the Net

Sale Proceeds under the Plan.  To the extent that the issue price of the Prepetition Secured Credit Facility Claims exceeds such Net Sale Proceeds, Sherwin will recognize CODI, all of which will be allocated to Glencore.

Generally, CODI results in taxable income.  However, a statutory exception provides that CODI may be excluded from income if it results from debt discharged in a title 11 bankruptcy case and the taxpayer is under the jurisdiction of the court in such.  Because Glencore is not a debtor in these Chapter 11 Cases it is unlikely that Glencore will qualify for this statutory exception.

    2.   Tax consequences to <u>Sherwin Pipeline</u>.

The transfer of the Acquired Assets by Sherwin Pipeline pursuant to the Sale Transaction will be treated as a taxable transaction regardless of whether the Stalking Horse Bidder is the Successful Bidder or the Stalking Horse Bidder is not the Successful Bidder and the Successful Bidder is instead a third-party. If the Stalking Horse Bidder is the Successful Bidder, Sherwin Pipeline is expected to recognize income or gain for federal income tax purposes to the extent  the fair value of its portion of the Acquired Assets exceeds its adjusted tax basis in such Acquired Assets. However, any such loss would be disallowed If the Stalking Horse Bidder is not the Successful Bidder and the Successful Bidder is instead a third-party, Sherwin Pipeline would recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between the portion of the Net Sale Proceeds received in exchange for its portion of the Acquired Assets and its adjusted tax basis in such Acquired Assets.  To the extent Sherwin Pipeline's gain triggered by the Sale Transaction exceeds its available losses (including net operating loss carryforwards ("**NOLs**") generated in prior years) it will owe federal income tax, the liability for which will constitute and Administrative Expense

B.    *Consequences to Holders of Class 3 Prepetition Secured Credit Facility Claims, Class 4A and 4B General Unsecured Claims.*

    1.   Class 3 Prepetition Secured Credit Facility Claims.

Pursuant to the Plan, Holders of Prepetition Secured Credit Facility Claims will either credit bid such Claims via the Stalking Horse Bidder and receive the Acquired Assets in full satisfaction of their Claims, or in the event that the Stalking Horse Bidder is not the Successful Bidder and the Successful Bidder is instead a third party, receive the Net Sale Proceeds in full satisfaction of their Claims.  In the case that the Stalking Horse Bidder is the Successful Bidder and thus the Holder of the Prepetition Secured Credit Facility Claims it is not expected to experience any federal income tax consequences due to the Sale Transaction, as both it and Sherwin will be disregarded entities for federal income tax purposes both owned by Glencore.

Alternatively, in the case that the Stalking Horse Bidder is not the Successful Bidder, the Holder of a Prepetition Secured Credit Facility Claim generally will recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between the amount of the Net Sale Proceeds received in exchange for its Claim and the Holder's adjusted tax basis in its Claim.

The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the Holder previously has claimed a bad debt deduction with respect to its Claim. The deductibility of capital losses is subject to limitations. See discussions of "Accrued but Unpaid Interest" and "Market Discount" below.

    2.   Class 4A and 4B General Unsecured Claims.

Pursuant to the Plan, all Holders of Class 4A General Unsecured Claims and Holders of Class 4B General Unsecured Claims that vote for the Plan will receive Cash in full satisfaction of their Claims. Such Holders generally will recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between the amount of Cash received in exchange for its Claim and such Holder's adjusted tax basis in its Claim.

The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the Holder previously has claimed a bad debt deduction with respect to its Claim. The deductibility of capital losses is subject to limitations. See discussions of "Accrued but Unpaid Interest" and "Market Discount" below.

      3.   Accrued but Unpaid Interest.

In general, to the extent that any consideration received pursuant to the Plan by a holder of any debt is received in satisfaction of interest or original issue discount ("**OID**") that accrued during the holder's holding period, such amount will be taxable to the holder as ordinary interest income if not previously included in the holder's gross income.  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full.

Pursuant to the Plan, all amounts received in exchange for any debt will be allocated first to the principal amount of such debt as determined for federal income tax purposes, and thereafter to accrued but unpaid interest or OID.  However, there is no assurance that the IRS would respect such allocation for federal income tax purposes. The tax basis of any property received in exchange for accrued but unpaid interest will be the fair market value of such property and the holding period of such property will begin on the day after receipt.  **Holders of Claims subject to the Plan are urged to consult their tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for federal income tax purposes.**

      4.   <u>Market Discount</u>

A holder of any debt acquired after the original issuance of the debt at a market discount (generally defined as the amount, if any, by which a holder's tax basis in the debt immediately after its acquisition is less than the adjusted issue price of the debt at such time, subject to a *de minimis* exception) generally will be required to treat any taxable gain recognized with respect to the debt as ordinary income to the extent of the market discount accrued during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.

C.      *Information Reporting and Withholding*

All distributions to Holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28 percent).  Backup withholding generally applies if the holder fails to furnish its social security number or other taxpayer identification number (a "**TIN**"), furnishes an incorrect TIN, fails properly to report interest or dividends, or under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  **Holders of Claims subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.**

     **THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS RECEIVING A DISTRIBUTION UNDER THE PLAN ARE URGED**

**TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

**ARTICLE XII.**
**RECOMMENDATION OF THE DEBTORS**

**In the opinion of the Debtors, the Plan is extremely preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a larger distribution to the Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.** In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. **Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.**

K&E 23662324

Dated:  January 13, 2016

Sherwin Alumina Company, LLC (for itself and all Debtors)

By:   _____
Name:   Thomas Russell
Title:   President and Chief Executive Officer

Prepared by:

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022

- and -

James H.M. Sprayregen, P.C.
Gregory F. Pesce
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654

Zack A. Clement (TX Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond
Houston, Texas 77025

*Proposed Counsel for the Debtors and Debtors in Possession*

37