**Exhibit B**

**Executed Stalking Horse Purchase Agreement**

EXECUTION COPY

**ASSET PURCHASE AGREEMENT**

**by and among**

**SHERWIN ALUMINA COMPANY, LLC,**

**and**

**SHERWIN PIPELINE, INC.,**

**as Sellers,**

**CORPUS CHRISTI ALUMINA LLC**

**as Buyer**

**and**

**the other Persons named, and solely for the purposes indicated, herein**

24175364

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................................................2

    Section 1.01  Defined Terms ...................................................................2

    Section 1.02  Interpretation.....................................................................17

ARTICLE II ASSETS .................................................................................................18

    Section 2.01  Agreement to Sell and Purchase ......................................18

    Section 2.02  Acquired Assets ................................................................18

    Section 2.03  Excluded Assets ...............................................................20

    Section 2.04  Assumed Liabilities ..........................................................22

    Section 2.05  Excluded Liabilities ..........................................................22

    Section 2.06  Assignment of Assigned Contracts and Rights; Cure Costs.....................23

ARTICLE III CONSIDERATION ................................................................................25

    Section 3.01  Purchase Price ..................................................................25

    Section 3.02  Allocated Values ..............................................................26

    Section 3.03  Professional Fees .............................................................26

ARTICLE IV REPRESENTATIONS AND WARRANTIES ........................................28

    Section 4.01  Representations and Warranties of Sellers .................28

    Section 4.02  Representations and Warranties of Buyer.................36

ARTICLE V CERTAIN COVENANTS ........................................................................37

    Section 5.01  Interim Operations ..........................................................37

    Section 5.02  Bankruptcy Actions .........................................................38

    Section 5.03  Access to Information .....................................................40

    Section 5.04  Confidentiality .................................................................41

    Section 5.05  Reasonable Best Efforts ..................................................41

    Section 5.06  Notification of Certain Matters .......................................41

    Section 5.07  Schedule Updates ...........................................................42

    Section 5.08  Notice of Litigation.........................................................42

    Section 5.09  Employee Matters ...........................................................42

    Section 5.10  Labor Matters...................................................................43

Section 5.11    Financing Cooperation ...................................................................43

ARTICLE VI CONDITIONS TO CLOSING ........................................................44

Section 6.01    Conditions to Sellers' Obligations .................................................44

Section 6.02    Conditions to Buyer's Obligations .................................................44

Section 6.03    Conditions to Buyer and Sellers' Obligations ...........................45

Section 6.04    Frustration of Closing Conditions .................................................45

ARTICLE VII CLOSING .....................................................................................45

Section 7.01    Time and Place of Closing .............................................................45

Section 7.02    Actions of Sellers at Closing .........................................................46

Section 7.03    Actions of Buyer at Closing ...........................................................47

Section 7.04    Actions of Allied at Closing ...........................................................47

ARTICLE VIII CERTAIN ADDITIONAL OBLIGATIONS ................................47

Section 8.01    Files ...................................................................................................47

Section 8.02    Further Cooperation ........................................................................47

ARTICLE IX TERMINATION .............................................................................48

Section 9.01    Right of Termination .......................................................................48

Section 9.02    Effect of Termination ......................................................................49

ARTICLE X TAX MATTERS ..............................................................................50

Section 10.01   Tax Matters ......................................................................................50

ARTICLE XI LIMITATIONS ON REPRESENTATIONS AND WARRANTIES ...................50

Section 11.01   Disclaimers of Representations and Warranties; Guarantor;
                Remedies ...........................................................................................50

Section 11.02   Guarantor and Remedies .................................................................52

ARTICLE XII MISCELLANEOUS ......................................................................52

Section 12.01   Negligence and Fault ......................................................................52

Section 12.02   Mutual Release.................................................................................52

Section 12.03   Survival .............................................................................................53

Section 12.04   Non-Compensatory Damages ........................................................53

Section 12.05   Specific Performance ......................................................................53

Section 12.06   Entire Agreement ............................................................................53

Section 12.07   Publicity ............................................................................................53

ii

Section 12.08  No Third Party Beneficiaries ..................................................................53

Section 12.09  Assignment ...............................................................................................54

Section 12.10  Governing Law .........................................................................................54

Section 12.11  Exclusive Jurisdiction; Waiver of Jury Trial ...........................................54

Section 12.12  Notices ......................................................................................................54

Section 12.13  Approval of the Bankruptcy Court ...........................................................56

Section 12.14  Severability ..............................................................................................56

Section 12.15  Counterparts .............................................................................................56

Section 12.16  Amendment and Waiver ...........................................................................56

Section 12.17  Expenses ...................................................................................................56

Section 12.18  Schedules and Exhibits ............................................................................56

Section 12.19  Matters Relating to the Senior Secured Lender .......................................56

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Bidding Procedures Order |
| Exhibit B | Form of Assignment and Assumption Agreement |

**SCHEDULES**

| | |
|---|---|
| Schedule 1.01(a) | Acquired Leased Real Property |
| Schedule 1.01(b) | Acquired Owned Real Property |
| Schedule 1.01(c) | Permitted Liens |
| Schedule 1.01(d) | Sellers' Knowledge Persons |
| Schedule 2.02(d) | Acquired Personal Property |
| Schedule 2.02(f) | Assumed Benefit Plans |
| Schedule 2.02(g) | Permits, Servitudes, Rights-of-use and Other Similar Rights |
| Schedule 2.02(n) | Intellectual Property |
| Schedule 2.03(d) | Excluded Contracts |
| Schedule 2.03 | Other Excluded Assets |
| Schedule 2.04 (e) | Other Assumed Liabilities |
| Schedule 2.06(c) | Assigned Contracts |
| Schedule 4.01(e) | Noncontravention |
| Schedule 4.01(f) | Governmental Approvals |
| Schedule 4.01(g) | Litigation |
| Schedule 4.01(h) | Brokers' and Other Fees |
| Schedule 4.01(i) | Taxes |
| Schedule 4.01(j)(i) | Seller Employees |
| Schedule 4.01(j)(ii) | Labor Matters |
| Schedule 4.01(k) | Benefit Plans |
| Schedule 4.01(l) | Environmental Matters |
| Schedule 4.01(m) | Compliance with Laws |

iii

| | |
|---|---|
| Schedule 4.01(n) | Material Contracts |
| Schedule 4.01(o) | Absence of Certain Changes |
| Schedule 4.01(p) | Real Property Matters |
| Schedule 4.01(q) | Insurance |
| Schedule 4.01(s) | Personal Property |
| Schedule 4.02(f) | Governmental Approvals |
| Schedule 4.02(h) | Buyer Brokers' Fees |
| Schedule 5.01 | Interim Operations |
| Schedule 6.02(e) | Key Supply Contracts |

iv

24175364

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered as of January 11, 2016, by and among (i) SHERWIN ALUMINA COMPANY, LLC, a Delaware limited liability company ("**Sherwin Alumina**"), and SHERWIN PIPELINE, INC., a Delaware corporation ("**Sherwin Pipeline**" and, together with Sherwin Alumina, "**Sellers**"), (ii) Corpus Christi Alumina LLC, a Delaware limited liability company (the "**Buyer**"), (iii) Commodity Funding LLC, a Delaware limited liability company, solely for the purposes of <u>Section 5.02(e)</u>, <u>Section 11.02</u> and <u>Article XII</u> ("**Guarantor**"), and (iv) Allied Alumina, LLC, a Delaware limited liability company, solely for the purposes of <u>Section 7.04</u> and <u>Article XII</u> ("**Allied**").  Sellers, Buyer, Guarantor and Allied are sometimes referred to herein, collectively, as the "**Parties**" and, individually, as a "**Party**."  Capitalized terms are defined in <u>Section 1.01</u>.

## RECITALS:

WHEREAS, Sellers are in the business of producing chemical grade alumina and smelter grade alumina (the "**Business**");

WHEREAS, Sellers plan to commence voluntary cases (together, the "**Bankruptcy Cases**") under chapter 11 of title 11 the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "**Bankruptcy Court**");

WHEREAS, Sellers expect to retain possession of their assets and expect to remain authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, in connection with the Bankruptcy Cases and subject to the respective terms and conditions contained herein and in the Sale Order, Sellers desire to sell and assign the Acquired Assets and the Assumed Liabilities to Buyer, and Buyer desires to purchase and assume the Acquired Assets and the Assumed Liabilities, pursuant to the Sale Order, which may be entered in connection with the confirmation of an Acceptable Chapter 11 Plan, free and clear of all liens, claims, and encumbrances other than Permitted Liens (collectively, the "**Sale Transaction**");

WHEREAS, Sellers have determined, in the exercise of their business judgment, that it is advisable and in the best interest of their estates and the beneficiaries of their estates to consummate the Sale Transaction provided for herein pursuant to the Bidding Procedures Order and the Sale Order, which may be entered in connection with the confirmation of an Acceptable Chapter 11 Plan;

WHEREAS, Buyer is the assignee of certain rights of the Senior Secured Lender under the Existing Senior Secured Credit Agreements, including the Existing Senior Secured Claims, and desires to credit bid all of the Existing Senior Secured Claims and to pay a specified amount in cash to the Sellers in connection with the Sale Transaction, subject to the approval of an Acceptable Chapter 11 Plan; and

WHEREAS, pursuant to the DIP Financing Order and the Bidding Procedures Order, Sellers shall seek authority for Buyer, on behalf of and as assignee of the Senior Secured Lender, to credit bid up to the entire aggregate amount of the Senior Secured Claims for the Acquired Assets (the "**Credit Bid**").

NOW, THEREFORE, in consideration of the premises and of the mutual promises, representations, warranties, covenants, conditions and agreements contained herein, the Parties hereto hereby agree as follows.

**ARTICLE I**
**DEFINITIONS**

Section 1.01   <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings set forth below.

"**Acceptable Chapter 11 Plan**" means either: (i) the proposed *Joint Plan of Sherwin Alumina Company, LLC and Sherwin Pipeline, Inc. Pursuant to Chapter 11 of the Bankruptcy Code*, to be filed in connection with the Bankruptcy Cases and which contemplates that Sellers and Buyer shall seek to consummate the Sale Transaction on the effective date of such chapter 11 plan, which chapter 11 plan shall in form and substance be acceptable to each of Sellers, Buyer and the Senior Secured Lender in their respective sole discretion; or (ii) any other plan pursuant to chapter 11 of the Bankruptcy Code that is consistent with this Agreement and otherwise acceptable in all respects to each of Sellers, Buyer and the Senior Secured Lender, in their respective sole discretion.

"**Accounts Receivable**" means any and all accounts receivable of Sellers, including all trade accounts, notes (including, without limitation, those certain promissory notes made by Nashtec in favor of Sherwin Alumina) and other receivables and indebtedness for borrowed money or overdue accounts receivable, in each case owing to any Seller, and all Claims relating thereto or arising therefrom.

"**Accrued Professional Compensation Claim**" has the meaning given that term in Section 3.03(a).

"**Acquired Assets**" has the meaning given that term in <u>Section 2.02</u>.

"**Acquired Leased Real Property**" means all of the Leased Real Property described in Schedule 1.01(a).

"**Acquired Personal Property**" has the meaning given that term in <u>Section 2.02(d)</u>.

"**Acquired Owned Real Property**" means all of the Owned Real Property described on Schedule 1.01(b).

"**Acquired Real Property**" means all of the Owned Real Property and the Leased Real Property and the Easements, other than the Excluded Properties.

2

"**Administrative Claim**" means a Claim (other than an Accrued Professional Compensation Claim) for costs and expenses of administration of the Estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses of preserving the Estates and operating the business of Sellers incurred after the Petition Date and through the effective date of the Acceptable Chapter 11 Plan, the Expense Reimbursement Amount, and fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the fees of the U.S. Trustee payable pursuant to section 1930(a) of the Judicial Code.  Notwithstanding anything to the contrary herein, amounts owing pursuant to the DIP Financing Order shall not constitute Administrative Claims.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code. For the purposes of construing this Agreement, no Seller shall be deemed an Affiliate of Buyer or the Senior Secured Lender, nor shall Buyer or the Senior Secured Lender be deemed an Affiliate of the Sellers.

"**Agreement**" has the meaning given that term in the preamble.

"**Allied**" has the meaning given that term in the preamble.

"**Allocation**" has the meaning given that term in Section 3.02.

"**Allowed**" has the meaning given that term in the Acceptable Chapter 11 Plan.

"**Alternative Transaction**" means (i) the filing of a chapter 11 plan of reorganization or liquidation (other than the Acceptable Chapter 11 Plan) contemplating the sale or retention of all or any material portion of the Acquired Assets, other than the Sale Transaction or (ii) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise to one or more third parties of all or any material portion of the Acquired Assets (whether in one or a series of transactions), other than in connection with the Sale Transaction, which sale, lease or other disposition is not acceptable to the Buyer.

"**Approved Budget**" shall have the meaning given that term in the DIP Financing Order.

"**Assigned Real Property Leases**" means all Leases (including all rights, benefits and privileges contained in such Leases and security deposits and pre-paid rents (rent paid more than one month in advance) held pursuant thereto) related to Acquired Leased Real Property.

"**Assigned Contracts**" means the Designated Contracts that are to be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code and the Sale Order and are set forth on, or deemed to be set forth on, Schedule 2.06(c) from time to time pursuant to Section 2.06(c), including Assigned Real Property Leases and the Pipeline Easement.

"**Assignment and Assumption Agreement**" has the meaning given that term in Section 7.02(h).

"**Assumed Benefit Plans**" has the meaning given that term in Section 2.02(f).

"**Assumed Liabilities**" has the meaning given that term in Section 2.04.

3

"**Auction**" has the meaning given that term in the Bidding Procedures Order.

"**Avoidance Actions**" means any claims or causes of action arising under chapter 5 of the Bankruptcy Code.

"**Back-up Bidder**" has the meaning given that term in Section 5.02(d).

"**Bankruptcy Cases**" has the meaning given that term in the recitals.

"**Bankruptcy Code**" has the meaning given that term in the recitals.

"**Bankruptcy Court**" has the meaning given that term in the recitals.

"**Benefit Plan**" means each employee benefit plan (as defined in Section 3(3) of ERISA), whether or not subject to ERISA, and each bonus, incentive, reimbursement, cafeteria, fringe benefit, stock option, stock purchase, profit sharing, incentive, cash or equity-based compensation, deferred compensation, retirement, employment, employee assistance, severance, redundancy, retention, termination, post-employment, change in control, pension, savings, profit sharing, money purchase, salary continuation, paid time off, vacation, sick, holiday, medical or family leave, life insurance or other employee benefit plan, program, policy, contract or agreement, in each case (i) sponsored, maintained, entered into, contributed to, or required to be contributed to or by Sellers or with respect to which Sellers have any liability or obligation (whether actual or contingent).

"**Bidding Procedures Order**" means a Final Order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit A, or otherwise an order of the Bankruptcy Court, in form and substance mutually acceptable to each of Sellers and Buyer in their reasonable discretion, approving *inter alia*, procedures for the sale of all or substantially all of the Sellers' assets pursuant to Section 363 of the Bankruptcy Code or, as applicable, the Acceptable Chapter 11 Plan.

"**Business**" has the meaning given that term in the recitals.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York or Houston, Texas are authorized or obligated by Law to close.

"**Buyer**" has the meaning given that term in the preamble.

"**Buyer Liability Amount**" has the meaning given that term in Section 2.04.

"**Buyer Material Adverse Effect**" means any change, effect, state of facts, occurrence, event or circumstance that prevents or materially impedes or delays the consummation by Buyer of the Sale Transaction.

"**Buyer Representatives**" means Buyer and its members, partners or shareholders, as the case may be, and its Affiliates, and its and their respective successors and assigns, and the officers, board of directors and/or managers, employees, agents, advisors and representatives of all of the foregoing Persons.

4

"**Claim**" means any "claim" as defined in Section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning given that term in <u>Section 7.01</u>.

"**Closing Cash Payment**" has the meaning given that term in <u>Section 3.01</u>.

"**Closing Date**" has the meaning given that term in <u>Section 7.01</u>.

"**COBRA**" means the means the group health continuation coverage requirements of Section 4980B of the Code and Section 601 et seq. of ERISA, and any similar state, local and foreign laws.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any agreement between Sellers and any labor organization that is subject to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, including the Expired Collective Bargaining Agreement.

"**Confirmation Order**" means a Final Order of the Bankruptcy Court, in form and substance acceptable to each of Sellers, Buyer and the Senior Secured Lender in their respective sole discretion, approving the Acceptable Chapter 11 Plan.

"**Contracts**" means all written or oral contracts, easement agreements constituting the Pipeline Easement, Leases, subleases, licenses, indentures, agreements, instruments, commitments, engagements and other similar legally binding arrangements.

"**Credit Bid**" has the meaning given that term in the recitals.

"**Cure Amount**" means, with respect to any Assigned Contract, the amounts required to be paid, if any, in connection with the assumption and assignment of such Assigned Contract pursuant to Section 365 or Section 1123(b)(2) of the Bankruptcy Code, which amount shall  paid by Buyer.

"**Cure Estimate**" has the meaning given that term in <u>Section 2.06</u>.

"**Designated Contracts**" means all Contracts and Leases or other executory contracts or unexpired leases of Sellers that may be assumed and assigned under Section 365 or Section 1123(b)(2) of the Bankruptcy Code, as applicable.

"**DIP Claims**" means (i) the aggregate principal amount of obligations outstanding under the DIP Credit Agreement and DIP Financing Order, together with accrued interest and any other Claim with respect to the DIP Credit Agreement and DIP Financing Order, and (ii) any Liens securing the foregoing.

"**DIP Credit Agreement**" means that certain Secured Super-Priority Debtor-in-Possession Credit Agreement dated as of the date hereof by and between Sellers, as borrowers, and the Senior Secured Lender, as lender, together with all collateral or security documents

5

executed in connection therewith by Sellers, as amended, supplemented and modified from time to time.

"**DIP Financing Order**" means the interim order or Final Order, as applicable, of the Bankruptcy Court, in form and substance acceptable to each of Sellers and the Senior Secured Lender in their respective sole discretion, to be entered by the Bankruptcy Court approving, among other things, the DIP Credit Agreement and unconditionally allowing and authorizing the exercise of the Credit Bid.

"**Easements**" means all easements (whether same are exclusive or non-exclusive, appurtenant or not), agreements, rights of way, servitudes, profits, and non-possessory interests that benefit or are used in connection with the Acquired Real Property, including pipeline easements, reciprocal easements, parking and contractor area licenses and easements, easements that are used in the operation of Seller's business, any and all agreements related to, providing access to or allowing the use of, the port facilities, docks, and marine improvements serving the Acquired Real Property (including easements, franchise agreements, and conditional conveyances), including those recorded in the public records of the county in which the Acquired Real Property is located and those that are unrecorded, implied, by necessity or acquired through adverse possession

"**Emissions Allowances**" means an authorization, whether perfected or un-perfected, filed or un-filed, under Environmental Law by a Governmental Authority for any air emissions source at any Acquired Real Property to emit a specified amount of any air pollutant under an emissions budget or similar formal trading program. This specifically includes SO2 and NOX allowances under the applicable federal programs, as well as allowances for these or other emissions, including volatile organic compounds, carbon or carbon equivalents, issued or authorized under any applicable federal, state, local, or regional Environmental Laws.

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such principles are considered in a proceeding at law or in equity.

"**Environmental Laws**" means any and all Laws and Permits including any conditions thereto, guidance of any Governmental Authority or voluntary remediation program  relating to Hazardous Materials or the protection of human health (with respect to exposure to Hazardous Materials) and the environment, including the Clean Air Act, the Clean Water Act, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Occupational Safety and Health Act of 1970, the Resource Conservation and Recovery Act of 1976, the Safe Drinking Water Act, the Toxic Substances Control Act and the Oil Pollution Act of 1990.

"**Environmental Financial Assurance**" means those trusts, letters of credit or other mechanisms established by the Sellers for the Business pursuant to certain Environmental Laws applicable to the Business, requiring that an owner or operator of a hazardous waste management facility shall provide assurance that funds will be available when needed for corrective action required by the Environmental Laws, including in connection with the closure and/or post-

closure care of a facility, to compensate for bodily injury and property damage to third parties caused by accidental occurrences arising from operations of the facility or group of facilities and/or third-party compensation for bodily injury and property damage caused by accidental releases arising from the operation of the underground storage tanks.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and the rules and regulations promulgated thereunder.

"**Estate**" means, as to each Seller, the estate created for each Seller on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

"**Excluded Assets**" has the meaning given that term in Section 2.03.

"**Excluded Benefit Plans**" has the meaning given that term in Section 2.03(e).

"**Excluded Contracts**" has the meaning given that term in Section 2.03(d).

"**Excluded Properties**" means any Real Property designated as an "Excluded Property" in Schedule 4.01(p), and the interests of any Seller with respect thereto.

"**Excluded Releases**" means any Release occurring on or originating from the Excluded Properties or any Rejected Asset.

"**Existing Senior Secured Claims**" means (i) the aggregate principal amount of obligations outstanding under the Existing Senior Secured Credit Agreement, together with accrued interest and any other Claims with respect to the Existing Senior Secured Credit Agreement, and (ii) any Liens securing the foregoing.

"**Existing Senior Secured Credit Agreement**" means that certain Eighth Amended and Restated Credit Agreement, dated as of July 29, 2015, between Sherwin Alumina, as borrower, and the Senior Secured Lender, as lender, together with all collateral or security documents executed in connection therewith by Sellers, as amended, supplemented and modified from time to time.

"**Expense Reimbursement Amount**" means an aggregate amount equal to the reasonable and documented out-of-pocket costs, fees and expenses of Buyer and its Affiliates (including legal, accounting, and other consulting fees and expenses, other than any success or similar fees payable to any financial advisors, consultants or other Persons) incurred in connection with the Sale Transaction, the Bankruptcy Cases, this Agreement and the transactions contemplated hereby, including the diligence, drafting, negotiation and execution of this Agreement; provided that the Expense Reimbursement Amount shall not include any such costs, fees and expenses that are in fact reimbursed under the DIP Financing Order, any Assumed Liabilities or any damages payable by or on behalf of Buyer hereunder.

"**Expired Collective Bargaining Agreement**" means the Collective Bargaining Agreement between Sherwin Alumina LLC and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, its Local Union No. 235A, covering terms and conditions of employment for certain hourly

employees at Gregory, Texas manufacturing facility, which expired in accordance with its terms on October 11, 2014.

"**Facilities**" has the meaning given that term in <u>Section 2.02(b)</u>.

"**Files**" has the meaning given that term in <u>Section 2.02(j)</u>.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; <u>provided</u> that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Bankruptcy Local Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

"**Governmental Authority**" means any federal, state, county or municipal government or any court of competent jurisdiction, regulatory or administrative agency, quasi-governmental body, board, bureau, department, commission or other governmental authority.

"**Ground Lease**" means that certain Facilities Ground Lease Agreement and Right of First Refusal, dated as of December 31, 2000, filed January 2, 2001 and recorded under Clerk's File No. 490821, Official Public Record of Real Property, San Patricio County, Texas, between Reynolds Metals Company, as lessor, and BPU Reynolds, Inc., as lessee, as assigned by that certain Assignment and Assumption Agreement made as of August 1, 2001 by BPU Reynolds, Inc., as assignor, to Sherwin Alumina, L.P., as assignee, recorded under Clerk's File No. 502135, Official Public Record of Real Property, San Patricio County, Texas.

"**Guarantor**" has the meaning given that term in the preamble.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including red mud, petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes regulated pursuant to any Environmental Law.

"**Intellectual Property**" means: (a) all patents, patent applications and invention disclosures worldwide, together with all reissues, continuations, continuations-in-part, divisionals, supplementary protection certificates, extensions and re-examinations thereof; (b) all registered and unregistered trademarks, service marks, trade names, logos, trade dress and slogans, worldwide, and registrations and applications for registration thereof and any and all goodwill associated therewith; (c) all copyrights in copyrightable works, and all other rights of authorship recognized by statute or otherwise, and all applications, registrations and renewals in connection therewith; (d) all mask works and semiconductor chip rights, and all applications, registrations and renewals in connection therewith; (e) all trade secrets and confidential information, including ideas, research and development, know-how, and marketing plans and proposals, confidential inventions, technical information, processes, drawings, technology,

research studies, computer programs, marketing studies, and customer lists; (f) domain names and uniform resource locators, and all contractual rights to the foregoing; (g) all seismic and geotechnical data and rights, to the extent the same is assignable without payments of fees or penalties or other liability; and (h) all other intellectual property rights relating to any or all of the foregoing.

"**Interim Period**" means that period commencing on the date of the execution of this Agreement and terminating upon the earlier of the Closing Date or the date of termination of this Agreement.

"**Inventory**" of any Person means all finished goods, all work-in-process, intermediaries, raw materials, spare parts, packaging materials and all other materials and supplies used or held for use by such Person in the production of finished goods.

"**IRS**" means the Internal Revenue Service.

"**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

"**Law**" means any applicable principle of common law, statute, law, rule, regulation, ordinance, order, code, notice to lessee, ruling, writ, injunction, decree or other official act of or by any Governmental Authority.

"**Leased Real Property**" means any Real Property leased or subleased by any Seller, as tenant or subtenant, including the Real Property described in Schedule 1.01(a), and all Easements benefitting or used in connection with such Real Property, and all of the appurtenances, benefits, privileges, hereditaments, easements, rights of way, servitudes, all appurtenant water rights, leases of submerged land, any and all agreements related to, providing access to or allowing the use of,  the port facilities, docks, and marine improvements serving the Acquired Real Property (including easements, franchise agreements, and conditional conveyances) and all other rights and interests thereon or in any way appertaining thereto, buildings, construction in progress and other improvements, equipment, fixtures, and other property located on or benefitting or used in connection with such Real Property.

"**Lease**" means (a) any lease, sublease, license, concession or other Contract relating to the occupancy of any Real Property, including the Ground Lease, (b) any long-term Contract to lease Real Property in which most of the rights and benefits comprising ownership of the Real Property are transferred to the tenant for the term thereof, (c) any Contract, license, or right to use pertaining to the possession or use of any Tangible Personal Property, (d) in the case of the foregoing clauses (a) – (c) above, together with all amendments, extensions, renewals, modifications, alterations, guaranties  and other changes thereto, and (e) including the right to all security deposits and other amounts and instruments deposited thereunder.

"**Liabilities**" means any and all claims, causes of action, payments, charges, judgments, assessments, liabilities, losses, damages, penalties, fines, costs and expenses, debts and obligations (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), including any attorneys' fees, legal or other expenses incurred in connection therewith and including liabilities, costs, losses and damages for personal injury or death or property damage.

"**License**" means any written or unwritten license agreement or other similar right of use to which any Seller is a party affecting all or any portion of any Real Property.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment, affidavit of mechanic's or materialman's lien, deposit arrangement, lien (statutory or otherwise), security interest, charge, encumbrance, Lease, sublease, financing statement, License, occupancy agreement, adverse claim or interest, Easement, covenant, condition, pledge, claim, conditional sales contract, installment land contract, security interest, burden, title defect, title retention agreement, voting trust agreement, proxy, interest, equity, option, preemptive right, right of first offer or refusal, assignment of the right to receive income, any type of preferential arrangement, or any right-of-way, encroachment or other restrictions or limitations of any nature whatsoever.

"**Material Adverse Effect**" means any change, effect, event, occurrence, state of facts or development (i) that, individually or in the aggregate, may be materially adverse to the business, operations, assets, condition (financial or otherwise), results of operations or prospects of any Seller or the Business or (ii) that prevents or materially impedes the consummation by any Seller of the Sale Transaction; <u>provided</u> that for the purposes of clause (i) above only, none of the following, either alone or taken together with other changes, effects, events, occurrences, states of facts or developments, shall constitute or be taken into account in determining whether there has been a Material Adverse Effect: (A) changes in or effects arising from or relating to general business or economic conditions affecting the industry in which the Sellers and the Business operate that are outside the control of Sellers, (B) changes in or effects arising from or relating to national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (C) changes in or effects arising from or relating to financial, banking, or securities markets, (D) changes in, or effects arising from or relating to changes in, Law, rules, regulations, orders, or other binding directives issued by any Governmental Authority, except, in the cases of clauses (A) through (D), to the extent that the same has had an effect on Sellers that is materially and disproportionately adverse relative to other similar participants in the industry in which Sellers and the Business operate, (E) changes or effects arising  from or relating to the taking of any action required to be taken by Sellers, or taken by Buyer, pursuant to this Agreement or the announcement of this Agreement or the transactions contemplated hereby, (F) changes or effects resulting from (1) the filing or existence of the Bankruptcy Cases, (2) the filing of any objection to the Sale Transaction (or the transactions contemplated thereby) or the Acceptable Chapter 11 Plan or any disclosure statement related thereto or the DIP Credit Agreement and financing contemplated thereby, (3) the filing of any routine automatic stay requests or objections to first day pleadings in the Bankruptcy Cases or (4) the filing of any objections to the rejection, assumption, or assumption and assignment of any Contract, Easement, or Lease in connection with the Sale Transaction, (G) changes or effects arising from or relating to (1) the continuation or commencement of any Claim (whether commenced by Sellers or any other Person) relating in any way related to the Expired Collective Bargaining Agreement or (2) the lockout that commenced on or about October 10, 2014 or any bargaining, discussions or negotiations and the conduct of the Parties in connection therewith related to any Collective Bargaining Agreement (H) changes or effects arising from or relating to any actions taken or omitted to be taken by or

10

on behalf of Buyer, the Senior Secured Lender or any of their respective Affiliates with respect to any Seller or the Business, or (I) changes directly resulting from Sellers' failure to take any action prohibited by this Agreement; provided, however, that nothing set forth in the immediately preceding proviso will limit or qualify the conditions to Closing set forth in Article VI (other than Section 6.02(a), Section 6.02(b) and Section 6.02(f)) or Seller's termination rights in Article IX (other than termination rights related to Section 6.02(a), Section 6.02(b) and Section 6.02(f) and the termination right in Section 9.01(n)).

"**Material Contract**" means any of the following (including any Contract executed in connection with any Senior Secured Credit Agreement to which any Seller is a party):

(a)     any Contract that (i) would reasonably be expected to result in aggregate payments by any Seller with respect to the Acquired Assets of more than $100,000 during the current fiscal year and (ii) cannot be terminated without penalty on 30 days or less notice;

(b)     any Contract that would reasonably be expected to result in aggregate revenues to any Seller with respect to the Acquired Assets of more than $50,000 during the current fiscal year;

(c)     any material purchase and sale, supply, transportation, processing, tolling, refining or similar Contract (in each case) relating to the Acquired Assets to which any Seller is a party;

(d)     any indenture, mortgage, loan, note, credit, sale-leaseback or similar Contract (in each case) to which any of the Acquired Assets are subject and all related security agreements or similar agreements associated therewith;

(e)     any material Contract relating to the Pipeline Easement, any water right, dock usage and pipeline usage, Lease, License and/or any other Contract materially affecting the ownership of, leasing of, title to or use of any Real Property or material personal property, in each case other than any other Easements;

(f)     any Collective Bargaining Agreement to which a Seller is or becomes a party after the date of this Agreement, any consulting Contract or employment Contract;

(g)     any Contract containing most favored nation clauses or similar provisions;

(h)     any Contract for capital expenditures or the acquisition of fixed assets pursuant to which any Seller has any unpaid payment obligation;

(i)     any Contract that restricts the right of any Seller to engage in any type of business, compete with any Person, solicit any customers, suppliers, employees or contractors of any other Person, or sell or purchase any product, in each case, in a manner that is material to the Business;

(j)     any Contract granting any Person a Lien on all or any part of the Acquired Assets, other than the Senior Secured Claims;

11

(k)    any Contract relating to the acquisition or disposition, directly or indirectly, of any business, Real Property or other material assets or properties, or the equity interests or other securities of any other Person;

(l)    any written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by any Seller;

(m)    any other Contract that is material to the Business and not entered into in the ordinary course of business of any Seller but is not otherwise disclosed in subsections (a) through (l) above; and

(n)    any amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

"**Nashtec**" means Nashtec LLC, a Delaware limited liability company.

"**Nashtec Supply Agreement**" means that certain Raw Material Supply and Waste Management Agreement dated March 31, 2005 between Nashtec, as successor in interest to Nashtec L.P., and Sherwin, as successor in interest to Sherwin Alumina, L.P

"**Necessary Consent**" has the meaning given that term in Section 2.06(h).

"**Non-Income Taxes**" means Property Taxes and/or any Transfer Taxes, and shall exclude Taxes based upon, measured by, or calculated with respect to (i) net income, profits or similar measures or (ii) multiple bases (including corporate franchise, business and occupation, business license or similar Taxes) if one or more of the bases on which such Tax is based, measured or calculated is described in clause (i), in each case together with any interest, penalties, or additions to such Tax.

"**Organizational Documents**" means the articles of incorporation, certificate of incorporation, certificate of formation, bylaws, operating agreement, certificate of limited partnership, partnership agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation or organization of a Person, including any amendments, supplements or modifications thereto.

"**Other Parties**" has the meaning given that term in Section 4.01(n).

"**Other Priority Claim**" means any Claim against any Seller entitled to priority in right of payment under section 507 of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

"**Other Secured Claim**" means any Secured Claim against any of the Sellers that is not a DIP Claim or an Existing Senior Secured Claim.

"**Owned Real Property**" means any Real Property in which any Seller has a fee title (or an equivalent) interest, benefits, privileges, hereditaments, including the Real Property described on Schedule 1.01(b), and all Easements benefitting or used in connection with such Real Property, and all of the appurtenant easements, rights of way, servitudes, all appurtenant water

12

rights, interests in submerged land, any and all agreements related to, providing access to or allowing the use of, the port facilities, docks, and marine improvements serving the Acquired Real Property (including easements, franchise agreements, and conditional conveyances) and all other rights, and interests thereon or in any way appurtenant thereto, buildings, construction in progress and other improvements, equipment, fixtures and other property located on or benefitting or used in connection with such Real Property.

"**Outside Date**" means the date that is 120 days after the Petition Date.

"**Parties**" has the meaning given that term in the preamble.

"**Permit**" means any permit, license, franchise, certificate, approval or authorization from any Governmental Authority.

"**Permitted Liens**" means (a) any Liens listed on Schedule 1.01(c), (b) Liens of lessors, lessees, sublessors, sublessees, licensors or licensees arising in the ordinary course of business under lease, sublease or  license agreements, in each case, to the extent arising in connection with Assumed Liabilities and provided that Sellers are not in default under the applicable lease, sublease or license agreement, (c) Liens that constitute Assumed Liabilities, (d) Liens that will be released pursuant to the Sale Order or Confirmation Order, as applicable, (e) real estate taxes, assessments and other governmental levies, fees or charges imposed with respect to the Acquired Real Property which are not due and payable as of the Closing Date or which are being contested by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP, (f) mechanics liens and similar liens for labor, materials or supplies provided with respect to the Acquired Real Property incurred in the ordinary course of business for amounts which are not delinquent and for which adequate reserves have been established in accordance with GAAP, (g) real property Laws to the extent same have not been violated by the existing improvements located on the Acquired Real Property and will not be violated by the continued use of the Acquired Real Property in the same manner as used by Sellers in the operation of its business, and (h) recorded easements, covenants, conditions, restrictions and other similar recorded matters affecting title to the Acquired Real Property to the extent same have not been violated by the existing improvements located on the Acquired Real Property and will not be violated by the continued use of the Acquired Real Property in the same manner as used by Sellers in the operation of its business and other minor title defects which do not impair the use, occupancy or value of the Acquired Real Property.

"**Person**" shall mean an individual, corporation, partnership, association, trust, limited liability company or any other entity or organization, including government or political subdivisions or an agency, unit or instrumentality thereof.

"**Petition Date**" means January 11, 2016.

"**Pipeline Easement**" has the meaning given that term in Schedule 2.02(g).

"**Plan Administrator**" means the Person selected by the Sellers and the Buyer to make or facilitate distributions that are to be made on and after the effective date of the Acceptable Chapter 11 Plan and effectuate the Wind Down.

"**Prevailing Bidder**" has the meaning given that term in <u>Section 5.02(d)</u>.

"**Professional Fee Escrow Account**" has the meaning given that term in <u>Section 3.03(a)</u>.

"**Priority Tax Claim**" means any Claim of a Governmental Authority of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**Property Taxes**" means ad valorem, property, excise and similar Taxes and/or any Taxes resulting from the assessment of the Acquired Assets by any Governmental Authority.

"**Purchase Price**" has the meaning given that term in <u>Section 3.01</u>.

"**Real Property**" means all parcels and tracts of land or submerged land owned or leased by Sellers and such other land used  by Sellers in the conduct of or in connection with Sellers' business, together with all buildings, structures, facilities, fixtures and improvements currently or hereinafter located thereon located thereon (including those under construction), all fixtures, systems, equipment and items of personal property attached or appurtenant thereto or located thereon or used in connection with the land, rights of way, servitudes, egress and ingress related thereto, and all privileges, all appurtenant mineral and water rights, all interests in submerged lands, any and all agreements related to, providing access to or allowing the use of, the port facilities, docks, and marine improvements serving such lands, options, rights, road crossing agreements or similar agreements with railroad related entities or third parties, Easements, hereditaments, benefits, privileges and appurtenances belonging to or for the benefit of such land, including all easements appurtenant to and for the benefit of such land, known or unknown, all utility capacity reservations or letters, encroachments or protrusions onto adjoining real property, all rights existing in and to any strips, gores, streets, alleys, passages and other rights-of-way included thereon or adjacent thereto (before or after vacation or abandonment thereof) and vaults beneath any such street, all air rights relating to the land and all reversionary interests in and to the land.

"**Rejected Assets**" means any of the Acquired Assets rejected by Buyer through written notice to Sellers pursuant to <u>Section 2.02</u> of this Agreement.

"**Release**" has the meaning set forth in the Environmental Laws, including the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, at 42 U.S.C. § 9601(22).

"**Retained Cash**" means cash held by or on behalf of Sellers as of immediately prior to the Closing in an aggregate amount equal to the sum of the following to the extent that they do not constitute Assumed Liabilities and without duplication:  (a) Allowed Other Secured Claims; (b) Allowed Administrative Claims; (c) the Professional Fee Escrow Amount; (d) Allowed Priority Tax Claims; (e) Allowed Other Priority Claims; and (f) the Wind Down Reserve.

"**Sale Hearing**" means the hearing to approve this Agreement and seek entry of the Sale Order.

14

"**Sale Motion**" means the motion of Sellers filed with the Bankruptcy Court seeking entry of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A, and Sale Order.

"**Sale Order**" means a Final Order of the Bankruptcy Court, in the form and substance acceptable to each of Sellers, the Buyer and the Senior Secured Lender in their respective sole discretion, which order may be the Confirmation Order, which order shall, solely with respect to the Sale Transaction, (i) approve: (A) the execution, delivery and performance by Sellers of this Agreement, including each and every term and condition hereof, (B) the sale of the Acquired Assets to Buyer, free and clear of all Liens, Claims and encumbrances (subject only to the Permitted Liens), including all liens, claims, liabilities, obligations and encumbrances under any Collective Bargaining Agreement, and without the further consent or approval of, or filing or notification with, any third party and (C) the performance by Sellers of their respective obligations under this Agreement; (ii) approve and authorize the assumption and assignment of each of the Assigned Contracts by and to Buyer such that, following the assumption and assignment of each such Assigned Contracts by and to Buyer, each such Assigned Contract will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing, (iii) find that (A) Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to the protections of Section 363(m) of the Bankruptcy Code and under other applicable bankruptcy and non-bankruptcy Law, (B) the consideration provided to the Sellers constitutes reasonably equivalent value and fair consideration for the Acquired Assets, (C) Sellers gave due and proper notice of this Agreement and its approval to each party entitled thereto, (D) that this Agreement was negotiated, proposed and entered into by Sellers and Buyer without collusion, in good faith and from arms'-length positions, and (E) that Buyer (a) is not a successor to, or subject to successor liability for, Sellers; (b) has not, de facto or otherwise, merged with or into Sellers; (c) is not an alter ego, joint employer or a continuation of Sellers; and (d) does not and will not have any responsibility for any obligations of Sellers based on any theory of successor or similar theories of liability; and (iv) contain such other terms and provisions as are acceptable to Sellers and Buyer.

"**Sale Transaction**" has meaning given that term in the recitals.

"**Section 363 Retained Cash**" means cash held by or on behalf of Sellers as of immediately prior to the Closing in an aggregate amount equal to the sum of the following to the extent that they do not constitute Assumed Liabilities and without duplication: (a) Allowed Administrative Claims; and (b) the Professional Fee Escrow Amount; provided that if the cash held by or on behalf of Sellers as of immediately prior to the Closing is less than the sum of clause (a) and clause (b), Sellers may draw an amount in Cash in the amount of any such deficiency, in each case solely in accordance with the terms of the DIP Credit Agreement and the DIP Financing Order.

"**Secured Claim**" means a Claim secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order or the Acceptable Chapter 11 Plan, or that is subject to setoff pursuant to Section 553 of the Bankruptcy Code, to the extent of the value of the creditor's

interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) of the Bankruptcy Code.

"**Seller Employees**" has the meaning given that term in Section 4.01(j).

"**Seller Representatives**" means Sellers and their respective members, partners or shareholders, as the case may be, and its Affiliates and its and their respective successors and assigns, and the officers, board of directors and/or managers, employees, agents, advisors and representatives of all of the foregoing Persons.

"**Sellers**" has the meaning given that term in the preamble.

"**Sellers' Knowledge**" means the actual knowledge as of the date hereof of those officers of Sellers that are identified on Schedule 1.01(d).

"**Senior Secured Lender**" means Commodity Funding LLC, a Delaware limited liability company, in its capacity as lender under each of the Existing Senior Secured Credit Agreement and the DIP Credit Agreement.

"**Senior Secured Claims**" means the Existing Senior Secured Claims and the DIP Claims.

"**Senior Secured Credit Agreements**" means the Existing Senior Secured Credit Agreement and the DIP Credit Agreement, each as amended, supplemented and modified from time to time.

"**Sherwin Alumina**" has the meaning given that term in the preamble.

"**Sherwin Pipeline**" has the meaning given that term in the preamble.

"**Straddle Period**" means any Tax period that includes, but does not end on, the Closing Date.

"**Tangible Personal Property**" means machinery, equipment (including all office equipment), office supplies, automobiles, trucks, tractors, trailers and other vehicles, fixtures, spare parts, production supplies, trade fixtures, computers (and related equipment) and related hardware, tools, furniture, office supplies, telephone equipment, materials, production supplies, spare parts, other miscellaneous supplies and other tangible property of any kind wherever located, together with any express or implied warranty by the manufacturers, sellers or lessors of any item or component part thereof and all maintenance records and other documents relating thereto.

"**Tax Proceeding**" has the meaning given that term in Section 10.01(b).

"**Tax Returns**" means any report, return, information statement, schedule, attachment, payee statement or other information required to be provided to any Taxing Authority with respect to Taxes or any amendment thereof, including any return of an affiliated, combined or unitary group, and any and all work papers relating to any Tax Return.

"**Taxes**" means (a) any taxes, assessments and other governmental charges imposed by any Taxing Authority, including net income, gross income, profits, gross receipts, license, employment, stamp, occupation, premium, alternative or add-on minimum, ad valorem, real property, personal property, transfer, real property transfer, value added, sales, use, environmental (including taxes under Section 59A of the Code), customs, duties, capital stock, franchise, excise, withholding, social security (or similar), unemployment, disability, payroll, fuel, excess profits, windfall profit, severance, estimated or other tax, including any interest, penalty or addition thereto, whether disputed or not, and any expenses incurred in connection with the determination, settlement or litigation of the Tax liability, (b) any obligations under any agreements or arrangements with respect to Taxes described in clause (a) above, and (c) any transferee liability in respect of Taxes described in clauses (a) and (b) above or payable by reason of assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

"**Taxing Authority**" means, with respect to any Tax, a Governmental Authority that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such entity, including any Governmental Authority that imposes, or is charged with collecting, Social Security or similar charges or premiums.

"**Termination Date**" has the meaning given that term in Section 9.01.

"**Third Party**" means any Person other than a Party to this Agreement or an Affiliate of a Party to this Agreement.

"**Transfer Taxes**" has the meaning given that term in Section 10.01(c).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. §§ 2101, et seq., or any similar state Laws.

"**Wind Down**" means the wind down, dissolution, and liquidation of the Sellers' Estates after the effective date of the Acceptable Chapter 11 Plan.

"**Wind Down Reserve**" means cash in an amount determined by the Sellers and the Buyer for the Plan Administrator to effectuate the Wind Down after the earlier of the Closing and the effective date of the Acceptable Chapter 11 Plan, which amount shall not exceed $100,000.

Section 1.02   Interpretation.  As used in this Agreement, unless the context otherwise requires, the term "includes" and its syntactical variants means "includes but is not limited to." The headings and captions contained in this Agreement have been inserted for convenience only and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions hereof.  Preparation of this Agreement has been a joint effort of the Parties and the resulting document shall not be construed more severely against one of the Parties than against the other.  All references herein to "Sections", "Articles", "Exhibits" and "Schedules" in this Agreement shall refer to the corresponding section, article, exhibit or schedule of this Agreement unless specific reference is made to such sections, articles, exhibits or schedule of another document or instrument.  The term "or" is not exclusive.  The word "extent" in the phrase "to the

17

extent" shall mean the degree to which a subject extends, and such phrase shall not mean simply "if". The words "hereof," "herein" and "hereunder" and words of similar import when used in any agreement or instrument shall refer to such agreement or instrument as a whole and not to any particular provision of such agreement or instrument. "$" means United States dollars.

## ARTICLE II
## ASSETS

Section 2.01    <u>Agreement to Sell and Purchase</u>.  Pursuant to Section 363 and 365 of the Bankruptcy Code and, as applicable, Section 1123 of the Bankruptcy Code, for the consideration hereinafter set forth and subject to the terms and conditions of this Agreement and the Sale Order, Buyer, directly and as assignee of the Senior Secured Lender, agrees to purchase from Sellers and Sellers agree to sell, transfer and assign to Buyer, all of Sellers' right, title and interests in, to and under the Acquired Assets as of the Closing free and clear of all Claims and Liens other than Permitted Liens (to the extent not otherwise discharged pursuant to the Sale Order).

Section 2.02    <u>Acquired Assets</u>.  Subject to <u>Section 2.03</u>, the term "**Acquired Assets**" shall mean all of Sellers' right, title and interests in, to and under all assets, properties, equipment, storage facilities, improvements, fixtures, rights and interests, of any kind and description (whether real, personal or mixed, tangible or intangible, or fixed, contingent or otherwise), owned, licensed or leased by any Seller, including those assets relating to, used in, or held for use, or necessary for the Business, wherever located and by whomever possessed, including the following (but, for the avoidance of doubt, excluding the Excluded Assets):

(a)    all of the Acquired Real Property and all of the Leases;

(b)    all improvements (including leaseholder improvements), docks, terminals, storage facilities, production facilities, structures, fabrication and maintenance shops, production equipment, pipelines, machinery and all other personal property, improvements, fixtures and facilities to the extent appurtenant to or related to the Acquired Real Property or the Business (collectively, the "**Facilities**") or otherwise owned by any Seller and all related facilities and appurtenances located at or on the Acquired Real Property;

(c)    all Inventory of the Sellers;

(d)    all Tangible Personal Property of any Seller, including all of the assets physically present at the Acquired Real Property and otherwise set forth on <u>Schedule 2.02(d)</u> (collectively, the "**Acquired Personal Property**");

(e)    all Assigned Contracts;

(f)    all assets related to the Benefits Plans set forth on <u>Schedule 2.02(f)</u> (such benefit plans, collectively, the "**Assumed Benefit Plans**");

(g)    all Permits, water rights, mineral rights, servitudes, rights-of-use, Easements, including the Pipeline Easement, and rights-of-way and other similar rights

24175364

under applicable Law (to the extent transferable) relating to the Acquired Real Property or the Facilities, including those described in Schedule 2.02(g);

(h)      all Accounts Receivable produced from or attributable to the Acquired Real Property or the Business during or attributable to any periods of time prior to, on or after the Closing Date, and all proceeds attributable thereto;

(i)      all Environmental Financial Assurance associated with the Acquired Property;

(j)      all records, files, maps, data, schedules, reports and logs relating to the Acquired Real Property, the Facilities or any other Acquired Assets, including (i) all accounting, land and engineering files, (ii) all title reports and similar documents and materials relating to the Owned Real Property, the Leases and the Easements, (iii) all title records (including title policies, abstracts of title, title opinions and memoranda, and title curative documents), (iv) corporate, financial, Tax and legal records and (v) all correspondence that relates to the foregoing (collectively, the "**Files**"), in each case, subject to Sellers' right to retain copies to the extent permitted by Section 8.01;

(k)      all outstanding proceeds from the settlements of Contract disputes, from or attributable to the Acquired Real Property or the Leases;

(l)      all credits, prepayments, payments, advances, refunds and similar amounts (except with respect to Taxes) to the extent related to the Acquired Assets;

(m)      all credits, prepayments, payments, advances, referrals and similar amounts attributable to Non-Income Taxes to the extent related to the Acquired Assets and attributable to Tax periods (or portions thereof) beginning on or after the Closing Date;

(n)      all Intellectual Property (other than Intellectual Property that relates exclusively to any, or is an, Excluded Asset), including the Intellectual Property set forth on Schedule 2.02(n);

(o)      all Emissions Allowances (if any);

(p)      all Claims of any Seller (including insurance benefits to the extent such benefits relate to an Acquired Asset or an Assumed Liability), Avoidance Actions, counterclaims and rights to setoff, whether asserted or unasserted, contingent or fixed, known or unknown, including any warranty or damage Claims, but in each case excluding those to the extent attributable to any Excluded Assets;

(q)      all email addresses/accounts and all telephone numbers;

(r)      all rights to (i) contest any outstanding and future decisions or orders of any Governmental Authority relating to the Acquired Assets, including with respect to supplemental bonding for docks, pipelines, rights-of-way and rights-of-use and Easements, (ii) manage all aspects of any pending, and assert and manage all aspects of

19

any future, appeals of such decisions and orders, and (iii) participate in any other similar proceeding relating to the Acquired Assets and involving any Seller that is not assigned to Buyer pursuant to clauses (i) and (ii) hereof;

(s)     all cash and cash equivalents of Sellers, other than Retained Cash; provided that in the event that the Sale Transaction is consummated other than pursuant to an Acceptable Chapter 11 Plan, then the Acquired Assets shall include all cash or cash equivalents of Sellers other than Section 363 Retained Cash.

(t)     all goodwill as a going concern and all other intangible property of the Business; and

(u)     all other assets, properties, rights and interests relating to the Business and owned by any Seller, or in which any Seller has an interest, which are not referred to in Section 2.02(a) through Section 2.02(t) but which are not otherwise Excluded Assets.

Notwithstanding anything herein or in Schedule 1.01(a), Schedule 1.01(b), Schedule 2.02(d), Schedule 2.02(f), Schedule 2.02(g), Schedule 2.02(n) or Schedule 2.06(c) to the contrary, Buyer shall have the right in its sole discretion to reject any of the Acquired Assets by providing written notice to Sellers of its election to reject any such assets until the Bid Deadline under the Bidding Procedures Order (provided that in the event that no Auction is held in accordance with the Bidding Procedures Order such date will be extended to the date that is two (2) Business Days prior to the Closing Date), in which event such Rejected Assets shall be deemed Excluded Assets for purposes of this Agreement.

Section 2.03   Excluded Assets.   The Acquired Assets shall not include, and there is excepted, reserved and excluded from the purchase and sale contemplated hereby, the "**Excluded Assets**", which shall consist of all of Sellers' right, title and interests in, to and under the properties and assets described in subsections (a) through (q) below:

(a)     the Retained Cash; provided that in the event that the Sale Transaction is consummated other than pursuant to an Acceptable Chapter 11 Plan, then the only cash and cash equivalents of Sellers which shall constitute Excluded Assets shall be the Section 363 Retained Cash;

(b)     the Excluded Properties;

(c)     all records, files, maps, data, schedules, reports and logs, in each case to the extent they relate exclusively to the Excluded Assets and the retention of which by Sellers would not reasonably be expected to be materially adverse to Buyer or the Business, in each case, subject to Buyer's right to make and retain copies pursuant to Section 8.01, and copies of any Files;

(d)     all Contracts that are not Assigned Contracts, including those set forth, or deemed to be set forth, on Schedule 2.03(d) from time to time pursuant to Section 2.06(c) (collectively, the "**Excluded Contracts**");

(e)     all assets related to the Benefit Plans that are not Assumed Benefit Plans (collectively, the "**Excluded Benefit Plans**");

(f)     all shares of capital stock or other equity interests of any Seller or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(g)     all Claims, liabilities, grievances, obligations, or encumbrances under any Collective Bargaining Agreements between Sellers and any labor organizations representing Seller Employees;

(h)     all Claims and causes of action excluded as Rejected Assets in accordance with Section 2.02;

(i)     Sellers' corporate charter or certificate of formation, minute and stock record books, income tax returns, corporate seal, checkbooks and canceled checks; provided that Buyer shall have the right to make copies of any portions of such documents relating to the Business or the Acquired Assets;

(j)     Sellers' rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument or other document executed and delivered between any Seller and Buyer in connection with the transactions contemplated hereby, or any side agreement between any Seller and Buyer entered into on or after the date hereof;

(k)     all privileged attorney-client (i) communications and (ii) other documents (other than title opinions);

(l)     all Rejected Assets and any other assets expressly excluded from Acquired Assets pursuant to Section 2.02;

(m)     all Claims related to or arising out of the Excluded Releases, the consequences of any Excluded Release, in each case against any Person claiming damages arising out of any Excluded Release;

(n)     all Accounts Receivable solely to the extent produced from or attributable to any of the Excluded Properties;

(o)     all proceeds solely to the extent arising from or related to the settlements of Contract disputes with respect to the Excluded Properties;

(p)     (i) all credits, prepayments, payments, advances and similar amounts attributable to Non-Income Taxes to the extent not related to the Acquired Assets and attributable to Tax periods (or portions thereof) ending on or before the Closing Date and (ii) all Tax refunds or rights to receive Tax refunds, whether attributable to Tax periods beginning before, on or after the Closing Date, other than Non-Income Tax refunds to the extent related to the Acquired Assets and attributable to Tax periods (or portions thereof) beginning on or after the Closing Date; and

21

(q)      all other assets set forth on Schedule 2.03.

Section 2.04   Assumed Liabilities.  On the terms and subject to the conditions of this Agreement, Buyer agrees, effective as of the Closing, to assume and to pay, perform and discharge when due, the following Liabilities (collectively, the "**Assumed Liabilities**") of Sellers; provided, however, that the aggregate amount payable by Buyer pursuant to this Section 2.04(e) for Assumed Liabilities that are trade payables that (i) are outstanding as of the Petition Date and (ii) remain outstanding as of immediately prior to the Closing shall not exceed the amount set forth on Schedule 2.04(e) (the "**Buyer Liability Amount**")

(a)      all Cure Amounts due and owing under any Assigned Contracts;

(b)      all of Sellers' Liabilities and obligations under the Assigned Contracts accruing after the Closing;

(c)      all Taxes allocable to Buyer pursuant to Section 10.01;

(d)      all Liabilities relating to or arising out of the Assumed Benefit Plans; and

(e)      any other Liabilities and obligations of Sellers identified in Schedule 2.04(e).

Section 2.05   Excluded Liabilities.  Notwithstanding anything contained herein to the contrary, Buyer shall not assume, or cause to be assumed, or be deemed to have assumed or caused to have assumed or be liable or responsible for any of the following Liabilities of Sellers or any of their Affiliates (collectively, the "**Excluded Liabilities**"):

(a)      all Liabilities that are not Assumed Liabilities; provided that in the event of a conflict between Section 2.04 and this Section 2.05, Section 2.04 will control;

(b)      all Liabilities (other than any Assumed Liabilities) relating to or arising out of any breach or violation of any Law (including any Environmental Law), Contract, Lease or Permit occurring prior to the Closing;

(c)      any Liability (other than any Assumed Liabilities) arising out of or relating to the Excluded Assets or any other assets of Sellers that are not Acquired Assets;

(d)      any Liability  relating to or arising out of the Excluded Benefit Plans;

(e)      any Liability (other than any Assumed Liabilities) relating to or arising out of this Agreement for which Sellers have responsibility;

(f)      except for the Assumed Benefit Plans, all Liabilities with respect to Seller Employees (including by reason of the Sale Transaction), including, without limitation, Liabilities with respect to the payment of wages and other compensation, Liabilities for severance, retention or termination,  and any Liabilities under COBRA (including with respect to qualified beneficiaries of Seller Employees) and the WARN Act;

(g)      all Liabilities arising under Environmental Laws (other than any Assumed Liabilities) arising out of or relating to any act, omission, circumstance or other event occurring prior to the Closing;

(h)      all Liabilities (other than any Assumed Liabilities) for fees and expenses (i) relating to the negotiation and preparation of this Agreement and (ii) relating to the Sale Transaction, in each case, to the extent incurred by Sellers;

(i)      any Liability (other than any Assumed Liabilities) for any Taxes of Sellers for any taxable period;

(j)      any Liability (other than any Assumed Liabilities) for any Taxes arising out of or relating to the operation of the Business (as currently or formerly conducted) or the ownership of the Acquired Assets in any period prior to the Closing, including any Property Taxes with respect to any period prior to the Closing; and

(k)      any Liability (other than any Assumed Liabilities) for any withholding taxes imposed as a result of the Sale Transaction.

Section 2.06    Assignment of Assigned Contracts and Rights; Cure Costs.

(a)      Sellers shall have delivered or made available to Buyer true and complete copies of the Designated Contracts (or in the case of oral Designated Contracts, true and complete written descriptions thereof), in each case including all amendments thereto and assignments thereof, on or before the fifteenth (15th) day following the execution of this Agreement.

(b)      Promptly, but in any event, on or before the fifteenth (15th) day following the execution of this Agreement, Sellers shall deliver to Buyer Seller's good-faith estimate of the Cure Amount with respect to each of Sellers' Designated Contracts (the "**Cure Estimate**").  From and after the delivery of the Cure Estimate, upon the reasonable request of Buyer, Sellers shall provide Buyer with, and consult with Buyer regarding, any material information received with respect to the Cure Estimate.

(c)      On or before the date that is two (2) days before the Bid Deadline under the Bidding Procedures Order, Buyer shall deliver Schedule 2.06(c) to Sellers.  At any time and from time to time prior to the Bid Deadline under the Bidding Procedures Order (or if no Auction is held in accordance with the Bidding Procedures Order, the date that is two (2) Business Days prior to the Closing Date), Buyer may, by written notice to Sellers, (i) elect to exclude from Schedule 2.06(c) any one or more of the Designated Contracts that would otherwise be Assigned Contracts, which shall thereafter be deemed to be Excluded Contracts and set forth on Schedule 2.03(d) and (ii) elect to designate any Designated Contracts which has not been previously rejected by Sellers to be an Assigned Contract, which shall thereafter be deemed to be Assigned Contracts and set forth on Schedule 2.06(c); provided that if the Cure Amount with respect to any Designated Contract is not acceptable to the Buyer in its sole discretion, then Buyer shall be entitled, until two Business Days prior to the Closing Date (if the assumption and assignment of the Assigned Contracts is approved in connection with the confirmation of

23

an Acceptable Plan) or until 30 days after the Closing Date (if the assumption and assignment of the Assigned Contracts is approved  other than in connection with the confirmation of an Acceptable Plan), to exclude from Schedule 2.06(c) such Designated Contract, which shall thereafter be deemed to be an Excluded Contract and set forth on Schedule 2.03(d); provided further that until such time (including after the Bid Deadline under the Bidding Procedures Order) as Sellers enter into an amendment to the Nashtec Supply Agreement on terms that are satisfactory to Buyer in its sole discretion, if the Nashtec Supply Agreement has not previously been excluded by Buyer in accordance with Section 2.02, Buyer shall be entitled to exclude, at its option, the Nashtec Supply Agreement from Schedule 2.06(c) , which shall thereafter be deemed to be an Excluded Contract and set forth on Schedule 2.03(d).  For the avoidance of doubt, any Designated Contract not set forth on, or deemed to be set forth on, Schedule 2.06(c) pursuant to this Section 2.06(c) as of the Closing Date (if the assumption and assignment of the Assigned Contracts is approved in connection with the confirmation of an Acceptable Plan) or as of 30 days after the Closing Date (if the assumption and assignment of the Assigned Contracts is approved other than in connection with the confirmation of an Acceptable Plan) will thereafter be an Excluded Contract.  Notwithstanding the foregoing, if Buyer elects to exclude a Contract after the Closing Date, Buyer shall reimburse Sellers for any out of pocket costs and expenses incurred with respect to such Contract from and after the Closing Date until such Contract may be rejected by Sellers.

(d)      At the Closing, and subject to the approval of the Bankruptcy Court pursuant to the Sale Order or such other order of the Bankruptcy Court, Sellers shall assume (to the extent required) and then assign to Buyer all Assigned Contracts pursuant to Section 365 and, as applicable, Section 1123(b)(2) of the Bankruptcy Code.  In connection with such assignment, Sellers shall cure all defaults under such Assigned Contracts to the extent required by Section 365(b) and, as applicable, Section 1123(b)(2) of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder, it being understood that Buyer shall cure any monetary or other payment defaults under such Assigned Contracts and shall pay any and all Cure Amounts due thereunder.

(e)      During the Interim Period, Sellers shall not file any motion to (or support any motion filed by another Person seeking to) reject any Designated Contracts pursuant to Section 365 or Section 1123(b)(2) of the Bankruptcy Code, as applicable, or take any other action (or fail to take any action that would result in rejection by operation of Law) to reject, repudiate or disclaim any Designated Contracts, without the prior written consent of Buyer.

(f)      Sellers shall use their reasonable best efforts to provide, and to cause the Seller Representatives to provide, financial and other pertinent information regarding the Designated Contracts, as is reasonably requested by Buyer, including using Sellers' reasonable best efforts to furnish Buyer's financing sources with such financial and other pertinent information regarding such Designated Contracts as may be reasonably requested.

24

(g)     At any time and from time to time after the Closing, without further consideration, each party hereto shall, at the reasonable request of the other party hereto, execute and deliver such further instruments of conveyance, assignment, assumption and transfer with respect to the Acquired Assets, the Assumed Liabilities and the Assigned Contracts, and take such further action as may be necessary or appropriate to (i) effectuate the Sale Transaction and other transactions contemplated by this Agreement, (ii) perfect or record title of Buyer in the Acquired Assets, or (iii) put Buyer in possession of the Acquired Assets and ensure that Buyer assumes the Assumed Liabilities.

(h)     Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Acquired Asset if an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than any Seller (each such action, a "**Necessary Consent**"), would constitute a breach thereof (after giving effect to any elimination of such approval, authorization or consent requirement by operation of the Sale Order) until such time as (i) such Necessary Consent is obtained or (ii) the Bankruptcy Court shall have entered an Order providing that such Necessary Consent is not required; provided, however, that if such Necessary Consent cannot be obtained, Sellers shall use their reasonable best efforts, to the extent legally permissible, to provide Buyer with the rights and benefits of the affected Contract or Permit, as applicable, for the term thereof, and, if Sellers provide such rights and benefits, Buyer shall assume all obligations and burdens thereunder.

## ARTICLE III
## CONSIDERATION

Section 3.01   Purchase Price.  The consideration for the sale, transfer and assignment of the Acquired Assets by Sellers to Buyer is Buyer's payment to Sellers of the sum of $95,250,000 (the "**Purchase Price**") and Buyer's assumption of the Assumed Liabilities pursuant to Section 2.04.  The Purchase Price shall be paid by Buyer to Sellers at the Closing by (i)  if and only if the Acceptable Chapter 11 Plan is confirmed by a Final Order, paying $250,000 in cash by means of a completed wire transfer in immediately available funds to Sellers (the "**Closing Cash Payment**") and (ii) paying the difference between the Purchase Price and the Closing Cash Payment (if any) by all or a portion of the Credit Bid of the corresponding amount of the Senior Secured Claims (allocated between the Senior Secured Claims as Buyer may determine in its sole discretion), it being understood that, to the extent that any Acquired Asset is not subject to a Lien with respect to the Senior Secured Claims, the portion of the Purchase Price allocated to any such Acquired Assets shall solely consist of consideration other than the Credit Bid; provided that:

(a)     if the Sale Transaction is consummated pursuant to an Acceptable Chapter 11 Plan and the aggregate amount of cash held by or on behalf of the Sellers as of immediately prior to the Closing (including amounts funded into the Professional Fee Escrow Account) is less than the Retained Cash amount, then the Purchase Price (but not the Closing Cash Payment, if any) shall be increased by an amount in cash equal to the

25

lesser of the amount of such deficit and $50,000; provided that if Sellers' counsel's *pro rata* portion of the sum of the cash held by or on behalf of the Sellers as of immediately prior to the Closing (including amounts funded into the Professional Fee Escrow Account) and such $50,000 (such *pro rata* portion to be determined by dividing Seller's counsel's Accrued Professional Compensation Claims determined pursuant to Section 3.03(d) by such cash sum) is less than Seller's counsel's Accrued Professional Compensation Claims determined pursuant to Section 3.03(d), then Buyer shall pay an additional amount of cash equal to such deficit to the Professional Fee Escrow Account for the benefit of Seller's counsel; or

(b)    if the Sale Transaction is consummated other than pursuant to an Acceptable Chapter 11 Plan, then (i) there shall be no Closing Cash Payment and (ii) the Purchase Price shall be increased by an amount in cash equal to $100,000.

Section 3.02    Allocated Values.  For the purposes of the Sale Transaction, no later than 60 Business Days following the Closing, Buyer shall provide to Sellers a proposed allocation of the Purchase Price and the Assumed Liabilities among the Acquired Assets in accordance with Section 1060 of the Code (the "**Allocation**").  The Allocation shall become final and binding 20 Business Days after Buyer provides the Allocation to Sellers, unless a Seller reasonably objects, in which case, Sellers shall provide comments on the Allocation to Buyer within 20 Business Days after Buyer provides the Allocation to Sellers.  If a Seller reasonably objects to the Allocation, Buyer shall consider any comments from such Seller in good faith and Buyer shall provide an adjusted Allocation, if Buyer reasonably determines that any adjustment is required, within 20 Business Days of receiving comments from such Seller but shall not be obligated to accept any comments provided by any Seller.  Buyer and (to the extent within their control) Sellers agree (a) that the Allocation, as adjusted, shall be used by Buyer and Sellers as the basis for reporting Acquired Asset values and other items for purposes of all Tax Returns, including IRS Form 8594 and (b) that neither they nor their Affiliates will take positions inconsistent with such Allocation in notices to Governmental Authorities, in audit or other proceedings with respect to Taxes, in notices to preferential purchase right holders or in other documents or notices relating to the Sale Transaction unless otherwise required by applicable Law or with the written consent of the other Party.

Section 3.03    Professional Fees.

(a)    Definitions.

(i)    "**Accrued Professional Compensation Claims**" means any accrued but unpaid professional fees incurred by the Sellers during the period commencing on the Petition Date and ending at the earlier of the Closing and the effective date of the Acceptable Chapter 11 Plan.

(ii)    "**Professional Fee Escrow Account**" means an escrow account to hold and maintain an amount of cash equal to the Professional Fee Escrow Amount funded, subject to and solely to the extent provided under the DIP Financing Order, from cash on or before the Closing Date in trust for Sellers'

professionals solely for the purpose of paying all allowed and unpaid Accrued Professional Compensation Claims.

(iii) "**Professional Fee Escrow Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Section 3.03(d).

(b) Establishment of Escrow. Prior to the Closing Date, Sellers shall establish the Professional Fee Escrow Account. Sellers shall fund the Professional Fee Escrow Account with cash in the amount of the aggregate Professional Fee Escrow Amount for all Sellers' professionals. Subject to and solely to the extent provided under the DIP Financing Order, the Professional Fee Escrow Account shall be funded on the Closing Date from Sellers' cash on hand, including the proceeds of the financing provided under the DIP Credit Agreement and, to the extent of any deficiency as contemplated by and subject to the limitations of Section 3.01, any additional cash payment made pursuant to Section 3.01. The Professional Fee Escrow Account shall be maintained in trust for Sellers' professionals. Such funds shall not be considered property of the Sellers' estates or Buyer; provided that Buyer shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Escrow over the aggregate allowed Accrued Professional Compensation Claims to be paid from the Professional Fee Escrow.

(c) Final Fee Applications and Payment of Accrued Professional Compensation Claims. All final requests for payment of claims of any of Sellers' Professional through the Closing Date shall be filed no later than the first Business Day that is 30 days after the Closing Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The amount of Accrued Professional Compensation Claims owing to Sellers' professionals shall be paid in cash to such professionals from funds held in the Professional Fee Escrow Account when such claims are allowed by a Final Order. After all Accrued Professional Compensation Claims have been paid in full, the Final Order allowing such Accrued Professional Compensation Claims shall direct the escrow agent to return any excess amounts to Buyer.

(d) Professional Fee Escrow Amount. To receive payment for unbilled fees and expenses incurred through the Effective Date, Sellers' professionals shall estimate their Accrued Professional Compensation Claims before and through the Effective Date and shall deliver such estimate to Sellers no later than three (3) Business Days before the Closing Date; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such professional and such professionals are not bound to any extent by the estimates. If a professional does not provide an estimate, Sellers may estimate the unbilled fees and expenses of such professional; provided that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such professional. The total amount so estimated shall be the Professional Fee Escrow Amount.

# ARTICLE IV
# REPRESENTATIONS AND WARRANTIES

Section 4.01   <u>Representations and Warranties of Sellers</u>.   Sellers jointly and severally represent and warrant to Buyer as of the date hereof and as of the Closing as follows.

(a)   <u>Organization</u>.   Each Seller is duly formed, validly existing and (to the extent applicable) in good standing under the Laws of the jurisdiction of its formation and has the requisite organizational power and authority to carry on its business as presently being conducted and to own, lease and operate its assets (including the Acquired Assets) where such properties are now owned, leased or operated.

(b)   <u>Qualification</u>.   Each Seller is duly qualified to do business and is in good standing in each jurisdiction in which the nature of its business as now conducted or the property owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, constitute a Material Adverse Effect.

(c)   <u>Authorization</u>.   Subject to the entry of the Bidding Procedures Order and the Sale Order, and such other authorization as is required, by the Bankruptcy Court, the execution and delivery by Sellers of this Agreement, the performance of the obligations by any Seller hereunder and the consummation of the Sale Transaction have been duly and validly authorized by all requisite action by each Seller's board of managers or directors (or other comparable governing body), its respective members or stockholders, as applicable, and under its Organizational Documents.   Subject to the entry of the Bidding Procedures Order and the Sale Order and such other authorization as is required, by the Bankruptcy Court, each Seller has the requisite organization power and authority to execute and deliver this Agreement, perform its obligations hereunder and consummate the Sale Transaction.

(d)   <u>Enforceability</u>.   Subject to the entry of the Bidding Procedures Order and the Sale Order and such other authorization as is required by the Bankruptcy Court and the Enforceability Exceptions, this Agreement has been duly executed and delivered by Sellers and constitutes the valid and legally binding obligation of Sellers, enforceable in accordance with its terms and conditions.

(e)   <u>Noncontravention</u>.   Except as described on <u>Schedule 4.01(e)</u> or as a result of the Bankruptcy Cases and subject to the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, neither the execution and the delivery of this Agreement, nor the consummation of the Sale Transaction, by any Seller will (i) conflict with, result in a violation, default, acceleration or breach of the terms of (with or without notice or passage of time), or create in any party the right to accelerate, terminate, modify or cancel (A) the Organizational Documents of each Seller, or (B) any Assigned Contract, (ii) result in the creation or imposition of any Lien (other than Permitted Liens) on any of the Acquired Assets, or (iii) assuming compliance with the matters described on <u>Schedule 4.01(e)</u>, conflict with or result in a violation or breach of any Law applicable to Sellers or the Acquired Assets.

(f)     <u>Governmental Approvals</u>.  Subject to entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, and except as described on <u>Schedule 4.01(f)</u>, or as required by any applicable antitrust or competition Law no consent, approval, order or authorization of, or filing or registration with, or notification to any Governmental Authority is required to be obtained by any Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the Sale Transaction.

(g)     <u>Litigation</u>.  Except (i) as described on <u>Schedule 4.01(g)</u> and (ii) for the Bankruptcy Cases,  there are no material (A) suits, actions, investigations, proceedings or litigation before or by any Governmental Authority that are pending or, to Sellers' Knowledge, threatened, or (B) judgments, orders or decrees outstanding, in each case of subparts (A) and (B) of this <u>Section 4.01(g)</u>, against any Seller that are attributable to any Seller's ownership or operation of any of the Acquired Assets or the Business.

(h)     <u>Brokers' and Other Fees</u>.  Except as described on <u>Schedule 4.01(h)</u>, no Seller has any Liability to pay any fees or commissions to any broker, finder, agent, lawyer or any other Person with respect to the execution and delivery of this Agreement or the consummation of the Sale Transaction for which Buyer may be liable.

(i)     <u>Taxes</u>.  Except as described on <u>Schedule 4.01(i)</u>:

(i)     During the past three (3) years, each Seller has (A) duly and timely filed or caused to be duly and timely filed all Non-Income Tax Returns required to be filed with respect to the Acquired Assets with the appropriate Taxing Authority, and each such Non-Income Tax Return is true, complete and correct, in all material respects, (B) paid all material Non-Income Taxes with respect to the Acquired Assets, and (C) made all material withholdings and deposits of Non-Income Taxes required by it with respect to the Acquired Assets and such Non-Income Taxes have been timely paid to the Taxing Authority responsible for the collection of such Non-Income Taxes.

(ii)     To Sellers' Knowledge, there are currently no proposed or pending adjustments by any Taxing Authority in connection with any Non-Income Tax Returns of any Seller or relating to the Acquired Assets, and no waiver or extension of any statute of limitations as to any Non-Income Tax matter relating to the Acquired Assets has been given or requested with respect to any Tax year. No Non-Income Tax audits or administrative or judicial proceedings by any Taxing Authority are being conducted, pending or, to Sellers' Knowledge, threatened with respect to any Seller.  To Sellers' Knowledge, no claim has ever been made by a Taxing Authority in a jurisdiction where Sellers do not file a Non-Income Tax Return that it is or may be subject to taxation in that jurisdiction.

(j)     <u>Labor Matters</u>.

(i)     <u>Schedule 4.01(j)(i)</u> sets forth, as of December 31, 2015, (A) a list of all persons who are classified by the Sellers as full-time and part-time

29

employees of the Business, including any employee who is not actively at work due to lockout, approved absence, whether paid or unpaid (*e.g.*, vacation, holiday, jury duty, Family and Medical Leave Act, pregnancy, parental and bereavement leave, military leave, scheduled time off, workers compensation, medical or disability leave) (the employees of Sellers from time to time, the "**Seller Employees**") and (B) except to the extent disclosure is prohibited by applicable Law, their respective job titles, current annual salaries or hourly rates of pay, dates of employment, active/inactive status, vacation/paid leave accrual and exempt/non-exempt status.

(ii)     Except as set forth in Schedule 4.01(j)(ii), within the last three (3) years, neither Sellers nor their Affiliates have:

(1)     violated in any material respect any applicable Laws relating to employment and employment practices, terms and conditions of employment and wages and hours in connection with the employment of any employees of the Business, including any such Laws relating to wages and hours, payment of wages, child labor, family and medical leave, access to facilities and employment opportunities for disabled persons, employment discrimination (including discrimination based upon sex, pregnancy, marital status, age, race, color, national origin, ethnicity, sexual orientation, disability, veteran status, religion or other classification protected by law or retaliation for exercise of rights under applicable Law), equal employment opportunities and affirmative action, employee privacy, fair employment practices, and the collection and payment of all taxes and other withholdings.   There are no pending or, to the Sellers' Knowledge, threatened material charges or complaints involving employees of the Business before any Governmental Authority regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or any other claims arising from or relating to the employment of any employees of the Business;

(2)     been a party to or bound by any Collective Bargaining Agreement with any labor organization representing employees of the Business or been involved in negotiations with any labor organization representing any employees of the Business regarding terms for a Collective Bargaining Agreement covering any employees of the Business, or any effects bargaining agreement, neutrality or card-check recognition agreement, or other labor agreement;

(3)     been subject to a lockout or strike involving employees of the Business;

(4)     implemented any plant closing, mass layoff or redundancy of employees of the Business that could require notice and/or consultation (without regard to any actions that could be taken by Buyer following the Closing) under applicable Laws (including the WARN Act);

24175364

(5)    (A) violated in any material respect any Laws regulating occupational safety and health, including applicable regulations promulgated by any Governmental Body in connection with the operation of the Business; (B) been found by a Governmental Body of competent jurisdiction to be in violation in any material respect of applicable occupational safety and health Laws or regulations in connection with the operation of the Business; or (C) failed in any material respect to maintain records and reports pertaining to occupational health and safety required by any applicable occupational safety and health Laws or any Governmental Authority in connection with the Business;

(6)    committed any material violation of Section 8 of the National Labor Relations Act as amended, 29 U.S.C. § 158, or any other labor Law of any jurisdiction in connection with any employees of the Business;

(iii)    As of the date hereof, the Expired Collective Bargaining Agreement applicable to Sellers has expired in accordance with its terms, Sellers are complying with the National Labor Relations Act with respect to the application of certain terms of the Expired Collective Bargaining Agreement and no other Collective Bargaining Agreement is in effect.

(k)    <u>Benefit Plans</u>.

(i)    Except as set forth on <u>Schedule 4.01(k)</u>, no Benefit Plan is subject to Section 302 or Title IV of ERISA or Section 412 of the Code.  No Benefit Plan is a "multiemployer plan" (as defined in Section 3(37) of ERISA) and within the past six (6) years Sellers have not contributed to or had any obligation to contribute to a multiemployer plan.

(ii)    Each Assumed Benefit Plan has been maintained and administered in compliance in all material respects with its terms and applicable Law, including, to the extent applicable, ERISA and the Code.  Each Assumed Benefit Plan that is intended to be tax-qualified within the meaning of Section 401(a) of the Code has either received a favorable determination letter from the IRS as to its qualification or may rely on a favorable opinion letter issued by the IRS as to its qualification and, to Sellers' Knowledge, no event has occurred that would reasonably be expected to affect the tax-qualified status of such Assumed Benefit Plan or trusts created thereunder.

(iii)    All contributions and premium payments that are due with respect to each Benefit Plan have been made within the time periods prescribed by ERISA, the Code, any other applicable Law and the terms of such Benefit Plan.

(iv)    Other than as a result of the filing of the Bankruptcy Cases, there are no actions or proceedings pending and, to Sellers' Knowledge, there are no suits, actions or proceedings threatened (other than routine claims for benefits) or investigations pending or threatened, relating to any of the Assumed Benefit Plans, which have been asserted or instituted against Sellers, any Assumed

Benefit Plan or the assets of any trust for any Assumed Benefit Plan.  To Sellers' Knowledge, other than as a result of the filing of the Bankruptcy Cases, there are no facts or circumstances that would reasonably be expected to give rise to any material liability in the event of any such actions, proceedings or investigations. No hearing, audit or investigation by the IRS, the U.S. Department of Labor or other Governmental Authority is pending, or to Sellers' Knowledge, threatened, with respect to any Assumed Benefit Plan.  There are no corrections, audits or proceedings initiated pursuant to the IRS Employee Plans Compliance Resolution System or similar proceedings pending with the IRS or DOL with respect to any Assumed Benefit Plan.

(v)      Neither the Sellers nor any of their respective directors, officers, employees or agents has, with respect to any Assumed Benefit Plan, engaged in or been a party to any "prohibited transaction", as such term is defined in Section 4975 of the Code or Section 406 of ERISA, which would result in the imposition of either a material penalty assessed pursuant to Section 502(i) of ERISA or a material Tax imposed by Section 4975 of the Code.

(vi)      Except as set forth on Schedule 4.01(k), no Benefit Plan provides health or life insurance benefits or other welfare-type benefits for current or future retired or terminated employees or other service providers of Seller other than in accordance with the group health continuation coverage requirements of Section 4980B of the IRC and Sections 601-608 of ERISA or similar group health continuation requirements under applicable state law.

(l)      Environmental Matters.  Except as described on Schedule 4.01(l), (i) the Acquired Assets and the Acquired Real Property and each Seller (with respect to the Acquired Assets and the Acquired Real Property) is, and for the past three (3) years has been, in compliance in all material respects with all Environmental Laws, (ii) during the past five (5) years, no Seller has received and, to Sellers' Knowledge, no other Person has received any written report, request for information or other information regarding any actual or alleged material  noncompliance with, material violation of, or any material Liability pursuant to, any Environmental Law, including any material investigatory, remedial, compensation or corrective action obligations, in each case with respect to the Acquired Assets and the Acquired Real Property, (iii) during the past five (5) years, no Seller (with respect to the Acquired Assets or the Acquired Real Property has (1) used, treated, stored, disposed of, arranged for or permitted the release or disposal of, transported, handled, manufactured, distributed any Hazardous Material, (2) Released any substance, including any Hazardous Material, or (3) owned or operated any property or facility contaminated by any substance, including any Hazardous Material, in each case under the preceding clauses (1), (2) and (3), so as to give rise to any material Liability of any Seller pursuant to any Environmental Law, (iv) to Sellers' Knowledge, during the past three (3) years, there has been no Release or disposal of Hazardous Materials on any Acquired Real Property in material violation of Environmental Laws and in an amount which would require reporting to any Governmental Authority under any Environmental Law and response from a Governmental Authority requiring material expenditure to materially comply with Environmental Law, and (v) during the past

32

five (5) years, no Seller (with respect to the Acquired Assets or the Acquired Real Property) has received any written notice of any Release or threatened Release of Hazardous Materials in material violation of, or any other material noncompliance with, or material remedial obligation under, Environmental Law.  Sellers have made available to Buyer all material reports, studies, correspondence and documents in Sellers' custody or reasonable control with respect to the Business or the Acquired Real Property that identify and describe any material non-compliance with Environmental Laws, or any material Liability pursuant to any Environmental Laws.

(m)     Compliance with Laws.  Except as described on Schedule 4.01(m) and as would not, individually or in the aggregate, have a Material Adverse Effect, Sellers' operation of the Acquired Assets and the Business is in compliance with all Laws of all Governmental Authorities having jurisdiction relating to the ownership and operation thereof.  Except as described on Schedule 4.01(m) and as would not, individually or in the aggregate, have a Material Adverse Effect, (i) all necessary Permits or other authorizations with regard to Sellers' ownership or operation of the Acquired Assets have been obtained and are held by Sellers, (ii) no breaches exist with respect to such Permits or other authorizations, and no Seller has received any written notice of any such breach, (iii) all such Permits may be transferred to Buyer, (iv) all such Permits are capable of being renewed under current operating conditions, and (v) no investigation or review by any Governmental Authority with respect to a violation by any Seller of any such Permits or other authorizations or of applicable Law is pending or, to Sellers' Knowledge, threatened in writing.

(n)     Material Contracts.  Schedule 4.01(n) sets forth a complete and correct list of all Material Contracts and Sellers have made available to Buyer accurate and complete copies of all such Material Contracts.  No Seller is in breach of any Material Contract, and Sellers' Knowledge, no other party to any Material Contract (such other parties thereunder, the "**Other Parties**"), is in breach, of any Material Contract, and to Sellers' Knowledge, no event has occurred which with notice or lapse of time or both would constitute a breach by any Seller or, to Sellers' Knowledge, by an Other Party, which would permit the termination, modification, or acceleration by any party under any Material Contract, except (A) for breaches, violations or defaults which would not, individually or in the aggregate, have a Material Adverse Effect, or (B) for breaches that shall be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Material Contracts). All Material Contracts are valid, binding and enforceable against Seller and, to Sellers' Knowledge, each Other Party, subject to the Enforceability Exceptions.

(o)     Absence of Certain Changes.  Except as described on Schedule 4.01(o) or as ordered by the Bankruptcy Court or as otherwise relates to the filing or pendency of the Bankruptcy Cases, since December 31, 2015, there has not been a Material Adverse Effect.

(p)     Real Property Matters.

33

(i)      Schedule 4.01(p), which Schedule separately lists the Excluded Properties, together with Schedule 1.01(b) and Schedule 1.01(a), sets forth a complete and correct list of all parcels of Real Property in which Sellers hold any interest.   Except for the Excluded Properties, Schedule 1.01(b) sets forth a complete and correct list of all parcels of Acquired Owned Real Property in which Sellers have any interest, Schedule 1.01(a) sets forth a complete and correct list of all parcels of Acquired Leased Real Property in which Sellers have an interest.

(ii)      Sellers have delivered to Buyer a complete and correct copy of each Lease to which a Seller is a party. All Leases (including any oral Lease related to the Leased Real Property) are set forth in Schedule 4.01(p).

(iii)      To Sellers' Knowledge, each of the Leases, Licenses and Easements related to or constituting any part of the Acquired Real Property is legal, valid, binding, enforceable and in full force and effect in accordance with the terms thereof, subject to the Enforceability Exceptions. Sellers are not in default and have received no written notice of any material breach or default on the part of or by any party under any such Lease, License or Easement which remains uncured and no event has occurred that, upon the giving of notice or the lapse of time or both, would constitute a default under any such Lease, License or Easement, or which would confer to the other parties to such agreements, any right to terminate such Lease, Licenses or Easements. The Sellers have not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the Leases, the Licenses and the Easements except as set forth on Schedule 4.01(p).

(iv)      Except as expressly identified on Schedule 4.01(p), Sellers (i) own all parcels of Owned Real Property described in Schedule 1.01(b), lease all parcels of Leased Real Property described in Schedule 1.01(a), and hold beneficial easement interests in the Easements, (ii) have good, marketable and indefeasible fee simple title to each parcel of Acquired Owned Real Property, and (iii) have a good, valid and enforceable leasehold interest in, and enjoys peaceful and undisturbed possession of, each parcel of Leased Real Property, in each case, free and clear of all Liens (other than the Permitted Liens).   At the Closing, Sellers shall transfer, assign and convey to Buyer: (i) good, marketable and indefeasible fee simple title to the parcels of Acquired Owned Real Property, subject only to the Permitted Liens, and (ii) all of Sellers' right, title and interests in, to and under all Leases, Licenses, and Easements which constitute any part of the Acquired Real Property or to which any Seller is a party or by which any Leased Real Property is bound or which are appurtenant to or benefit the Acquired Leased Real Property or the Acquired Owned Real Property.

(v)      The Acquired Real Property constitutes all of the Real Property currently owned, used or occupied by Sellers, other than any Real Property owned or leased by any of Sellers' Affiliates, with respect to which no representation is made hereunder.

34

(vi)     With respect to the Acquired Real Property, except as set forth on Schedule 4.01(p):

(1)     no portion thereof is subject to any pending eminent domain, condemnation or any similar legal proceeding by any Governmental Authority adverse to the Acquired Real Property and, to Sellers' Knowledge, there are no threatened condemnation or other similar legal proceedings with respect thereto adverse to the Acquired Real Property;

(2)     the Acquired Real Property is not subject to any outstanding options, rights of first offer or rights of first refusal, or similar rights, to purchase the Acquired Real Property or any portion thereof or interest therein; and

(3)     each parcel of land comprising the Acquired Real Property has a right of access thereto through and over public roadways and streets and there are no pending or threatened governmental proceedings which would impair or curtail free access to and from a public roadway or street.

(vii)     Sellers have not received any written notice of any material violation of any applicable building, zoning, subdivision, health and safety and other land use Laws, including the Americans with Disabilities Act of 1990 and the Texas Architectural Barriers Act, each as have been amended, or any insurance requirements affecting the Acquired Real Property.

(q)     Insurance.  Schedule 4.01(q) sets forth a list of all policies of insurance owned, held by or maintained by any Seller related to the Acquired Assets as of the date of this Agreement.  Such policies of insurance are in full force and effect and satisfy all requirements of applicable Law subject to the Enforceability Exceptions.  Except as set forth in Schedule 4.01(q), during the period commencing on December 31, 2014 up to the date of this Agreement, Sellers have not, with respect to the Acquired Assets, received any written notice from the insurer under any insurance policy applicable to the Acquired Assets disclaiming coverage with respect to a particular claim or such policy in general (other than a reservation of rights notice) or canceling or amending any such policy.

(r)     Intellectual Property.  To Sellers' Knowledge, none of the registrations, issuances or applications pertaining to the Intellectual Property set forth on Schedule 2.02(n) have expired or been cancelled, abandoned or otherwise terminated, and payment of all material renewal and maintenance fees, costs and expenses in respect thereof, and all material filings related thereto, have been duly made as of the date of this Agreement.  Sellers, the operation of the Acquired Assets and the Business are not infringing or otherwise breaching the Intellectual Property rights of any other Person, and to Sellers' Knowledge, no Person is infringing or otherwise violating any of the Intellectual Property set forth on Schedule 2.02(n).

(s)     Personal Property.  Except for the Liens described on Schedule 4.01(s), Sellers have good and valid title to, or a valid leasehold interest in, all Acquired Personal Property, free and clear of any Liens, other than Permitted Liens.  On the Closing Date,

35

Buyer will have acquired all of Sellers' right, title and interests in, to and under all of the Acquired Personal Property, free and clear of all Liens, other than the Permitted Liens.

Section 4.02   <u>Representations and Warranties of Buyer</u>.  Buyer represents and warrants to Sellers as of the date hereof and as of the Closing as follows:

(a)   <u>Organization</u>.  Buyer is duly formed, validly existing and (to the extent applicable) in good standing under the Laws of the jurisdiction of its formation and has the requisite organizational power and authority to carry on its business as presently being conducted and to own, lease and operate its properties where such properties are now owned, leased or operated.

(b)   <u>Qualification</u>.  Buyer is duly qualified to do business and is in good standing in each jurisdiction in which the nature of its business as now conducted or the property owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, have a Buyer Material Adverse Effect.

(c)   <u>Authorization</u>.  The execution and delivery by Buyer of this Agreement, the performance of its obligations hereunder and the consummation of the Sale Transaction have been duly and validly authorized by all requisite action by Buyer's board of directors or managers (or other comparable governing body) and under its Organizational Documents.  Buyer has the requisite organizational power and authority to execute and deliver this Agreement, perform its obligations hereunder and consummate the Sale Transaction.

(d)   <u>Enforceability</u>.  This Agreement has been duly executed and delivered by Buyer and constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions except insofar as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such principles are considered in a proceeding at law or in equity.

(e)   <u>Noncontravention</u>.  Neither the execution and the delivery of this Agreement, nor the consummation of the Sale Transaction, by Buyer will (i) conflict with, result in a violation, default, acceleration or breach of the terms of (with or without notice or passage of time), or create in any party the right to accelerate, terminate, modify or cancel (A) the Organizational Documents of Buyer, or (B) any Contract of Buyer, or (ii) conflict with or result in a violation or breach of any Law applicable to Buyer, other than, in the case of clauses (i)(B) and (ii), any such items that would not, individually or in the aggregate, have a Buyer Material Adverse Effect.

(f)   <u>Approvals</u>.  Subject to entry of a Sale Order by the Bankruptcy Court, and except as described on <u>Schedule 4.02(f)</u>, no consent, approval, order or authorization of, or filing or registration with, or notification to any Governmental Authority or other

36

Person is required to be obtained by Buyer in connection with the execution, delivery and performance of this Agreement and the consummation of the Sale Transaction.

(g)     <u>Litigation</u>.   There are no (i) suits, actions, investigations, proceedings or litigation before or by any Governmental Authority that are pending or, to Buyer's knowledge, threatened, or (ii) judgments, orders or decrees outstanding, in each case of subparts (i) and (ii) of this paragraph, against Buyer or any Affiliate of Buyer that, individually or in the aggregate, would have a Buyer Material Adverse Effect.

(h)     <u>Brokers' and Other Fees</u>.   Except as disclosed on <u>Schedule 4.02(h)</u>, Buyer has no Liability to pay any fees or commissions to any broker, finder, agent, lawyer or any other Person with respect to the execution and delivery of this Agreement or the consummation of the Sale Transaction for which Sellers will be liable or obligated.

(i)     <u>Buyer's Right to Bid Senior Secured Claims</u>.   Buyer has full right and authority, in Buyer's sole discretion, to Credit Bid pursuant to Section 363(k) and, as applicable, Section 1129(b)(2)(A)(ii) of the Bankruptcy Code.

(j)     <u>Financing</u>.   Buyer will have at the Closing sufficient funds in an aggregate amount necessary to pay the Closing Cash Payment, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate the transactions contemplated by this Agreement

(k)     <u>Adequate Assurances Regarding Contracts</u>.   Buyer will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts.

## ARTICLE V
## CERTAIN COVENANTS

Section 5.01   <u>Interim Operations</u>.   Except as (v) limited or restricted by the DIP Credit Agreement,  (w) set forth in <u>Schedule 5.01</u>, (x) expressly agreed to in writing by Buyer, (y) ordered by the Bankruptcy Court or prohibited by restrictions or limitations under the Bankruptcy Code on Chapter 11 debtors or (z) otherwise contemplated by the terms of this Agreement, during the Interim Period, Sellers shall operate the Acquired Assets and the Business in all material respects in the ordinary course in a manner consistent, in all material respects, with past practice.  In addition, except as (a) limited or restricted by the DIP Credit Agreement, (b) set forth in <u>Schedule 5.01</u>, (c) ordered by the Bankruptcy Court or prohibited by restrictions or limitations under the Bankruptcy Code on Chapter 11 debtors or (d) otherwise contemplated by the terms of this Agreement, Sellers shall not do any of the following in connection with the Acquired Assets without the prior written consent of Buyer:

(a)     subject any of the Acquired Assets to any Lien other than Permitted Liens;

(b)     sell, lease, license, pledge, cancel, abandon, permit to lapse or otherwise dispose of any Acquired Asset having a fair market value in excess of $25,000, except sales of Inventory in the ordinary course of business;

(c)    (i) terminate or extend, waive, modify, rescind or make any material amendments to any Assigned Contract or waive, release or assign any material rights or claims thereunder, in each case outside of the ordinary course of business, (ii) make any assignment to any Governmental Authority or Person of any indemnification, contribution or other similar right to payment or reimbursement from third parties with respect to any Liabilities relating to decommissioning or plugging and abandonment or (iii) take any action that would reasonably be expected to have a material adverse effect on the expected benefits to Buyer from any Assigned Contract;

(d)    enter into or modify any Collective Bargaining Agreement covering terms and conditions for any Seller Employees or, directly or indirectly, increase, modify, or accelerate the payment of any compensation of any current or former employee, consultant, independent contractor, partner, or agent of Business;

(e)    initiate, settle or compromise any material action, suit, litigation or other proceeding involving the Acquired Assets, other than with respect to trade claims or workers compensation or the reemployment-related claims related to their non-unionized employees;

(f)    alter, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of itself or any joint venture or similar arrangement to which any Seller is a party which is an Acquired Asset hereunder;

(g)    voluntarily incur any Assumed Liabilities, except in the ordinary course of business, or make or agree to make any capital expenditures or investments with respect to the Acquired Assets that are not permitted by the Approved Budget;

(h)    issue any capital stock, equity interest, option, warrant, subscription, call, exchange right or other right to purchase equity of any Person, or issue any obligations convertible into or exchangeable for equity in any Seller;

(i)    agree, whether in writing or otherwise, to do any of the foregoing.

Section 5.02    Bankruptcy Actions.

(a)    After consultation with Buyer, Sellers shall file the Sale Motion with the Bankruptcy Court within five days of the execution date of this Agreement, seeking entry by the Bankruptcy Court of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A, and the Sale Order.  The Sale Motion shall request, among other things, the scheduling of the Auction of the Acquired Assets to be commenced no later than 75 days after the Petition Date.

(b)    The bidding procedures employed with respect to the marketing and sale of the Acquired Assets shall comply in all material respects with those reflected in the Bidding Procedures Order and, to the extent such bidding procedures contain terms not otherwise set forth in the Bidding Procedures Order attached hereto, are otherwise acceptable to Sellers and Buyer.

38

(c)      Sellers shall use their reasonable best efforts to obtain entry of (i) the Bidding Procedures Order not later than 35 days after the Petition Date, and (ii) the Sale Order approving the Sale Transaction not later than 100 days after the Petition Date . In the event the Bidding Procedures Order or the Sale Order shall be appealed, Sellers and Buyer shall use reasonable best efforts to defend such appeal and to obtain a Final Order with respect thereto.

(d)      If an Auction is conducted, and Buyer is not declared  the prevailing bidder at the conclusion of such Auction (such prevailing party, the "**Prevailing Bidder**") but is the next highest bidder at the Auction, Buyer shall be required to serve as a back-up bidder (the "**Back-up Bidder**") and keep Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Central time) on the Outside Date, (ii) the closing of an Alternative Transaction with the Prevailing Bidder and (iii) the Termination Date. Prior to the Outside Date or Termination Date (as applicable), if the Prevailing Bidder fails to consummate the applicable Alternative Transaction, the Back-up Bidder shall (x) be deemed to have the new prevailing bid, and the Sellers and the Back-up Bidder shall be required, at the election of either the Back-up Bidder or the Sellers and without further order of the Bankruptcy Court, to require the Sellers or the Back-up Bidder, as applicable, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be modified from time to time with the consent of each party); and (y) be entitled to pursue, on behalf of Sellers, any claims for damages against such Prevailing Bidder; provided that any such damages shall be split 70/30 between Buyer and Sellers; provided further than in the event Buyer does not elect to pursue such claims, Sellers shall be entitled to 100% of any such damages as they are able to obtain.

(e)      Neither Seller shall contest or otherwise interfere in the Senior Secured Lender's or Buyer's right to exercise its Credit Bid in accordance with the DIP Financing Order and/or Bidding Procedures Order; it being acknowledged and agreed that, subject to the entry of the DIP Financing Order and/or the Bidding Procedures Order, any remaining amount of Senior Secured Claims not Credit Bid pursuant Section 3.01 hereof towards payment of the Purchase Price may be, in the Buyer's sole discretion, bid by the Buyer at the Auction (if conducted). Prior to the Closing, Guarantor will assign or cause the assignment to Buyer of the Senior Secured Claims to the extent necessary to effectuate the Credit Bid.

(f)      Support of Acceptable Chapter 11 Plan.  As long as the DIP Credit Agreement has not been terminated in accordance with the terms thereof or this Agreement has not been terminated in accordance with Article IX, Buyer agrees that it shall, and shall cause its Affiliates to: (i) vote all of its Claims, including the Senior Secured Claims, to accept the Acceptable Chapter 11 Plan by delivering its duly executed and completed ballot or ballots (as applicable) accepting the Acceptable Chapter 11 Plan on a timely basis, and not change or withdraw such vote; (ii) vote all of its Claims, including Claims pursuant to the DIP Credit Agreement, to reject any other proposed plan of reorganization that is not the Acceptable Chapter 11 Plan by delivering duly executed

39

and completed ballot or ballots (as applicable) rejecting any such plan on a timely basis, and not change or withdraw such vote or opt out of the third party releases provided under the Acceptable Chapter 11 Plan; (iii) not object to the treatment afforded to claims on account of the DIP Credit Agreement under the Acceptable Chapter 11 Plan and (iv)(1) actively support acceptance, implementation, confirmation and effectiveness of the Acceptable Chapter 11 Plan, and (2) not, in any capacity (A) object to, delay, impede or take any other action that would reasonably be expected to interfere with acceptance, implementation, confirmation or effectiveness of the Acceptable Chapter 11 Plan, (B) propose, file, support or vote for any restructuring, workout, plan of arrangement or plan of reorganization for Sellers other than the Acceptable Chapter 11 Plan, or (C) direct any other party to take any action inconsistent with this <u>Section 5.02(f)</u>.  In the event that the DIP Credit Agreement or this Agreement are terminated, the Buyer shall have the right to withdraw any vote in support of the Acceptable Chapter 11 Plan in its sole and absolute discretion and the Sellers agree that they shall not oppose such withdrawal or revocation.

(g)     <u>Support of Sale Transaction</u>.  As long as the DIP Credit Agreement has not been terminated in accordance with the terms thereof or this Agreement has not been terminated in accordance with <u>Article IX</u>, Sellers agree, subject only to their fiduciary duties as set forth in <u>Section 9.01(o)</u> hereof, to (i)(1) actively support acceptance, implementation, confirmation and effectiveness of the Acceptable Chapter 11 Plan, and (2) not, in any capacity (A) object to, delay, impede or take any other action that would reasonably be expected to interfere with acceptance, implementation, confirmation or effectiveness of the Acceptable Chapter 11 Plan, (B) propose, file, support any restructuring, workout, plan of arrangement or plan of reorganization for Sellers other than the Acceptable Chapter 11 Plan, or (C) direct any other party to take any action inconsistent with this <u>Section 5.02(g)</u> and (ii) if Sellers and Buyer determine in their reasonable discretion that the Acceptable Chapter 11 Plan cannot be confirmed on or before the Outside Date, (1) actively support the consummation of the Sale Transaction as a stand-alone sale under Section 363 of the Bankruptcy Code, and (2) not, in any capacity (A) object to, delay, impede or take any other action that would reasonably be expected to interfere with the consummation of the Sale Transaction as a stand-alone sale under Section 363 of the Bankruptcy Code, (B) propose, file, support any transaction other than the Sale Transaction, or (C) direct any other party to take any action inconsistent with this <u>Section 5.02(g)</u>.

(h)     <u>Waiver of Rule 6004(h) and 6006(d)</u>.  The Parties shall use reasonable best efforts to obtain Bankruptcy Court approval to waive rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, for the Sale Order to be effective and enforceable immediately upon entry of the Sale Order, and for authorization to freely close the Sale Transaction at any time upon or after entry of the Sale Order, in which case the Sale Order shall be deemed to be a Final Order.

Section 5.03   <u>Access to Information</u>.  Sellers shall afford to Buyer and the Buyer Representatives reasonable access, upon reasonable prior written notice (including via email), during normal business hours during the Interim Period, to the Acquired Assets and the Files; <u>provided</u>, <u>however</u>, that such access does not unreasonably disrupt the normal operations of Sellers.

Section 5.04 <u>Confidentiality</u>. Buyer acknowledges that, by virtue of its right of access to the Files and the Acquired Assets hereunder, Buyer will become privy to confidential and other information of Sellers and their Affiliates and that such confidential information shall be held confidential by Buyer and its Affiliates and their respective officers, employees, agents, advisors or representatives in a manner that is consistent with the confidentiality obligations of the Senior Secured Lender pursuant to the DIP Credit Agreement. The foregoing confidentiality restriction on Buyer shall terminate upon the one (1) year anniversary of the date hereof; <u>provided</u>, <u>however</u>, that if the Closing occurs prior to the one (1) year anniversary of the date hereof, the confidentiality restriction on Buyer as to the Acquired Assets shall terminate upon the Closing.

Section 5.05 <u>Reasonable Best Efforts</u>. Subject to any applicable order of the Bankruptcy Court, and otherwise on the terms and subject to the conditions of this Agreement, each of Sellers and Buyer shall use their reasonable best efforts to cause the Closing to occur as promptly as practicable, and neither Sellers nor Buyer shall take any action to prevent or delay, or fail to take any action in order to prevent or delay, the Closing from occurring as promptly as practicable. Without limiting the generality of the foregoing, each of Sellers and Buyer shall (and shall cause their respective directors, officers and Subsidiaries, and use their reasonable best efforts to cause their respective Affiliates, employees, agents, attorneys, accountants and representatives, to) consult and cooperate with and provide reasonable assistance to each other and otherwise use reasonable best efforts in connection with (i) obtaining all necessary consents, licenses, qualifications or other permission or action by, and giving all necessary notices to and making all necessary filings with applications and submissions to, any Governmental Authority or other Person with respect to the consummation of the Sale Transaction, and (ii) in general, consummating and making effective the Sale Transaction. Notwithstanding the foregoing, (x) no Party shall be required by this <u>Section 5.05</u> to pay any consideration, to divest itself of any of, or otherwise rearrange the composition of, its assets or to agree to any conditions or requirements that could, individually or in the aggregate, have a Material Adverse Effect, or, in the sole discretion of Buyer, any adverse effect on Buyer or the expected benefits to Buyer of the Sale Transaction, as applicable and (y) neither Buyer nor the Senior Secured Lender shall be required in order to obtain the approval of any Governmental Authority for the transfer of the Acquired Assets contemplated by this Agreement to pay any consideration, agree to any conditions or requirements or take any other action that Buyer determines in its sole discretion to be unacceptable.

Section 5.06 <u>Notification of Certain Matters</u>. During the Interim Period, each of Buyer and Sellers will give prompt written notice to the other Party of any of the following: (a) upon obtaining knowledge that any of its representations or warranties contained herein are not true and correct such that the condition to Closing set forth in <u>Section 6.01(a)</u> or <u>Section 6.02(a)</u>, as applicable, is not reasonably likely to be satisfied on or prior to the Closing Date; (b) receipt of any notice or other communication from any Third Party alleging that the consent of such Third Party is required in connection with the Sale Transaction or that the Sale Transaction otherwise violates the rights of or confers remedies upon such Third Party; or (c) upon obtaining knowledge of the breach by the other Party of a representation or warranty of such other Party under this Agreement such that the condition to Closing set forth in <u>Section 6.01(a)</u> or <u>Section 6.02(a)</u>, as applicable, is not reasonably likely to be satisfied on or prior to the Closing Date.

Section 5.07   Schedule Updates.   In addition to any other rights under this Agreement to update or supplement schedules contained herein, (i) Sellers shall have the right to supplement or amend its schedules to Section 4.01 attached hereto and (ii) Buyer shall have the right to supplement or amend its schedules to Section 2.02(d), Section 2.02(f), Section 2.02(g), Section 2.02(n), Section 2.04(e), Section 2.06(c) and Section 4.02(h) attached hereto, each by providing written notice from time to time to the other Parties hereto prior to the Bid Deadline under the Bidding Procedures Order (provided that in the event that no Auction is held in accordance with the Bidding Procedures Order, such date will be extended to the date that is two (2) Business Days prior to the Closing Date); provided that any such supplements or updates to Sellers' schedules   will not be binding on the Buyer if the result(s) thereof, individually or in the aggregate, have or would reasonably be expected to have a Material Adverse Effect.

Section 5.08   Notice of Litigation.  During the Interim Period, (a) Buyer, upon obtaining knowledge of the same, will promptly notify Sellers of any suit, action, investigation, proceeding or litigation that is commenced or threatened in writing against Buyer that concerns this Agreement or the Sale Transaction and (b) Sellers, upon obtaining knowledge of the same, will promptly notify Buyer of any suit, action, investigation, proceeding or litigation that is commenced or threatened in writing against Sellers or any Affiliate thereof, that (i) concerns this Agreement or the Sale Transaction or (ii) would have been listed in Schedule 4.01(g) as an exception to the representation contained in Section 4.01(g) if such action, suit, investigation, proceeding or litigation had arisen prior to the date hereof; provided, however, that Sellers shall not be required to notify Buyer of any pleadings, documents or other communications filed on the Bankruptcy Court's docket in the Bankruptcy Cases.

Section 5.09   Employee Matters.

(a)   This Sale Transaction involves the sale of assets only and does not involve the transfer of any Seller Employees to any operation of Buyer or its Affiliates and thus nothing herein shall be construed as obligating Buyer to offer employment to or hire any of Seller Employees.  Buyer may offer employment, in its sole discretion, in accordance with its particular staffing needs and applicable Law and on those terms and conditions as determined by Buyer in its sole discretion, to any Seller Employees.  Nothing in this Agreement is intended to, or shall (i) serve as a guarantee of employment for any Seller Employee for any period of time or on any particular terms and conditions of employment, or (ii) require the Buyer to continue any Benefit Plans or provide any particular employee benefits, other than to the extent included in the Assumed Liabilities.

(b)   Prior to Closing, Sellers shall provide Buyer with reasonable access to the Seller Employees for purposes of recruiting and hiring such employees, and shall not take any action to interfere with any offers of employment that Buyer makes to the Seller Employees or impede or in any way hinder Buyer's hiring of any Seller Employees, it being understood that, solely with respect to any Seller Employee who is not actively at work due to lockout, approved absence, whether paid or unpaid (e.g., vacation, holiday, jury duty, Family and Medical Leave Act, pregnancy parental and bereavement leave, scheduled time off, workers compensation, medical or disability leave), "reasonable access" shall only require Sellers to provide Buyer with the name and contact information

42

of any such Seller Employee in the Sellers' books and records as of the date of any such request by Buyer.

(c)     During the period beginning on the Closing Date and ending on the two (2) year anniversary of the Closing Date, Sellers shall not, directly or indirectly, solicit for employment any Seller Employee that accepts employment with Buyer for so long as he or she is employed by Buyer or any of its Affiliates and for a period of three (3) months thereafter; provided that general advertisements (and any discussions based upon responses thereto) shall not be deemed to be a breach of the non-solicitation restriction in this provision.

(d)     Sellers acknowledge that the restrictions contained in this Section 5.09 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the Sale Transaction.

(e)     Sellers will continue to be responsible on and after the Closing for disability benefits for any Seller Employees who are absent from work as of the Closing due to workers' compensation leave, disability, illness, or injury ("disabled employees"), solely to the extent required by, and consistent in all respects with the terms of the Sellers' workers' compensation obligations and applicable disability benefit plans in effect as of the Closing. Sellers' obligation to any such disabled employee(s) will continue until such employee's disability terminates or until the Sellers' obligations under its disability benefit plans expire. Upon the termination of any such Seller Employee's disability, in Buyer's sole discretion, Buyer may make such employee an offer of employment consistent with the Buyer's option under Section 5.09(a).

(f)     Sellers will be solely liable for the payment to Seller Employees of any vacation or other and paid leave liabilities accrued before the Closing.

(g)     Sellers shall provide any notices required under applicable labor and employment Laws to any labor organizations representing Seller Employees with respect to this Sale Transaction and comply with any bargaining obligations with such labor organizations with respect to the Sale Transaction. Further, Sellers shall be solely liable for any WARN Act obligations resulting from an "employment loss" (as defined in the WARN Act) occurring on or prior to the Closing or as a result of this Sale Transaction.

Section 5.10   Labor Matters. Sellers shall use their reasonable best efforts to provide, and to cause the Seller Representatives to furnish Buyer and its financing sources with such financial and other pertinent information regarding such labor matters as may be reasonably requested.

Section 5.11   Financing Cooperation. Sellers shall use their reasonable best efforts to provide, and to cause the Seller Representatives to provide, such cooperation as is reasonably requested by Buyer in connection with the arrangement of the financing of Buyer and its Affiliates in connection with the Sale Transaction and in any negotiations with respect to any Assigned Contracts, including using Sellers' reasonable best efforts to furnish Buyer and its

financing sources with such financial and other pertinent information regarding the Acquired Assets as may be reasonably requested to consummate such financing and contesting any attempts by any parties to such Assigned Contracts that such Assigned Contracts are terminated or terminable for any reason.

## ARTICLE VI
## CONDITIONS TO CLOSING

Section 6.01   Conditions to Sellers' Obligations.   The obligations of Sellers to consummate the Sale Transaction are subject to the satisfaction of, or waiver by Sellers, on or prior to the Closing Date of each of the following conditions.

(a)     Representations and Warranties of Buyer.   The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all respects on the date hereof and on and as of the Closing Date (other than representations and warranties that are made as of another date, which shall be so true and correct as of such date only); provided, however, that this condition shall be deemed to have been satisfied even if such representations and warranties are not true and correct unless the individual or aggregate impact of all inaccuracies of such representations and warranties has resulted or would reasonably be expected to result in a Buyer Material Adverse Effect.

(b)     Performance by Buyer.   Buyer shall have performed or complied with, in all material respects, all obligations, agreements and covenants contained in this Agreement as to which performance or compliance by Buyer is required prior to or at the Closing.

(c)     Execution and Delivery of Closing Documents.   Buyer shall have executed and delivered to Sellers all of the documents described in Section 7.03 and Buyer shall be ready, willing and able to deliver to Sellers the Purchase Price in accordance with Section 3.01.

Section 6.02   Conditions to Buyer's Obligations.   The obligations of Buyer to consummate the Sale Transaction are subject to the satisfaction of, or waiver by Buyer, on or prior to the Closing Date of each of the following conditions.

(a)     Representations and Warranties of Sellers.   The representations and warranties of Sellers set forth in Section 4.01 shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by materiality or a Material Adverse Effect, in which case such representations and warranties shall be true and correct in all respects) as of the Closing Date with the same force and effect as if made on and as of such date (other than representations and warranties that are made as of another date, which shall be so true and correct as of such date only).

(b)     Performance by Sellers.   Sellers shall have performed or complied with, in all material respects, all covenants or agreements contained in this Agreement as to which performance or compliance by Sellers is required prior to or at the Closing.

44

(c)    <u>No Litigation</u>.  No suit, action, investigation, proceeding or litigation shall be pending that would reasonably be expected to restrain or prohibit the consummation of the Sale Transaction.

(d)    <u>Execution and Delivery of Closing Documents</u>.    Sellers shall have executed and delivered to Buyer all of the documents described in <u>Section 7.02</u>.

(e)    <u>Key Supply Contracts</u>. Buyer will have received evidence satisfactory to Buyer in its sole discretion (including collateral or revised terms for supply) that the goods, products, and materials currently supplied pursuant to the Material Contracts identified on <u>Schedule 6.02(e)</u> will be available to Buyer on contractual terms satisfactory to Buyer post-Closing whether under Assigned Contracts or otherwise.

(f)    <u>No Material Adverse Effect</u>. (i) No change, effect, event, occurrence, state of facts or development shall have occurred since the date of this Agreement, which individually or in the aggregate constitutes, or is reasonably likely to constitute, a Material Adverse Effect, (ii) no damage, destruction or other change shall have occurred to any of the material Acquired Assets, which individually or in the aggregate constitutes, or is reasonably likely to constitute, a Material Adverse Effect, and (iii) no order shall have been issued which individually or in the aggregate constitutes, or is reasonably likely to constitute, a Material Adverse Effect.

Section 6.03    <u>Conditions to Buyer and Sellers' Obligations</u>.  The obligations of each of Buyer and Sellers to consummate the Sale Transaction are subject to the fulfillment or waiver by Buyer and Sellers on or prior to the Closing Date of each of the following conditions:

(a)    <u>Entry of Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order, which Sale Order shall have become a Final Order.

(b)    <u>Credit Bid</u>.  The Bankruptcy Court shall have entered a Final Order, unconditionally allowing, authorizing and approving the Credit Bid pursuant to Section 363(k) or Section 1123(b)(4) of the Bankruptcy Code, as applicable.

(c)    <u>No Injunctions or Restraints</u>.    No applicable Law enacted, entered, promulgated, enforced or issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation of the Sale Transaction shall be in effect.

Section 6.04    <u>Frustration of Closing Conditions</u>.  Neither Buyer nor any Seller may rely on the failure of any condition set forth in this <u>Article VI</u> to be satisfied to prevent the Closing from occurring, if such failure was caused by such Party's failure to use its reasonable best efforts to cause the satisfaction of such condition to occur as required by <u>Section 5.05</u>.

**ARTICLE VII**
**CLOSING**

Section 7.01    <u>Time and Place of Closing</u>.  The closing of the Sale Transaction pursuant to this Agreement (the "**Closing**") shall take place by electronic exchange of documents (or, if the Parties desire a physical closing, at the offices of Kirkland & Ellis LLP, located at 601

45

Lexington Avenue, New York, NY 10022), at 10:00 a.m., New York time on the second (2nd) Business Day following the satisfaction (or, to the extent permitted, the waiver) of the conditions set forth in Article VI, or at such other place, time and date as may be agreed by Sellers and Buyer.  The date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**".

Section 7.02   Actions of Sellers at Closing.  At the Closing, Sellers shall:

(a)    execute and deliver to Buyer duly executed special warranty deeds, bills of sale and all other instruments of sale, assignment and transfer as are necessary or appropriate to sell, assign and transfer to Buyer and to vest in Buyer all of Sellers' right, title and interests in, to and under the Acquired Assets (in recordable form, where appropriate) in accordance with this Agreement, including certificate of title or origin (or like documents) with respect to all vehicles and other Tangible Personal Property included in the Acquired Assets for which a certificate of title or origin is required in order for all of Sellers' right, title and interests therein, thereto and thereunder to be transferred to Buyer, and, with respect to the Leases and the Acquired Real Property (including the Pipeline Easement and the Ground Lease), good and marketable title thereto, free and clear of all Liens, Claims and encumbrances (other than the Permitted Liens), in each case in form and substance reasonably acceptable to the Buyer;

(b)    deliver to Buyer possession of the Acquired Assets, together with all keys, combinations and passwords applicable to the Acquired Assets;

(c)    deliver executed statements described in Treasury Regulation §1.1445-2(b)(2) certifying that Sherwin Pipeline is not (A) an entity disregarded as separate from its owner for U.S. federal income tax purposes, and (B) is not a "foreign person" as defined in Section 1445 of the Code;

(d)    deliver to Buyer a certificate duly executed by an authorized officer of Sellers, dated as of Closing Date, certifying on behalf of Sellers that the conditions set forth in Section 6.02(a) and Section 6.02(b) have been fulfilled;

(e)    deliver a certificate from the secretary or a senior officer of Sellers certifying and attaching a copy of the resolutions or written consent of the governing body of each Seller approving this Agreement and the Sale Transaction;

(f)    execute, acknowledge and deliver any other agreements and take any other actions provided for herein or which are reasonably necessary to effectuate the Sale Transaction and, as applicable, the Acceptable Chapter 11 Plan;

(g)    deliver to Buyer a Texas Comptroller Form 01-917, Statement of Occasional Sale duly executed by Sellers; and

(h)    deliver to Buyer an assignment and assumption agreement substantially in the form of Exhibit B (the "**Assignment and Assumption Agreement**") duly executed by Sellers.

Section 7.03    Actions of Buyer at Closing.  At the Closing, Buyer shall:

(a)    deliver to Sellers the Closing Cash Payment by wire transfer as set forth in Section 3.01;

(b)    deliver to Sellers the Assignment and Assumption Agreement duly executed by Buyer;

(c)    deliver to Sellers a certificate duly executed by an authorized officer of Buyer, dated as of Closing Date, certifying on behalf of Buyer that the conditions set forth in Section 6.01(a) and Section 6.01(b) have been fulfilled;

(d)    deliver a certificate from the secretary or a senior officer of Buyer certifying and attaching a copy of the resolutions or written consent of the governing body of Buyer approving this Agreement and the Sale Transaction; and

(e)    execute, acknowledge and deliver any other agreements and take any other actions provided for herein or which are reasonably necessary to effectuate the Sale Transaction and the Acceptable Chapter 11 Plan, as applicable.

Section 7.04    Actions of Allied at Closing.  Immediately prior to the Closing, Allied shall contribute all of the ownership interests of Nashtec held by Allied to Sherwin Alumina, subject to the receipt of any required consents or approvals of third parties (including the Bankruptcy Court), and such ownership interests shall, upon written election of the Buyer at or prior to the Closing, be either Acquired Assets or Excluded Assets. Sellers agree to reasonably cooperate with the parties' efforts to obtain any such consents or approvals.

## ARTICLE VIII
## CERTAIN ADDITIONAL OBLIGATIONS

Section 8.01    Files.  To the extent any Files are not located with the Acquired Assets, Sellers shall make such Files, to the extent related to the Acquired Assets, available for copy and pickup by Buyer at Buyer's sole cost and expense upon request after the Closing.  Buyer recognizes that certain of the Files may contain information relating to assets or businesses of Sellers and their Affiliates other than the Acquired Assets and that Sellers and their Affiliates may retain copies thereof.

Section 8.02    Further Cooperation.  After the Closing, and subject to the terms and conditions of this Agreement, each of Buyer and Sellers, at the request of the other and without additional consideration, shall execute and deliver, or shall cause to be executed and delivered from time to time, such further instruments of conveyance and transfer and shall take such other action as the other Party may reasonably request to carry out and effectuate the Sale Transaction and the Acceptable Chapter 11 Plan, as applicable.

## ARTICLE IX
## TERMINATION

Section 9.01   <u>Right of Termination</u>.  This Agreement and the Sale Transaction may be completely terminated at any time prior to the Closing without further order of the Bankruptcy Court (any such date, the "**Termination Date**"):

(a)        by mutual written consent of Buyer and Sellers;

(b)        by Sellers, by written notice to Buyer, if any of the conditions set forth in <u>Section 6.01</u> or <u>Section 6.03</u> is not satisfied, has not otherwise been waived by Sellers and is incapable of being satisfied by the Outside Date; <u>provided</u>, <u>however</u>, that at the time of such termination, Sellers shall not be in material breach of their obligations under this Agreement;

(c)        by Buyer, by written notice to Sellers, if any of the conditions set forth in <u>Section 6.02</u> or <u>Section 6.03</u> is not satisfied, has not been waived by Buyer and is incapable of being satisfied by the Outside Date; <u>provided</u>, <u>however</u>, that at the time of such termination, Buyer shall not be in material breach of its obligations under this Agreement;

(d)        by either Buyer or Sellers, by written notice to the other Party, if the Closing does not occur on or prior to the Outside Date; <u>provided</u>, <u>however</u>, that at the time of such termination, the Party seeking to terminate shall not be in material breach of its obligations under this Agreement if such breach has been a principal cause or resulted in the failure of the Closing to occur on or prior to the Outside Date;

(e)        (i) by Buyer or Sellers, by written notice to the other, if Sellers enter into a definitive agreement with respect to an Alternative Transaction, (ii) by either Buyer or Sellers, by written notice to the other, if the Bankruptcy Court approves an Alternative Transaction, or automatically if an Alternative Transaction is consummated; or (iii) by Buyer, by written notice to Sellers, if Sellers seek to have any Alternative Transaction approved by the Bankruptcy Court, which for the avoidance of doubt may include the filing of a chapter 11 plan of reorganization or liquidation that proposes an Alternative Transaction; <u>provided</u> that Buyer shall not be entitled to terminate this Agreement pursuant to this <u>Section 9.01(e)</u> for so long as Buyer would otherwise be required to serve as the Backup Bidder in accordance with <u>Section 5.02(d)</u> absent such termination;

(f)        by Buyer, by written notice to Sellers, if the Bidding Procedures Order is not entered on or before February 15, 2016 or such order shall have been stayed, vacated, reversed, modified or amended at any time in any respect without the prior written consent of Buyer in its sole discretion;

(g)        by Buyer, by written notice to Sellers, if the Bankruptcy Court shall not have entered the DIP Financing Order on or before February 15, 2016;

(h)     by Buyer, by written notice to Sellers, if the condition specified in <u>Section 6.02(e)</u> has not been satisfied to the satisfaction of Buyer, in its reasonable discretion, on or before February 28, 2016;

(i)     by Buyer, by written notice to Sellers, if the Sale Order is not entered on or before April 20, 2016 or such order shall have been stayed, vacated, reversed, modified or amended at any time in any respect without the prior written consent of Buyer in its sole discretion;

(j)     by Buyer, by written notice to Sellers, if Sellers (A) move to voluntarily dismiss any of the Bankruptcy Cases, (B) move for conversion of any of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code or (C) move for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in any of the Bankruptcy Cases;

(k)     by Buyer, by written notice to Sellers, if (A) a trustee or an examiner with expanded powers is appointed in any of the Bankruptcy Cases or (B) any of the Bankruptcy Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(l)     by Buyer, by written notice to Sellers, if any court of competent jurisdiction shall enter a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(m)     by Buyer, by written notice to Sellers, if any Event of Default (as defined in the DIP Credit Agreement) shall have occurred, subject to any applicable cure period under the DIP Credit Agreement or the DIP Financing Order, or the Senior Secured Lender's obligations under the DIP Credit Agreement are terminated;

(n)     by Buyer, by written notice to Sellers, if there shall have occurred since the date hereof a Material Adverse Effect;

(o)     by Sellers, if they or either of their governing bodies determines, in consultation with outside legal counsel, that proceeding with the Sale Transaction or failing to terminate this Agreement would be inconsistent with their or such governing body's fiduciary duties under applicable Law; or

(p)     by Buyer, if either Noranda Bauxite Limited or Gregory Power Partners, L.P. (i) defaults in any material respect under or validly terminates (pursuant to the terms thereof or a Final Order, as applicable) its supply agreement with the Sherwin Alumina, (ii) ceases to operate in the ordinary course of business in any material respect or (iii) commences, or is the subject of, an insolvency or bankruptcy proceeding in the United States or any other jurisdiction.

Section 9.02   <u>Effect of Termination</u>.  In the event that Closing does not occur as a result of either Buyer or Sellers exercising their rights to terminate this Agreement pursuant to <u>Section 9.01</u>, then:

(a)      upon such termination, this Agreement shall thereafter be null and void, without any Liability or obligation on the part of any Party under this Agreement, except that the provisions of Section 1.01, Section 1.02, Section 5.04, Section 9.01, this Section 9.02, Section 11.01 and Article XII shall survive any termination of this Agreement.

(b)      notwithstanding Section 9.02(a), if this Agreement is terminated in accordance with Section 9.01 other than pursuant to Section 9.01(a), or Section 9.01(b) or Section 9.01(d) (by Sellers in circumstances where Buyer is not permitted to terminate pursuant to the proviso to Section 9.01(d)), then the Sellers shall pay to Buyer the Expense Reimbursement Amount by wire transfer of immediately available funds within two (2) Business Days of the date of such termination

## ARTICLE X
## TAX MATTERS

Section 10.01  Tax Matters.

(a)      Tax Allocation.  The Non-Income Taxes for which Sellers shall be and remain liable is the amount of Non-Income Taxes assessed with respect to the ownership or operation of the Acquired Assets for (i) any Tax period ending prior to the Closing Date and (ii) any Straddle Period multiplied by a fraction, the numerator of which is the number of days in the Straddle Period ending immediately prior to the Closing Date and the denominator of which is the number of days in the entire Straddle Period.  All Property Taxes with respect to the ownership or operation of the Acquired Assets arising on or after the Closing Date shall be allocated to and borne by Buyer.

(b)      Tax Returns and Tax Proceedings.  Except as otherwise provided in Section 10.01(c), after the Closing, Buyer shall control all matters  in connection with the filing of Tax Returns and any audit, litigation or other proceeding (each, a "**Tax Proceeding**") with respect to Taxes imposed on or with respect to the Acquired Assets and shall have the sole right to, at its own expense, participate in or assume the defense of or settle any claim, suit, action litigation or proceeding (including any Tax audit).

(c)      Transfer Taxes.  Buyer shall be responsible for the filing of all Tax Returns and the payment of all state and local transfer, documentary, recording, sales, use, stamp, registration or other similar Taxes (the "**Transfer Taxes**") resulting from the Sale Transaction and not eliminated through the application of Section 1146(a) of the Bankruptcy Code.  Buyer and Sellers shall cooperate in good faith to minimize, to the extent permissible under applicable Law, the amount of any such Transfer Taxes.

(d)      Tax Treatment of Payments.  Adjustments made pursuant to this Section 10.01 shall be treated for all Tax purposes as adjustments to the Purchase Price, unless otherwise required by applicable Law.

## ARTICLE XI
## LIMITATIONS ON REPRESENTATIONS AND WARRANTIES

Section 11.01  Disclaimers of Representations and Warranties; Guarantor; Remedies.

50

(a)     EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN Section 4.01 OF THIS AGREEMENT, (I) SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED AND (II) SELLERS EXPRESSLY DISCLAIM, AND BUYER HEREBY WAIVES, ALL LIABILITY AND RESPONSIBILITY FOR, AND BUYER IS NOT RELYING ON, ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY SELLERS OR ANY OFFICER, DIRECTOR, SUPERVISOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF SELLERS OR ANY OF THEIR RESPECTIVE AFFILIATES).

(b)     EXCEPT AS EXPRESSLY SET FORTH IN Section 4.01 OF THIS AGREEMENT, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLERS EXPRESSLY DISCLAIM, AND BUYER HEREBY WAIVES AND IS NOT RELYING ON, ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO THE ASSETS, (II) THE QUALITY OF THE ASSETS, (III) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (IV) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (V) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY SELLERS OR THIRD PARTIES WITH RESPECT TO THE ASSETS, (VI) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER, ITS AFFILIATES OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, AND (VII) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT.

(c)     SELLERS EXPRESSLY DISCLAIM AND NEGATE, AND BUYER IS NOT RELYING ON AND HEREBY EXPRESSLY WAIVES (I) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (II) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (III) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (IV) ANY RIGHTS OF PURCHASERS UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION, (V) ANY CLAIMS BY BUYER FOR DAMAGES BECAUSE OF DEFECTS, WHETHER KNOWN OR UNKNOWN AS OF THE DATE OF THIS AGREEMENT OR THE CLOSING DATE, AND (VI) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW; IT BEING THE EXPRESS INTENTION OF BOTH BUYER AND SELLERS THAT, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN Section 4.01 OF THIS AGREEMENT, THE ASSETS SHALL BE CONVEYED TO BUYER IN THEIR PRESENT CONDITION AND STATE OF

REPAIR, "AS IS" AND "WHERE IS," WITH ALL FAULTS, AND THAT BUYER HAS MADE OR SHALL MAKE PRIOR TO CLOSING SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE.

Section 11.02 <u>Guarantor and Remedies</u>.   Guarantor hereby unconditionally guarantees the payment of any damages payable by Buyer to Sellers for breach of this Agreement; <u>provided</u> that, notwithstanding anything to the contrary herein, (i) Sellers expressly acknowledge and agree that their only recourse against Guarantor for damages (if any) for breach or otherwise shall be limited to (A) a cash payment up to the amount of the Closing Cash Payment and (B) a set-off against the amount of the Senior Secured Claims in an aggregate amount not to exceed $10,000,000, and in no event shall the Guarantor, Buyer or their Affiliates have any Liability for a cash payment to the Sellers in excess of the amount of the Closing Cash Payment and (ii) Guarantor expressly agrees that Sellers shall be entitled, and that Buyer shall not raise any objections, to the foregoing remedies with respect to such damages, if any.   Guarantor hereby makes the representations and warranties set forth in <u>Section 4.02(a)</u> through <u>Section 4.02(h)</u>, which shall apply mutatis mutandis to Guarantor as if references to Guarantor were substituted for references to Buyer.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01 <u>Negligence and Fault</u>.   THE DISCLAIMER, WAIVER AND LIMITATION OF LIABILITY PROVISIONS SET FORTH IN THIS AGREEMENT SHALL ENTITLE THE BENEFICIARY THEREOF TO SUCH DISCLAIMER, WAIVER OR LIMITATION OF LIABILITY HEREUNDER IN ACCORDANCE WITH THE TERMS HEREOF, INCLUDING WHERE ANY CLAIM IS THE RESULT OF: (A) STRICT LIABILITY, (B) THE VIOLATION OF ANY LAW BY SUCH BENEFICIARY OR BY A PRE-EXISTING CONDITION, OR (C) THE SOLE, CONCURRENT OR COMPARATIVE NEGLIGENCE OF SUCH BENEFICIARY THEREOF.

Section 12.02 <u>Mutual Release</u>.   Except for the rights and obligations of the Parties specifically set forth in this Agreement, effective as of Closing, each Party hereto, to the fullest extent permitted by Law, hereby irrevocably and unconditionally releases, remises and forever discharges the other Parties hereto and their Affiliates and all such Parties' past, present and future shareholders, partners, members, board of directors and/or supervisors, managers, officers, employees, agents, representatives and advisors from any and all suits, legal or administrative proceedings, claims, demands, damages, losses, costs, Liabilities, interest or causes of action whatsoever as of the Closing, at Law or in equity, known or unknown, which such Party might now or subsequently may have, based on, relating to or arising out of this Agreement or the Senior Secured Credit Agreements, the transactions contemplated hereby and thereby, the ownership, use or operation of the Acquired Assets or the condition, quality, status or nature of the Acquired Assets, including rights to cost recovery and contribution under Environmental Laws, breaches of statutory or implied warranties, nuisance or other tort actions, rights to punitive damages, common law rights of contribution and rights under insurance maintained by any other Party or any of such Party's Affiliates.

Section 12.03  Survival.   The representations and warranties of Buyer and Sellers contained herein and in the certificates delivered at Closing (other than those contained in Sections 4.01(h) and 4.02(h)) shall terminate upon Closing and be of no further force or effect for any purpose.  The covenants and other agreements of the Parties contained herein and the representations contained in Sections 4.01(h) and 4.02(h) shall survive the Closing (except to the extent otherwise specifically set forth in the applicable covenant or other agreement contained herein).

Section 12.04  Non-Compensatory Damages.   Neither Buyer nor any Seller shall be entitled to recover from the other, or their respective Affiliates, any indirect, special, consequential, punitive or exemplary damages, or damages for lost profits of any kind or loss of business opportunity, arising under or in connection with this Agreement or the Sale Transaction, except to the extent any such Party suffers such damages (including costs of defense and reasonable attorneys' fees incurred in connection with defending of such damages) to a Third Party, which damages (including costs of defense and reasonable attorneys' fees incurred in connection with defending against such damages) shall not be excluded by this provision as to recovery hereunder.  Subject to the preceding sentence, Buyer, on behalf of itself and each of its Affiliates, and Sellers, on behalf of themselves and each of their respective Affiliates, waive any right to recover any indirect, special, consequential, punitive or exemplary damages, or damages for lost profits of any kind or loss of business opportunity, arising in connection with or with respect to this Agreement or the Sale Transaction.

Section 12.05  Specific Performance.  Each of the Parties agrees that irreparable damage would occur and that the Parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that each of the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement without proof of damages or posting of any bond or other security, this being in addition to any other remedy to which it is entitled at law or in equity.

Section 12.06  Entire Agreement.   This Agreement, the documents to be executed pursuant hereto and the exhibits and schedules attached hereto constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties pertaining to the subject matter hereof.

Section 12.07  Publicity.  Each Party shall consult with the other Parties prior to making any public release concerning this Agreement or the Sale Transaction and, except as required by applicable Law or by any Governmental Authority or stock exchange (including the Bankruptcy Court in connection with the Bankruptcy Cases) (in which case the Party required to make such release shall allow the other Parties reasonable time to comment on such release in advance of such issuance), no Party shall issue any such release without the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed.

Section 12.08  No Third Party Beneficiaries.  Except with respect to (a) the Persons included within the definition of Seller Representatives or Buyer Representatives (and in such

53

cases, only to the extent expressly provided herein), (b) the Senior Secured Lender and its Affiliates with respect to <u>Section 12.19</u> and (c) any permitted successor to Sellers or Buyer, or assignee of Sellers or Buyer, this Agreement is for the sole benefit of the Parties and nothing in this Agreement shall provide any benefit to any Third Party or entitle any Third Party to any claim, cause of action, remedy or right of any kind.

Section 12.09   <u>Assignment</u>.   No Party may assign or delegate any of its rights or duties hereunder without the prior written consent of the other Parties and any assignment made without such consent shall be void; <u>provided</u>, <u>however</u>, that Buyer may assign this Agreement or any rights hereunder to one or more Affiliates of Buyer without the consent of Sellers.  Any assignment made by Buyer or Sellers as permitted hereby shall not relieve Buyer or Sellers, as applicable, from any Liability or obligation hereunder.  Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors and assigns.

Section 12.10   <u>Governing Law</u>.  THIS AGREEMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK EXCLUDING ANY CONFLICTS OF LAW, RULE OR PRINCIPLE THAT MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION, AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

Section 12.11   <u>Exclusive Jurisdiction; Waiver of Jury Trial</u>.   ALL ACTIONS AND PROCEEDINGS WITH RESPECT TO, ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, RELATED TO, OR FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE EXCLUSIVELY LITIGATED, HEARD AND DETERMINED IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION AND AUTHORITY OF THE BANKRUPTCY COURT TO HEAR AND DETERMINE ANY SUCH ACTION OR PROCEEDING; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE BANKRUPTCY CASES ARE CLOSED OR THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK.  EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.12   <u>Notices</u>.   Any notice, communication, request, instruction or other document required or permitted hereunder shall be given in writing and delivered in person or sent by United States mail (postage prepaid, return receipt requested), telex, facsimile, telecopy or reliable overnight courier service to the addresses of the Parties set forth below.  Any such notice shall be effective (i) when delivered if delivered by hand or transmitted by facsimile or e-mail (with acknowledgment received) during normal business hours or, if not delivered during normal business hours, on the next Business Day, (ii) two (2) Business Days after the same are

sent if sent by certified or registered mail, postage prepaid, return receipt requested or (iii) one (1) Business Day after the same are sent if sent by a reliable overnight courier service, with acknowledgment of receipt.

Sellers or Allied:
Sherwin Alumina Company, LLC
P.O. Box 9911
Corpus Christi, TX 78469
Attention: Thomas Russell
Phone [*]

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL  60654
Fax: (312) 862-2200
Attention: Richard J. Campbell, P.C.
            Steve Toth
            rcampbell@kirkland.com
            steve.toth@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY  10022
Fax: (212) 446-4900
Attention: Joshua A. Sussberg, P.C.
            jsussberg@kirkland.com

Buyer or Guarantor:
Glencore Ltd.
Three Stamford Plaza
301 Tresser Blvd.
Stamford, CT 06901
Fax: [*]
Attention: Andy Smith
            Andy. Smith@Glencore-us.com

with a copy (which shall not constitute notice) to:

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 100178-0061
Attention:  Steven J. Reisman
            sreisman@curtis.com

55

Fax (212) 697-1559

Each Party may, by written notice so delivered, change its address for notice purposes hereunder.

Section 12.13 <u>Approval of the Bankruptcy Court</u>.  Notwithstanding anything herein to the contrary, any and all obligations under this Agreement are subject to entry of the Sale Order.

Section 12.14 <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms and provision of this Agreement shall nevertheless remain in full force and effect; <u>provided</u>, <u>however</u>, that in such case the Parties hereto shall use their reasonable best efforts to achieve the purpose of the invalid term or provision.

Section 12.15 <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, and each counterpart hereof shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.  Any signature hereto delivered by a Party by facsimile or electronic transmission shall be deemed an original signature hereto.

Section 12.16 <u>Amendment and Waiver</u>.  This Agreement may be amended, supplemented, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by an authorized officer of each of the Parties or, in the case of a waiver, by or on behalf of the Party waiving compliance.  No waiver of any of the provisions of this Agreement or rights hereunder shall be deemed or shall constitute a waiver of any other provisions hereof or right hereunder (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

Section 12.17 <u>Expenses</u>.  Whether or not the Sale Transaction is consummated, except as otherwise expressly provided herein or in the Bidding Procedures Order, each of the Parties shall be responsible for the payment of its own respective costs and expenses incurred in connection with the negotiations leading up to and the performance of its respective obligations pursuant to this Agreement, including the fees of any attorneys, accountants, brokers or advisors employed or retained by or on behalf of such party.

Section 12.18 <u>Schedules and Exhibits</u>.  The inclusion of any matter upon any Schedule or any Exhibit attached hereto does not constitute an admission or agreement that such matter is material with respect to the representations and warranties contained herein.

Section 12.19 <u>Matters Relating to the Senior Secured Lender</u>.  Sellers, on behalf of themselves and their respective Affiliates, acknowledge and agree that (a) neither the Senior Secured Lender nor any of its Affiliates (other than Buyer), shall have any Liability or other obligation for any breach by Buyer of any of its obligations under this Agreement, including Buyer's obligations to consummate the Sale Transaction in accordance with the terms of this Agreement and (b) neither the Senior Secured Lender nor any of its Affiliates (other than Buyer) shall in any way be deemed to be attributed or otherwise responsible for any of the representations, warranties, covenants, obligations or other agreements of Buyer under this Agreement.

**[The remainder of this page is left intentionally blank.]**

57

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date first written above.

SELLERS:

**SHERWIN ALUMINA COMPANY, LLC**

By: _Thomas D Russell_

Its: _____

**SHERWIN PIPELINE, INC.**

By: _Thomas D Russell_

Its: _____

**IN WITNESS WHEREOF,** the undersigned has executed this Agreement as of the date first written above.

BUYER:

**CORPUS CHRISTI ALUMINA LLC**

Digitally signed by Blandine Lewine
DN: cn=Blandine Lewine, o=Glencore Ltd,
ou, email=blandine.lewine@glencore-us.com, c=US
Date: 2016.01.10 21:43:36 -05'00'

By: Blandine Lewine

Authorized Signatory

**IN WITNESS WHEREOF,** the undersigned has executed this Agreement as of the date first written above solely for purposes of Section 7.04 and Article XII hereof.

**ALLIED ALUMINA, LLC**

Digitally signed by Blandine Lewine
DN: cn=Blandine Lewine, o=Glencore Ltd,
ou, email=blandine.lewine@glencore-
us.com, c=US
Date: 2016.01.10 21:44:07 -05'00'

By: Blandine Lewine

Authorized Signatory

**IN WITNESS WHEREOF,** the undersigned has executed this Agreement as of the date first written above solely for purposes of Section 11.02 and Article XII hereof.

GUARANTOR:

**COMMODITY FUNDING, LLC**

Digitally signed by Blandine Lewine
DN: cn=Blandine Lewine, o=Glencore Ltd,
ou, email=blandine.lewine@glencore-
us.com, c=US
Date: 2016.01.10 21:44:43 -05'00'

By:  Blandine Lewine

Authorized Signatory