

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

ENTERED
01/13/2016

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SHERWIN ALUMINA COMPANY, LLC, *et al.*,[1] | § | Case No. 16-20012 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO
(A) OBTAIN POST-PETITION SECURED FINANCING AND (B) UTILIZE
CASH COLLATERAL, (II) GRANTING LIENS AND SUPER-PRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE
PROTECTION TO PREPETITION SECURED LENDER, (IV) MODIFYING
THE AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING**
(Docket No. 26)

Upon the motion (the "Motion") of above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for Southern District of Texas (the "Local Rules"), and the Procedures for Complex Chapter 11 Bankruptcy Cases promulgated by the United States Bankruptcy Court for Southern District of Texas (the "Texas Complex Case Rules"), seeking entry of an interim order (this "Interim Order") and a final order (the "Final Order"), among other things:  (a) authorizing, pursuant to Bankruptcy Code sections 105(a), 361, 362, 363(c),

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sherwin Alumina Company, LLC (2376); and Sherwin Pipeline, Inc. (9047). The debtors' service address is:  4633 Highway 361, Gregory, Texas 78359.

and 364(c) and (e) and Bankruptcy Rules 2002, 4001, and 9014, Sherwin Alumina Company, LLC ("Sherwin"), in its capacity as borrower, to enter into a debtor-in-possession financing agreement (as amended, restated, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement"),[2] substantially in the form attached to the Motion as Exhibit B, with Commodity Funding, LLC, as lender (in such capacity, the "DIP Lender"), to obtain cash advances and other extensions of credit in an aggregate principal amount not to exceed $40 million (the "DIP Facility" and, the loans under such facility, the "DIP Loans") on the terms and conditions of the DIP Credit Agreement (together with this Interim Order, the Final Order, and any and all documents, agreements, and instruments delivered pursuant thereto or executed or filed in connection therewith, as may be amended hereafter from time to time, including, without limitation, the Approved Budget (as defined below), collectively, the "DIP Facility Documents"); (b) granting super-priority administrative claim status under Bankruptcy Code section 364(c)(1) to all obligations of the Debtors incurred in connection with the DIP Facility Documents (collectively, the "DIP Obligations"), with priority over any and all administrative expenses of any kind or nature, including, without limitation, the kinds specified in or arising or ordered under Bankruptcy Code sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114, subject and subordinate only to the Carve-Out (as defined below) on the terms and conditions set forth herein, and determining that the DIP Obligations are secured under Bankruptcy Code sections 364(c)(2) and 364(c)(3) by valid, enforceable, non-avoidable, and fully perfected liens on and security interests in all of the property, assets and other interests in property and assets of the Debtors (including Avoidance Actions (as defined below)), and all other property of the Debtors' estates (within the meaning of

---

[2]       Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

section 541 of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, whether owned or hereafter acquired, and all proceeds thereof, subject and subordinate only to (A) the Prepetition Credit Agreement Liens (as defined below), (B) any valid, perfected, enforceable and non-avoidable liens in existence as of the Petition Date (as defined below), which were senior to the Prepetition Credit Agreement Liens (the "Permitted Priority Liens"), and (C) the Carve-Out, in each case on the terms and conditions set forth in the DIP Facility Documents; (c) approving pursuant to sections 363 and 364 of the Bankruptcy Code the form and manner of adequate protection set forth herein to be provided to the Prepetition Lender (as defined below); (d) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility Documents, as set forth herein; (e) scheduling, pursuant to Bankruptcy Rule 4001(c)(2), a hearing (the "Final Hearing") to consider entry of the Final Order; (f) this Court's finding, pursuant to Bankruptcy Rules 2002 and 4001(c)(l), the Texas Complex Case Rules, and the Local Rules of this Court that notice of the hearing to grant the Motion on an interim basis (the "Interim Hearing") was sufficient having been given to (i) the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), (ii) counsel to the DIP Lender, (iii) counsel to the Prepetition Lender and any other known secured creditors of record, (iv) the thirty (30) largest unsecured creditors of the Debtors, (v) any known party asserting a lien against any of the Debtors' assets, and (vi) the Internal Revenue Service (collectively, the "Notice Parties"); and such notice being sufficient and adequate, and no other or further notice being required; and the Interim Hearing having been held on January 13, 2016; and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing, and the entire record herein; and this Court having heard and

resolved or overruled all objections, reservations of rights, and other statements with respect to the Motion on the merits; and this Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their estates and creditors; and after due deliberation and consideration, and sufficient cause appearing therefor, **IT IS HEREBY FOUND, DETERMINED, AND DECREED THAT**:[3]

> A.    Petition Date. On January 11, 2016 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   The Debtors are operating their business and managing their affairs as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.   No trustee, examiner, or committee has been appointed in the Chapter 11 Cases.

> B.    Jurisdiction; Venue. This Court has jurisdiction over the Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. §§157(b)(2)(D) and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D). Venue for the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.

> C.    Committee Formation.   As of the date hereof, the U.S. Trustee has not appointed an official committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

> D.    Prepetition Loan Documents.   Sherwin is the borrower under that certain Credit Agreement, dated as of July 1, 2009 (as amended and restated from time to time, the "Prepetition Credit Agreement"), by and between Sherwin and Commodity Funding, LLC (in such capacity, the "Prepetition Lender").   Pursuant to the Prepetition Credit Agreement and all agreements, documents, notes, mortgages, security agreements, pledges, guaranties, instruments,

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

amendments, and any other agreements delivered pursuant thereto or in connection therewith (collectively with the Prepetition Credit Agreement, the "Prepetition Loan Documents"), the Prepetition Lender provided the Debtors with a revolving credit facility up to the aggregate principal amount of $95,000,000 (including letter of credit availability and amounts guaranteed by affiliates of the Prepetition Lender, the total aggregate amount of which shall not exceed $14,200,000).

   E.  <u>Prepetition Credit Agreement Obligations</u>. For purposes of this Interim Order, the term "<u>Prepetition Credit Agreement Obligations</u>" shall mean all indebtedness and other amounts owed, as of the Petition Date, under the Prepetition Loan Documents, including, without limitation, all Loans (as defined in the Prepetition Credit Agreement).

   F.  <u>Prepetition Credit Agreement Liens</u>. To secure the Prepetition Credit Agreement Obligations under the Prepetition Loan Documents, Sherwin granted the Prepetition Lender first-priority senior liens and security interests (the "<u>Prepetition Credit Agreement Liens</u>") upon and in substantially all of the Sherwin's property and assets (and the assets of Sherwin's wholly owned subsidiary, Sherwin Pipeline, Inc.), as and to the extent set forth in the Prepetition Loan Documents and the ancillary documents thereto (collectively, the "<u>Prepetition Collateral</u>").

   G.  <u>Debtors' Stipulations</u>. Subject only to the rights of the Creditors' Committee (if any) as set forth in paragraph 15 hereof, after consultation with its attorneys and financial advisors, each Debtor (on behalf of, and for, itself and its estate) admits, stipulates, acknowledges, and agrees to the following (collectively, the "<u>Debtors' Stipulations</u>"):

   (i)  as of the Petition Date, (a) the Prepetition Credit Agreement Obligations are legal, valid, binding, fully perfected, and non-avoidable obligations in the aggregate

liquidated amount of $95 million; (b) the Prepetition Credit Agreement Obligations and Prepetition Credit Agreement Liens constitute legal, valid, binding, fully perfected, and non-avoidable senior first-priority obligations of the Debtors, enforceable in accordance with the terms and conditions of the Prepetition Loan Documents; and (c) no portion of the Prepetition Credit Agreement Obligations or Prepetition Credit Agreement Liens are subject to any offset, challenge, defense, claim, or counterclaim of any kind or any nature, nor is any portion of the Prepetition Credit Agreement Obligations or Prepetition Credit Agreement Liens subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law; and

      (ii)     subject to entry of the Final Order, the Debtors and their estates shall be deemed to have (a) waived, discharged, and released the Prepetition Lender, solely in its capacity as such, together with the Prepetition Lender's shareholders, affiliates, parents, subsidiaries, controlling persons, directors, agents, officers, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their sole respective capacities as such (all of the foregoing, the "Prepetition Lender Releasees") of any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), offsets, defenses, objections, challenges, causes of action, and/or choses in action, or other claims arising under or pursuant to the Bankruptcy Code or under any other applicable law against any and all of the Prepetition Lender Releasees, whether at law or in equity, arising under or relating to the Prepetition Loan Documents or the transactions contemplated thereunder, and (b) waived, discharged and released any offsets, defenses, objections, challenges, causes of action, and/or choses in action with respect to the Prepetition Credit Agreement Obligations and Prepetition Credit Agreement Liens,

including, without limitation, actions related to recharacterization, subordination, avoidance, and any right or basis to challenge or object to the amount, validity, enforceability, and/or perfection of the Prepetition Credit Agreement Obligations and/or Prepetition Credit Agreement Liens.

H.     <u>Cash Collateral</u>.   For purposes of this Interim Order, the term "<u>Cash Collateral</u>" shall mean and include all "cash collateral," as defined in Bankruptcy Code section 363 in which the DIP Lender and the Prepetition Lender, as applicable, have a lien, security interest, or other interest (including, without limitation, any adequate protection liens or security interests), in each case whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise.

I.     <u>Use of Cash Collateral</u>.   The Debtors require the use of Cash Collateral to operate their business.  Without the use of Cash Collateral, the Debtors will not be able to meet their cash requirements for working capital needs or to fund the administration of the Chapter 11 Cases (including the payment of professional fees).  The Prepetition Lender does not consent to the use of any Cash Collateral, except on the terms and conditions, and for the purposes, specified herein and in the DIP Facility Documents.  The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and adequately protect all applicable parties' interests in the Prepetition Collateral.

J.     <u>Purpose and Necessity of Financing</u>.   The Debtors require the financing described in the Motion to fund, among other things, ongoing working capital and general corporate needs of the Debtors and the costs of the Chapter 11 Cases in accordance with the terms set forth in the DIP Facility Documents.  If the Debtors do not obtain authorization to borrow under the DIP Facility Documents and the DIP Facility is not approved, the Debtors will

suffer immediate and irreparable harm. The Debtors, in consultation with their advisors, have determined that they could not obtain adequate unsecured credit allowable as an administrative expense under Bankruptcy Code section 503, or other financing under Bankruptcy Code sections 364(c), on equal or more favorable terms than those set forth in the DIP Facility Documents based on the totality of the circumstances. Moreover, a loan facility in the amount provided by the DIP Facility Documents is not available to the Debtors without granting the DIP Lender super-priority claims, liens, and security interests, pursuant to Bankruptcy Code sections 364(c)(l), (2) and (3) as provided in this Interim Order and the other DIP Facility Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the DIP Facility provided under the DIP Facility Documents represents the best financing package available to the Debtors and is in the best interests of the Debtors' estates and their creditors. The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and adequately protect all applicable parties' interests in the Prepetition Collateral (if any).

K.      <u>Good Cause</u>.  The ability of the Debtors to obtain sufficient working capital and liquidity under this Interim Order and the other DIP Facility Documents is vital to the Debtors' estates and creditors. The liquidity to be provided under the DIP Facility Documents will enable the Debtors to continue to operate their business in the ordinary course and preserve the value of the Debtors' business. The Debtors' estates will be immediately and irreparably harmed if this Interim Order is not entered. Good cause has, therefore, exists for the relief sought in the Motion.

L.     <u>Good Faith</u>.  The DIP Facility Documents have been negotiated in good faith and at arm's-length by and among the Debtors and the DIP Lender.  The DIP Facility and other financial accommodations made to the Debtors by the DIP Lender pursuant to this Interim Order and the other DIP Facility Documents shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in Bankruptcy Code section 364(e), and the DIP Lender shall be entitled to all protections afforded thereunder, including, without limitation, the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision thereof is vacated, reversed or modified, on appeal or otherwise.

M.     <u>Business Judgment and Entire Fairness</u>.  The terms of the DIP Facility Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are the best available to the Debtors under the circumstances as of the Petition Date, are supported by reasonably equivalent value and fair consideration, and satisfy the "entire fairness" standard as to the Debtors.

N.     <u>Consideration</u>.  The Debtors will receive and have received fair and reasonable consideration from the DIP Lender and the Prepetition Lender in exchange for the use of Cash Collateral and from the DIP Lender for the financial accommodations provided under this Interim Order and the other DIP Facility Documents.

O.     <u>Notice</u>.  Sufficient and adequate notice of the Interim Hearing and the entry of this Interim Order have been given in accordance with Bankruptcy Rule 4001, and no other or further notice need be given for entry of this Interim Order.

P.     <u>Immediate Entry of Interim Order</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  The Motion and this Interim Order comply with Local Bankruptcy Rule 4001-1(b) and (c).  The

permission granted herein to enter into the DIP Facility Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors and their estates and creditors as its implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing business and further enhance the Debtors' prospects for a successful restructuring. Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED:**

1.      <u>Disposition</u>.   The relief requested in the Motion (including the terms and provisions of the DIP Facility Documents) is granted on an interim basis, subject to the terms set forth herein. Any objections to and/or reservations regarding the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits. This Interim Order shall be valid, binding on all parties in interest, and fully effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014.

2.      <u>Authorization</u>.

(a)      Subject to the Carve-Out, the Debtors are hereby authorized to immediately obtain DIP Loans in the aggregate principal amount of up to $500,000 (the "<u>Interim Borrowing Amount</u>"), pursuant to the terms of this Interim Order and subject to the terms of the DIP Facility Documents. The Debtors may use the proceeds of the DIP Facility to fund, in accordance with the DIP Facility Documents, (i) the working capital and general corporate needs of the Debtors and the costs of the Chapter 11 Cases (including funding the Carve-Out and paying professional fees and expenses) in accordance with the DIP Facility Documents

including, without limitation, the Approved Budget (and the variances permitted thereto), and (ii) provide adequate protection, in accordance with the terms of this Interim Order.

(b)     Subject to the Carve-Out, the Debtors are authorized to use Cash Collateral in which the DIP Lender and the Prepetition Lender, as applicable, may have an interest, in accordance with the terms, conditions, and limitations set forth in this Interim Order and the other DIP Facility Documents, without further approval by this Court.  Any dispute in connection with the use of Cash Collateral in accordance with the Interim Order and the other DIP Facility Documents shall be heard exclusively by this Court.

(c)     In entering into the DIP Facility Documents, and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments related thereto are terminated in accordance with the terms of the DIP Facility Documents, the Debtors shall not in any way grant, seek to grant, or cause to be granted any lien and/or claim that is senior to or *pari passu* with any of the liens, security interests, and claims provided under this Interim Order to the DIP Lender or the Prepetition Lender (other than the Carve-Out), including, without limitation, by offering a subsequent lender or any other party a superior or *pari passu* lien or claim pursuant to Bankruptcy Code section 364(d), or otherwise;

3.     <u>Authority to Execute and Deliver Necessary Documents</u>.

(a)     The Debtors are authorized to negotiate, prepare, enter into, and deliver the DIP Facility Documents, including any amendments thereto, that are requested by the DIP Lender.  The Debtors are further authorized and directed to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, and mortgages or deeds of trust encumbering all of the DIP Collateral (as defined below) and securing all of the Debtors'

- 11 -

obligations under the DIP Facility Documents, including payment of all DIP Obligations in cash that are requested by the DIP Lender.

(b)     The Debtors are hereby further authorized to (i) perform all of their obligations under the DIP Facility Documents, and such other agreements as may be required by the DIP Facility Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under this Interim Order and the other DIP Facility Documents, including, without limitation, the payment of fees, and the reimbursement of present and future costs and expenses (including, without limitation, funding the Carve-Out and the DIP Lender's attorneys' and other advisors' fees and expenses), paid or incurred by the DIP Lender as provided for in this Interim Order and the other DIP Facility Documents.  All such unpaid fees, commissions, costs, and other expenses of the DIP Lender shall be included and constitute part of the principal amount of the DIP Obligations and be secured by the DIP Liens.

(c)     All DIP Obligations shall constitute legal, valid, binding, fully perfected and non-avoidable obligations of the Debtors, enforceable against the Debtors' estates and their respective successors and assigns (including, without limitation, any successor trustee or other estate representative in the Chapter 11 Cases or subsequent or superseding chapter 7 or Chapter 11 Case (each, a "Successor Case," and, collectively, the "Successor Cases")), in accordance with the terms of this Interim Order and the other DIP Facility Documents, and no obligation, payment, transfer, or grant of security under this Interim Order or the other DIP Facility Documents shall be voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under Bankruptcy Code section 502(d)) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable,

contractual or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

   4. <u>DIP Claims</u>.

    (a) Subject to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all DIP Obligations shall constitute allowed super-priority administrative expense claims (the "<u>DIP Claims</u>") in the Chapter 11 Cases against the Debtors, their estates in the Chapter 11 Cases, and any Successor Cases, having priority over any and all other administrative claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under Bankruptcy Code sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof; <u>provided</u> that the DIP Claims shall have recourse to proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "<u>Avoidance Actions</u>") solely upon entry of the Final Order. Except as expressly set forth herein, no other super-priority claims shall be granted or allowed in the Chapter 11 Cases.

    (b) The DIP Claims, and other rights and remedies granted under this Interim Order and the other DIP Facility Documents to the DIP Lender shall continue in the Chapter 11 Cases and in any Successor Cases, and DIP Claims shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and

completely satisfied and the DIP Lender's commitments have been terminated in accordance with the DIP Facility Documents.

5.      DIP Liens.

(a)      To secure the DIP Obligations, the DIP Lender is hereby granted, immediately upon the entry of this Interim Order, continuing valid, binding, enforceable, fully perfected and non-avoidable liens on and senior security interests (collectively, the "DIP Liens") in all Prepetition Collateral, all of the other property, assets and interests in property and assets of the Debtors (or any successor trustee or other estate representative in the Chapter 11 Cases or Successor Cases), and all "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors (or any successor trustee or other estate representative in the Chapter 11 Cases or Successor Cases), of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, accounts, documents, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, commercial tort claims, cash, cash equivalents, securities accounts, deposit accounts, commodity accounts, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action, including Avoidance Actions (subject to entry of the Final Order), and other general intangibles, and all products and proceeds thereof (collectively, the "DIP Collateral").  The DIP Liens securing the DIP Collateral shall be subject in all respects only to the Carve-Out, the Permitted Priority Liens, and the Prepetition Credit Agreement Liens.

(b)      Except as provided in the final sentence of the precedent paragraph, the DIP Liens shall not at any time be (i) made subject or subordinate to, or made *pari passu* with, any other lien, security interest, or claim existing as of the Petition Date, or created under

Bankruptcy Code sections 363 or 364(d) or otherwise or (ii) any lien or security interest that is avoided and preserved for the benefit of the Debtors' estate under Bankruptcy Code section 551.

(c)     The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements or other agreements or instruments, such that no additional steps need be taken by the DIP Lender to perfect such interests.  Subject to notice of hearing and entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the transactions granting the DIP Lender the DIP Liens on such fee, leasehold or other interest or other DIP Collateral or the proceeds of any assignment, sale or other transfer thereof.

(d)     The DIP Liens and other rights and remedies granted under this Interim Order to the DIP Lender shall continue in the Chapter 11 Cases and in any Successor Cases, and such liens and security interests shall maintain their first priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and the DIP Lender's commitments have been terminated in accordance with the DIP Facility Documents.

6.     <u>Additional Perfection Measures</u>. The DIP Liens and the Replacement Liens (as defined below) shall be perfected by operation of law immediately upon entry of this Interim Order.  None of the Debtors, the DIP Lender, or the Prepetition Lender shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens or the Replacement Liens.

(a)     The DIP Lender or the Prepetition Lender may, but shall not be obligated to, obtain consents from any landlord, licensor, or other party in interest, file mortgages, financing statements, notices of lien or similar instruments, or otherwise record or perfect such security interests and liens, in which case:

i.     all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

ii.     no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)     In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Lender or the Prepetition Lender may, but shall not be obligated to, file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of DIP

Collateral or Prepetition Collateral, as applicable, and such filings by the DIP Lender or the Prepetition Lender shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

7.      Fees.  All fees, costs and/or expenses payable or reimbursable by the Debtors as set forth in the DIP Facility Documents are hereby approved.  The Debtors are hereby authorized to pay all such fees, costs, and expenses in accordance with the terms of this Interim Order and the other DIP Facility Documents, without the DIP Lender or its counsel having to file any further application with this Court for approval or payment of such fees, costs or expenses, provided that such fees, costs, and expenses shall not include or be deemed to include any costs and expenses incurred by the DIP Lender to the extent such costs are primarily related to (a) the Prepetition Credit Agreement or (b) any sale of a material portion of the Debtors' assets to the DIP Lender or any of its affiliates.  Any such fees, costs, and expenses incurred by professionals retained by the DIP Lender shall be paid within ten (10) calendar days of delivery of a summary invoice to the Debtors; provided that the Debtors shall promptly provide copies of such invoices to the U.S. Trustee, and the Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten (10) days after receipt thereof.  In the event that within ten (10) days from receipt of such invoices the Debtors or the U.S. Trustee raises an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Court shall hear and determine such dispute; provided, further, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered"

- 17 -

pursuant to a final order of the Court.  Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Lender, whether incurred prior to or after the Petition Date, shall be deemed fully earned, indefeasibly paid, irrevocable, and non-avoidable pursuant to, and in accordance with, the terms of the DIP Facility Documents and, irrespective of any subsequent order approving or denying approval of the DIP Facility Documents or any other financing pursuant to section 364 of the Bankruptcy Code, fully entitled to all protections of Bankruptcy Code section 364(e).  All such unpaid fees, costs and expenses of the DIP Lender, including, without limitation, all fees referred to in the DIP Facility Documents (including, without limitation, all attorneys' and other professionals' fees and expenses of the DIP Lender to the extent provided in this Interim Order), shall constitute DIP Obligations and shall be secured by the DIP Collateral and afforded all priorities and protections afforded to the DIP Obligations under this Interim Order and the other DIP Facility Documents.

8.     _Adequate Protection for Prepetition Lender_.  The Debtors have requested that the Prepetition Lender consent to, among other things, (i) the Debtors' use of Cash Collateral and the other Prepetition Collateral, and (ii) the incurrence of the DIP Obligations by the Debtors under the DIP Facility Documents.  The Debtors acknowledge and stipulate that the Prepetition Lender is entitled, pursuant to Bankruptcy Code sections 361 and 363(e), to adequate protection solely to the extent of its interests in the Prepetition Collateral, including the Cash Collateral, in exchange for the Debtors' continued use of such Prepetition Collateral, including to the extent of the aggregate diminution in value, if any, of the Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral.  As adequate protection, the Prepetition Lender and its assignees and designees are hereby granted the protections described

in clauses (a) through (c) below and such other protections set forth in this Interim Order including, without limitation, the right to credit bid the Prepetition Credit Agreement Obligations set forth in paragraph 19 of this Interim Order and the reporting obligations set forth in paragraph 22 of this Interim Order, which shall be referred to collectively as the "Adequate Protection Obligations":

      (a)    Adequate Protection Liens.  Pursuant to Bankruptcy Code sections 361 and 363(e), as adequate protection of the interests of the Prepetition Lender in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value, (ii) the Debtors' use of Cash Collateral and other Prepetition Collateral, and (iii) the imposition of the automatic stay, the Debtors hereby grant to the Prepetition Lender, continuing valid, binding, enforceable, fully perfected and non-avoidable liens on and post-petition security interests in and liens on the DIP Collateral (the "Replacement Liens").  The Replacement Liens shall be junior in priority only to:  (i) the Carve-Out; (ii) the DIP Liens on the DIP Collateral; and (iii) the Permitted Priority Liens and Prepetition Credit Agreement Liens on the Prepetition Collateral.  The Replacement Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

      (b)    Adequate Protection Claim.  As further adequate protection of the interests of the Prepetition Lender in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value, (ii) the Debtors' use of Cash Collateral and other Prepetition Collateral, and (iii) the imposition of the automatic stay, the Prepetition Lender is hereby granted, as and to the extent provided by Bankruptcy Code section 507(b), an allowed

super-priority administrative expense claim in the Chapter 11 Cases and any Successor Cases (the "<u>Adequate Protection Claim</u>").  The Adequate Protection Claim shall have priority over any and all other administrative claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under Bankruptcy Code sections 105(a), 326, 328, 330, 331, 365, 503(a) 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof including, without limitation, but subject to the entry of the Final Order, any proceeds or property recovered in connection with the pursuit of the Avoidance Actions; <u>provided</u> that the Adequate Protection Claim shall be junior in priority in all respects to the DIP Claims and the Carve-Out.

(c)    <u>Payment of Prepetition Lender's Fees and Expenses</u>.    As additional adequate protection for the use of the Prepetition Collateral (including Cash Collateral) by the Debtors, the Debtors shall pay, monthly in arrears in cash, all reasonable and documented out of pocket costs and expenses of Curtis, Mallet-Prevost, Colt & Mosle LLP, as counsel to the Prepetition Lender and one law firm acting as local counsel to the DIP Lender in connection with the negotiation and documentation of the DIP Facility Documents and the Chapter 11 Cases, solely in its capacity as such under the DIP Facility Documents, including all reasonable and documented fees, out-of-pocket expenses and out-of-pocket disbursements of Curtis, Mallet-Prevost, Colt & Mosle LLP and any such firm acting as local counsel to the DIP Lender, incurred in connection with the Chapter 11 Cases, regardless of when such expenses are actually

incurred, and including, but not limited to, the monitoring of the Chapter 11 Cases or in connection with the enforcement or protection of any of the Prepetition Lender's rights and remedies.

      9.     <u>Budget</u>.

      (a)     Attached as <u>Exhibit A</u> hereto and incorporated by reference is a budget (the "<u>Approved Budget</u>") setting forth a 13-week budget (the "<u>Original Budget Period</u>"), which reflects on a line item basis the Debtors' anticipated cumulative cash receipts, disbursements, and expenses (other than receipts, disbursements, and expenses on account of professional fees and expenses) on a weekly basis and all necessary and required cumulative expenses.

      (b)     The Debtors shall be authorized to use proceeds of the DIP Facility in accordance with the Approved Budget subject to the permitted variances set forth and defined in the DIP Credit Agreement (each a "<u>Permitted Variance</u>").

      (c)     Not later than one month prior to the expiration of the Original Budget Period, the Debtors shall provide to the DIP Lender a proposed budget for an additional 13-week period in substantially the same format as the previous budget, which, upon acceptance by the DIP Lender, in its reasonable discretion, shall become the Approved Budget; <u>provided</u> that a new budget may be effectuated at any time with the consent of the DIP Lender.  For the avoidance of any doubt, during the Remedies Notice Period (as defined below), the Debtors may continue to use the proceeds of the DIP Facility in the ordinary course of business, consistent with past practices and the most recent Approved Budget, but may not enter into any transactions or arrangements that are not in the ordinary course of business; <u>provided</u> that in no event shall any proceeds of the DIP Facility be used for capital expenditures during the Remedies Notice Period. The Debtors shall provide the DIP Lender with a weekly report, in a form and substance

acceptable to the DIP Lender, in its reasonable discretion, of the variances from the Approved Budget for each weekly period during the term of the DIP Facility within four (4) business days after the end of such weekly period (with the first such report delivered within four (4) business days after January 22, 2016, which report shall show the percentage variance of actual receipts and disbursements from those reflected in the Approved Budget).

(d)     Nothing contained herein or the other DIP Facility Documents shall be construed to limit the ability of the DIP Lender to object to the allowance of any fees and expenses of Professionals (as defined below).

10.     Carve-Out.

(a)     Payment of any amounts on account of the DIP Liens and the DIP Claims shall be subject and subordinate to payment of:  (i) amounts payable pursuant to 28 U.S.C. § 1930 (collectively, the "UST Fees") and incurred after the first business day following effective delivery of a Carve-Out Trigger Notice (as defined below); (ii) fees and expenses up to $25,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) allowed fees, expenses and costs of attorneys, accountants and other professionals retained in the Chapter 11 Cases by the Debtors or, subject in all respects to the Approved Budget, the Creditors' Committee (if any), pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 (collectively, the "Professionals") owed pursuant to such Professionals' respective engagement letters (other than any success fee, transaction fee, or other similar fee set forth in such Professionals' respective engagement letter) and, in respect of Professionals retained by the Creditors' Committee (if any), to the extent permitted under the Approved Budget, which are actually incurred on or prior to the first business day following delivery of a Carve-Out Trigger Notice, whether or not allowed by interim order, procedural order, or otherwise, prior to or after

- 22 -

such date (collectively, the "Estate Professional Fees"); and (iv) allowed fees, expenses and costs of Professionals owed pursuant to such Professionals' respective engagement letter (other than any success fee, transaction fee, or other similar fee set forth in such Professionals' respective engagement letter) to the extent permitted under the Approved Budget, which are actually incurred after the first business day following delivery of a Carve-Out Trigger Notice not to exceed $250,000 in the aggregate (the "Post-Carve-Out Trigger Notice Cap"), whether or not allowed by interim order, procedural order, or otherwise, prior to or after such date, in each case subject to the rights of the DIP Lender to object to the allowance of any such fees and expenses, it being understood that the Approved Budget shall always include cash to fund the Post-Carve-Out Trigger Notice Cap in full in cash to the extent provided in the DIP Facility Documents. (the immediately preceding clauses (i), (ii), (iii) and (iv), collectively, the "Carve-Out").

(b)     For purposes of this Interim order, "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Lender to the Debtors (including via email), which notice may be delivered at any time following the occurrence and during the continuation of an Event of Default (as defined below).  Within five (5) business days following the delivery of a Carve-Out Trigger Notice, each Professional shall provide written notice (including via e-mail) to the DIP Lender of its accrued but unpaid Estate Professional Fees as of the date of the Carve-Out Trigger Notice (such fees collectively, the "Pre-Carve-Out Trigger Notice Reserve").   The Debtors shall thereafter be authorized to utilize any and all cash on hand as of the date of the Carve-Out Trigger Notice and any available cash thereafter held by the Debtors to fund the Pre-Carve-Out Trigger Notice Reserve, and to deposit and hold such cash in a segregated account in trust to pay any such Estate Professional Fees prior to any and all other claims other than UST

fees.  In addition, the Debtors shall deposit cash in such segregated account in an amount not to exceed the Post-Carve-Out Trigger Notice Cap to pay Estate Professional Fees benefiting from the Post-Carve-Out Trigger Notice Cap (the "Post Carve-Out Trigger Notice Reserve," and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims other than UST fees.

(c)     All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "Pre-Carve-Out Amounts") until paid in full in cash, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender and the Prepetition Lender in accordance with their rights and priorities under applicable law.  All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender and the Prepetition Lender in accordance with their rights and priorities under applicable law.

(d)     Notwithstanding anything to the contrary in this Interim Order, if either of the Carve-Out Reserves are not funded in full in the amounts set forth herein, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth herein, prior to making any payments to the DIP Lender and/or the Prepetition Lender in accordance with their rights and priorities under applicable law. Notwithstanding anything to the contrary in the DIP Facility Documents, the Prepetition Credit Agreement, this Interim Order, or the Final Order, following delivery of a Carve-Out Trigger

Notice, the DIP Lender and Prepetition Lender shall not, and shall not direct any entity to, sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been funded in full in cash.

(e)     Further, notwithstanding anything to the contrary in the DIP Facility Documents, the Prepetition Credit Agreement, this Interim Order, or the Final Order, the failure of the Carve-Out Reserves to satisfy in full the Estate Professional Fees shall not affect the priority of the Carve-Out and, furthermore, in no way shall the Approved Budget, Permitted Variance, Carve-Out, Post-Carve-Out Trigger Notice Cap, Carve-Out Reserves, or any of the foregoing be construed as a cap or limitation on the allowance of Estate Professional Fees; provided that the foregoing shall not be construed as an authorization to use any proceeds of the DIP Facility, DIP Collateral or proceeds thereof, the Prepetition Collateral, the  Cash Collateral or proceeds thereof or any Cash Collateral to pay any such Estate Professional Fees.

(f)     Any payment or reimbursement made prior to the occurrence of the Carve-Out Trigger Notice in respect of any Estate Professional Fees shall not reduce the Carve-Out.

(g)     For the avoidance of doubt, the proceeds of the DIP Facility may be used, subject to the Approved Budget on the terms set forth herein for payment of (i) amounts payable pursuant to 28 U.S.C. § 1930 and (ii) fees and expenses of Professionals allowed and payable under Sections 330 and 331 of the Bankruptcy Code.

11.     Termination of DIP Facility and Cash Collateral Usage.     Notwithstanding anything in this Interim Order or the other DIP Facility Documents to the contrary, the DIP Lender's obligation to make DIP Loans in accordance with the DIP Facility Documents and the Prepetition Lender's consent to the use of Cash Collateral shall automatically terminate without

any further action by this Court o9r the DIP Lender or Prepetition Lender, upon the earliest to occur of (such date, the "Termination Date"): (i) May 10, 2016; (ii) the effective date of a plan of reorganization or liquidation under chapter 11 of the Bankruptcy Code (a "Chapter 11 Plan") in respect of any Debtor; (iii) the date on which all DIP Obligations become due and payable; (iv) an Event of Default; (v) the acceptance by any Debtor of any offer or bid for the purchase of all or substantially all of the assets of any Debtor or any of the equity of a reorganized Debtor which is unacceptable to the DIP Lender, unless the proceeds of such offer or bid will be used to pay in full in cash all of the DIP Obligations (which, for the avoidance of doubt, may occur only upon the payment in full in cash of all Prepetition Credit Agreement Obligations); (vi) the acceleration of the DIP Loans in accordance with the DIP Facility Documents; or (vii) the conversion or dismissal of the Chapter 11 Cases.

12.     Events of Default. The occurrence of any event identified in Section 8.1 of the DIP Credit Agreement shall constitute an "Event of Default" upon five (5) business days following delivery of written notice (such period of time, the "Waiting Period") by the DIP Lender to the Debtors, the U.S. Trustee, the Creditors' Committee (if any), and any other official committee appointed in the Chapter 11 Cases unless such event has been cured or waived by the DIP Lender during the Waiting Period.

13.     Automatic Stay Modified.

(a)     Subject to the provisions of subparagraphs (b) and (c) hereof, the automatic stay provisions of Bankruptcy Code section 362 hereby are, to the extent applicable, vacated, and modified to the extent necessary to allow the DIP Lender:

i.     whether or not an Event of Default has occurred, to require all cash, checks or other collections or proceeds from DIP Collateral received by the Debtors to be

deposited in accordance with the requirements of the DIP Facility Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Lender under the DIP Facility Documents in accordance with any requirements of the DIP Facility Documents;

ii.     upon the occurrence of an Event of Default, to exercise all rights and remedies provided for in this Interim Order, the other DIP Facility Documents, or under other applicable bankruptcy and nonbankruptcy law to effect the repayment of the DIP Obligations to the extent permitted under this Interim Order and the other DIP Facility Documents (including the right to setoff funds in accounts maintained by the Debtors with the DIP Lender to repay the DIP Obligations, as to which such prior written notice shall not be required) without requiring prior authorization of this Court in order to exercise such rights and remedies; and

iii.     immediately upon the occurrence of an Event of Default, without providing any prior notice thereof, (A) the DIP Lender may charge interest at the default rates pursuant to the DIP Credit Agreement, (B) the DIP Lender shall not have any further obligation to provide financing under this Interim Order, the DIP other Facility Documents, or otherwise, and may, in its sole discretion, terminate all commitments with respect to the DIP Facility, (C) the DIP Lender may declare all DIP Obligations to be immediately due and payable; (D) the DIP Lender may freeze monies or balances in the Debtors' accounts, and (E) after the expiration of the Waiting Period any authorization to use Cash Collateral shall terminate.

(b)     During the Waiting Period, the Debtors shall not use any Cash Collateral or any DIP Facility proceeds to pay any expenses except those provided for in the Approved Budget that were actually incurred prior to an Event of Default, but which remain unpaid at the

time of an Event of Default.   In no event will expenses under the Approved Budget be considered incurred until the week such expenses are listed in the Approved Budget.

(c)      The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under the DIP Facility Documents or otherwise.  The Debtors shall cooperate fully with the DIP Lender in its exercise of rights and remedies, whether against the DIP Collateral or otherwise.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition, or continuance of the automatic stay of Bankruptcy Code section 362(a), use of Cash Collateral, or other injunctive relief requested.

14.      Restriction on Use of DIP Facility.

(a)      The DIP Claims, DIP Liens, Adequate Protection Claim, Replacement Liens, Prepetition Credit Agreement Obligations, and Prepetition Credit Agreement Liens shall be senior to, and, no proceeds or portion of the DIP Facility, the DIP Collateral or proceeds thereof, the Prepetition Collateral or proceeds thereof, Cash Collateral or proceeds thereof, or any portion of the Carve-Out may be used to pay, directly or indirectly by the Debtors, the Creditors' Committee (if any), or any trustee or other estate representative appointed in these Chapter 11 Cases or any Successor Cases or any other person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) for any of the following actions or activities (the "Proscribed Actions"): (i) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens, Replacement Liens, or Prepetition Credit Agreement Liens; (ii) to seek authorization to obtain claims that are senior to, or *pari passu* with, the DIP Claims, Adequate Protection Claim or Prepetition Obligations; or

- 28 -

(iii) except as expressly set forth in the proviso at the end of this paragraph, directly or indirectly prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or any other relief against, or adverse to the interests of the DIP Lender or the Prepetition Lender, and any of their respective officers, managers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter, including, without limitation, (A) any Avoidance Actions; (B) any "lender liability" claims and causes of action; (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, DIP Obligations, Adequate Protection Claim or Prepetition Obligations, DIP Liens, Replacement Liens, or Prepetition Credit Agreement Liens; (D) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part or the DIP Obligations, Adequate Protection Claim or Prepetition Obligations, DIP Liens, Replacement Liens, or Prepetition Credit Agreement Liens; (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Lender or Prepetition Lender hereunder or under any of the other DIP Facility Documents or the Prepetition Loan Documents, including, claims, proceedings, or actions that might prevent, hinder or delay any of its assertions, enforcements, realizations, or remedies on or against the DIP Collateral or Prepetition Collateral in accordance with this Interim Order or the other DIP Facility Documents or the Prepetition Loan Documents; or (F) objecting to, contesting, or interfering with, in any way, the DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; provided that the foregoing shall not limit the ability of (x) the Creditors' Committee (if any), subject to an investigation budget not to exceed

$25,000, to investigate (and commence discovery in respect of) claims, causes of action, objections, or other litigation against the Prepetition Lender or its affiliates related to the validity, priority, or enforceability of the Prepetition Credit Agreement Obligations and Prepetition Credit Agreement Liens, or (y) the ability of the Debtors and their advisors to respond to inquiries by the Creditors' Committee related to the foregoing or in connection therewith.

15.   Challenge Period.

(a)   Subject only to the terms of this paragraph 15, the Debtors' Stipulations shall be without prejudice to the rights of the Creditors' Committee (if any) to seek to disallow the Prepetition Credit Agreement Obligations or to pursue any claims or seek appropriate remedies against the Prepetition Lender in connection with the Prepetition Credit Agreement Obligations.  The Debtors' Stipulations shall be binding upon all parties (including, without limitation, the Debtors, the Creditors' Committee (if any), any trustee, examiner or other estate representative appointed in the Chapter 11 Cases, and any Chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Cases) (each, a "Challenge Party"), unless and solely to the extent that (i) a Challenge Party commences a Challenge (as defined below) prior to the expiration of the Challenge Period (as defined below) and (ii) the Court rules in favor of the plaintiff in any such timely filed Challenge.  For purposes of this Interim Order:  (A) "Challenge" means that a party in interest that has been granted standing by the Court, must commence, as appropriate, a contested matter or adversary proceeding, raising an objection, claim, suit or other  challenge, including, without limitation, a claim in the nature of setoff, counterclaim or defense against the Prepetition Lender on behalf of the Debtors' estates, or to object to or to challenge the Debtors' Stipulations; and (B) subject to entry of the Final Order, "Challenge Period" means (i) with respect to any party in interest other than the Creditors'

Committee (if any), the period from the Petition Date until the date that is 75 calendar days after the entry of this Interim Order and (ii) with respect to the Creditors' Committee (if any), 60 calendar days from the date the U.S. Trustee appoints the Creditors' Committee (if any).

(b)     Upon the expiration of the Challenge Period without the filing of a Challenge (the "Challenge Period Termination Date"):  (A) any and all such Challenges and objections by any Challenge Party shall be deemed to be forever waived, released and barred; (B) all matters not subject to the Challenge, and all of the Debtors' Stipulations shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases; and (C) any and all claims or causes of action against the Prepetition Lender and/or its affiliates relating in any way to the validity, priority, or enforceability of the Prepetition Credit Agreement Obligations and Prepetition Credit Agreement Liens shall be forever waived, released and barred by the Debtors, the Debtors' estates, and all creditors, interest holders and other parties in interest in the Chapter 11 Cases and any Successor Cases.

(c)     Nothing in this Interim Order vests or confers on any person, including the Creditors' Committee (if any), standing or authority to directly or indirectly support or pursue any cause of action, claim, defense, or other right of the Debtors or their estates under the Bankruptcy Code or any other applicable law.

16.    DIP Lender Release.  Upon entry of this Interim Order, the Debtors, on their own behalf and their estates (including any successor trustee or other estate representative in any Chapter 11 Cases or Successor Cases), forever and irrevocably:  (i) release, discharge, and acquit the DIP Lender, solely in its capacity as DIP Lender, and each of its former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial

advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Facility Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the DIP Liens and DIP Claims.

17.     <u>Limits on Lender's Liability</u>. Nothing in this Interim Order or in any of the DIP Facility Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from any and all activities by the Debtors in the operation of their business or in connection with their restructuring efforts.

18.     <u>Limitation on Additional Surcharges and Marshalling</u>. | Subject to entry of the Final Order, no action, inaction or acquiescence by the DIP Lender or the Prepetition Lender, including funding the Debtors' ongoing operations under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lender or the Prepetition Lender to a charge against the DIP Collateral or Prepetition Collateral, as applicable, pursuant to Bankruptcy Code sections 506(c) or 552(b), and no such costs, fees, or expenses shall be so charged against the DIP Collateral without the prior written consent of the DIP Lender or the Prepetition Lender, as applicable.   The DIP Lender and the Prepetition Lender shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral.

19.     <u>Right to Credit Bid</u>.  Prior to the indefeasible payment in full, in cash, of the DIP Obligations and the Prepetition Credit Agreement Obligations, as applicable, the DIP Lender and the Prepetition Lender (including their assignees and designees) shall have the right to credit bid up to the full amount of the DIP Obligations and Prepetition Credit Agreement Obligations, as applicable in connection with any bulk or piecemeal sale of all or any portion of the DIP Collateral or the Prepetition Collateral, as applicable, conducted pursuant to a Chapter 11 Plan or section 363 of the Bankruptcy Code.  No sale of any DIP Collateral or the Prepetition Collateral shall constitute a waiver by the DIP Lender or the Prepetition Lender, as applicable, of any deficiency claim under any applicable law.  For the avoidance of doubt, as part of the Adequate Protection Obligations, the Prepetition Lender (including its assignees and designees) shall be allowed to credit bid the full amount of the Prepetition Credit Agreement Obligations with respect to any sale of the Prepetition Collateral not in the ordinary course of business pursuant to a Chapter 11 Plan or section 363 of the Bankruptcy Code.

20.     <u>Proofs of Claim</u>.  The DIP Lender and the Prepetition Lender are hereby relieved of the requirement to file proofs of claim in the Chapter 11 Cases with respect to any DIP Obligations or Prepetition Credit Agreement Obligations, as applicable.

21.     <u>Access to DIP Collateral</u>.  Subject to entry of a Final Order upon adequate notice, and notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Lender contained in this Interim Order or the other DIP Facility Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Facility Documents, upon three (3) business days' written notice to the Debtors and any landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default has occurred and is continuing, the DIP Lender (i) may, unless

otherwise provided in any separate agreement by and between the applicable landlord or licensor, and the DIP Lender (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their business, in either the case of subparagraph (i) or (ii) of this paragraph without interference from lienholders or licensors thereunder, subject to the rights of such lienholders or licensors under applicable law; provided, however, that the DIP Lender shall pay only rent and additional rent, fees, royalties or other obligations of the Debtors that first arise after the DIP Lender's written notice referenced above and that are payable during the period of such occupancy or use by the DIP Lender, as the case may be, calculated on a per diem basis. Nothing herein shall require the Debtors or the DIP Lender to assume any lease or license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Lender in this paragraph.

      22.    <u>Reporting</u>.  The Debtors shall provide the DIP Lender and the Prepetition Lender with the following documentation, reports and other information (collectively, the "<u>Reporting Information</u>"):  (i) reports of cash receipts and disbursements and incurred expenses on a weekly basis, commencing on the entry of the Interim Order; (ii) copies of all reports filed with the Office of the United States Trustee within two (2) business days before such filing; (iii) a good-faith estimate of the accrued but unpaid fees, expenses, and costs incurred by the Debtors' advisors as of a date identified by the DIP Lender or the Prepetition Lender, as such party may

from time to time reasonably request in writing; (iv) an illustrative, non-binding forecast of the projected fees, expenses, and costs of the Debtors' advisors for a period identified by the DIP Lender or the Prepetition Lender, as such party may from time to time reasonably request in writing; (v) regular updates necessary to keep the DIP Lender and the Prepetition Lender reasonably informed regarding any material developments relating to the Debtors' efforts to market and sell any portion of the DIP Collateral or the Prepetition Collateral, as applicable, conducted pursuant to a Chapter 11 Plan or section 363 of the Bankruptcy Code; and (vi) such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of the Debtors, or concerning any matter that may affect the administration of the estate, as the DIP Lender or the Prepetition Lender may from time to time reasonably request in writing as soon as reasonably practicable, but in no event later than 10 business days after any such request.   All Reporting Information shall be in accordance with accounting principles and bookkeeping practices consistently applied with past accounting principles and bookkeeping practices and reporting of the Debtors to the Prepetition Lender.   Upon reasonable written notice (including via email) to the Debtors' counsel, during normal business hours, the DIP Lender or the Prepetition Lender and their respective agents and advisors shall have full access to the Debtors' business records, business premises, and to the DIP Collateral and the Prepetition Collateral, and any documentation or information related thereto, to enable the DIP Lender, the Prepetition Lender or their agents and advisors to (a) review, appraise, and evaluate the DIP Collateral and the Prepetition Collateral, (b) inspect and review the financial records and all other records of the Debtors concerning the Debtors' overall financial condition, and (c) evaluate all other records relating to the operations of the Debtors and value of the DIP Collateral and the Prepetition Collateral.   The Debtors shall cooperate in a

commercially reasonable manner with the DIP Lender and the Prepetition Lender, as applicable, regarding such reviews, evaluations, and inspections, and shall make its employees and professionals reasonably available during normal business hours and with prior written notice to the Debtors' counsel (including via email) to the DIP Lender, and the Prepetition Collateral and their respective professionals and consultants to conduct such reviews, evaluations and inspections.

23.     <u>Collateral Rights</u>. Subject to and after payment in full of all Prepetition Credit Agreement Obligations, in the event that any party who has both received notice of the Interim Hearing and holds a lien or security interest in DIP Collateral or Prepetition Collateral that is junior and/or subordinate to the DIP Liens or the Replacement Liens in such DIP Collateral or Prepetition Collateral, as applicable, receives or is paid the proceeds of such DIP Collateral or Prepetition Collateral, as applicable, or receives any other payment with respect thereto from any other source, prior to indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations under the DIP Facility Documents and the termination of the commitments in accordance with the DIP Facility Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such Collateral in trust for the DIP Lender and shall immediately turn over such proceeds (i) first for application to the DIP Obligations under the DIP Facility Documents in accordance with this this this Interim Order and the other DIP Facility Documents until indefeasibly paid in full, and (ii) second for application to the Adequate Protection Claim.

24.     <u>Cash Management Systems</u>. The Debtors are authorized to maintain their cash management system in a manner consistent with the this Interim Order, the other DIP Facility Documents, and the order of this Court approving the maintenance of the Debtors' cash

management system, provided, however, that such order is on terms and conditions acceptable to the DIP Lender and such order is not inconsistent with the terms specified herein and the DIP Facility Documents.

25.     Insurance Policies.   Upon entry of this Interim Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral. The Debtors are authorized and directed to take any actions necessary to have the DIP Lender be added as an additional insured and loss payee on each insurance policy.

26.     Mandatory Repayments.   Subject to and after payment in full of all Prepetition Credit Agreement Obligations, the Debtors shall promptly remit to the DIP Lender 100% of the net cash proceeds from any and all asset sales (other than the sales of inventory in the ordinary course of the Debtors' business), insurance and condemnation proceeds (unless the Debtors promptly informs the DIP Lender that such proceeds are to be used by the Debtors to repair or replace damaged property and are in fact so used within 150 calendar days of the Debtors' receipt of such proceeds), and other extraordinary receipts.

27.     Payment of Compensation.   So long as an Event of Default has not occurred, and to the extent permitted under the DIP Facility Documents (including, for the avoidance of doubt, the Approved Budget, as applicable), the Debtors shall be permitted to pay fees and expenses allowed and payable, as applicable, by any interim, procedural, or final order of this Court (that has not been vacated or stayed, unless the stay has been vacated) under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable

28.     <u>Successors and Assigns</u>.  The DIP Facility Documents and the provisions of this Interim Order shall be binding upon the Debtors, the DIP Lender, the Prepetition Lender, and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the DIP Lender, the Prepetition Lender, and each of their respective successors and assigns including, without limitation, any trustee, responsible officer, estate administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code.  The provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders, and all other parties in interest.

29.     <u>Binding Nature of Agreement</u>.  Each of the DIP Facility Documents to which the Debtors are or will become a party shall constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with its terms.  The DIP Facility Documents have been or will be properly executed and delivered to the DIP Lender by the Debtors no later than one business day after entry of this Interim Order.  The rights, remedies, powers, privileges, liens, and priorities of the DIP Lender provided for in this Interim Order and in the other DIP Facility Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order), by any Chapter 11 Plan in the Chapter 11 Cases, by the dismissal or conversion of the Chapter 11 Cases or in any Successor Cases under the Bankruptcy Code unless and until the DIP Obligations have first been indefeasibly paid in full in cash and completely satisfied and the commitments terminated in accordance with the DIP Facility Documents.

30.     <u>Binding Effect of Interim Order</u>.  The terms of this Interim Order shall be binding on any trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

31.     <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to Bankruptcy Code section 364, and Bankruptcy Rules 4001(b) and (c), granting the DIP Lender all protections afforded by Bankruptcy Code section 364(e).  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtors to the DIP Lender, prior to the date of receipt by the DIP Lender of written notice of the effective date of such action or (ii) the validity and enforceability of any lien or priority authorized or created under this Interim Order or pursuant to the other DIP Facility Documents.  Notwithstanding any such reversal, stay, modification or vacatur, any post-petition indebtedness, obligation or liability incurred by the Debtors to the DIP Lender prior to written notice to the DIP Lender of the effective date of such action shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the other DIP Facility Documents with respect to all such indebtedness, obligations or liability.

32.     <u>No Waiver</u>. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Court.

33.     <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the other DIP Facility Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights thereunder, or otherwise of the DIP Lender.

34.    <u>No Third Party Beneficiary</u>. Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

35.    <u>Survival</u>. Except as otherwise provided herein, (a) the protections afforded to the DIP Lender and the Prepetition Lender under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing any of the Chapter 11 Cases or (ii) converting the Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Replacement Liens, the DIP Claims and the Adequate Protection Claim shall continue in the Chapter 11 Cases, in any Successor Cases or after any such dismissal. Except as otherwise provided herein, the DIP Liens, the Replacement Liens, the DIP Claims and the Adequate Protection Claim shall maintain their priorities as provided in this Interim Order, the Final Order, and the other DIP Facility Documents, and shall not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Lender in accordance with the Final Order), or any conversion of the Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Cases, or by any other act or omission until (i) all DIP Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments under the DIP Facility Documents are terminated in accordance therewith, and (ii) the Prepetition Credit Agreement Obligations have been indefeasibly repaid in full.

36.    <u>Amendments, Consents, Waivers, and Modifications</u>.  The Debtors and the DIP Lender may enter into any non-material amendments, consents, waivers or modifications to the DIP Facility Documents without the need for further notice and hearing or any order of this

Court; provided that the Debtors shall provide the U.S. Trustee and the Creditors' Committee (if any) with notice of any non-material modification to the DIP Facility Documents.

37. <u>Priority of Terms</u>. To the extent of any conflict between or among the terms and provisions of (a) this Interim Order, on the one hand, or (b) the other DIP Facility Documents, the Motion, any other order of this Court, or any other agreements, on the other hand, the terms and provisions of this Interim Order shall govern unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the other DIP Facility Documents.

38. <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction overall all matters pertaining to the implementation, interpretation and enforcement of this Interim Order and the other DIP Facility Documents.

39. <u>Entry of Interim Order; Effect</u>.  This Interim Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Interim Order on this Court's docket in the Chapter 11 Cases.

40. <u>Adequate Notice</u>.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to the U.S. Trustee, counsel to the DIP Lender, counsel to any known secured creditors of record, the thirty (30) largest unsecured creditors of the Debtors, any known party asserting a lien against any of the Debtors' assets, the Internal Revenue Service, any known party effected by the terms of the Final Order, and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with this Court and served so as to be <u>actually</u> <u>received</u> no later than five business (5) days prior to the Final Hearing by the following:  (i) Sherwin Alumina Company, LLC, 4633 Highway 361, Gregory, Texas

78359 (Attn:   Kent Britton (kbritton@sherwinalumina.com)); (ii) Kirkland & Ellis LLP, 300

North   LaSalle,   Chicago,   Illinois   60654   (Attn.:       Gregory   F.   Pesce,   Esq.

(gregory.pesce@kirkland.com)), proposed co-counsel to the Debtors; (iii) Curtis, Mallet-Prevost,

Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178-0061 (Attn:   Steven J.

Reisman, Esq. (sreisman@curtis.com)), counsel to the DIP Lender and Prepetition Lender; and

(iv) the Office of the United States Trustee for Southern District of Texas, 606 N. Carancahua

Street, Suite 1107 Corpus Christi, Texas 78401).

41.   <u>Final Hearing Date</u>.   The Final Hearing to consider the entry of the Final Order

approving the relief sought in the Motion shall be held on February 10, **2016 at 10:00 a.m.**

 before the Honorable David Jones, at the United States Bankruptcy Court for the Southern

District of Texas.


**Signed:  January 13, 2016**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>Exhibit A</u>**

**Approved Budget**

**SHERWIN ALUMINA COMPANY, LLC**

| | | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Week Number | | | | | | | | | | | | | | | |
| Week Ending | | 01/15 | 01/22 | 01/29 | 02/05 | 02/12 | 02/19 | 02/26 | 03/04 | 03/11 | 03/18 | 03/25 | 04/01 | 04/08 | Weeks |
| Results | | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | 1 to 13 |
| **Receipts** | | | | | | | | | | | | | | | |
| Miscellaneous Receipts | | - | - | 317 | - | - | - | 313 | - | - | - | 313 | - | - | 943 |
| Principal and Interest from Noranda | | - | - | 598 | - | - | - | - | 586 | - | - | - | 590 | - | 1,774 |
| Alumina Receipts | | - | - | - | - | 16,954 | - | - | - | 15,860 | - | - | - | 16,954 | 49,768 |
| Total Receipts | A | - | - | 914 | - | 16,954 | - | 313 | 586 | 15,860 | - | 313 | 590 | 16,954 | 52,486 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Payroll | | - | 563 | 705 | 1 | 465 | 311 | 705 | 2 | 465 | 311 | - | 706 | - | 4,233 |
| Insurance & Taxes | | - | 355 | 68 | - | - | 373 | 1 | 268 | - | 483 | - | 321 | - | 1,869 |
| Accounts Payable | | 1,881 | 1,869 | 1,882 | 1,892 | 1,995 | 1,911 | 2,374 | 2,208 | 2,592 | 3,145 | 2,911 | 2,979 | 2,835 | 30,477 |
| Utilities | | - | 303 | 2,763 | - | - | - | 281 | 2,902 | - | - | 263 | 2,815 | - | 9,327 |
| Caustic | | - | - | - | - | 2,761 | - | - | - | 2,273 | - | - | - | - | 5,034 |
| Bauxite | | 997 | - | 943 | - | 983 | 2,875 | 983 | 983 | 983 | 3,858 | 983 | - | 983 | 14,571 |
| Freight Mid-Ship | | 288 | - | 288 | 288 | - | 288 | 288 | - | 288 | - | 288 | - | 288 | 2,304 |
| 2nd PT Freight & Demurrage | | - | - | 350 | - | - | - | - | 250 | - | - | - | 250 | - | 850 |
| Demurrage | | - | - | 71 | - | - | - | - | 8 | - | - | - | 32 | - | 112 |
| Total Operating Disbursements | B | 3,167 | 3,089 | 7,071 | 2,181 | 6,204 | 5,758 | 4,633 | 6,620 | 6,601 | 7,797 | 4,445 | 7,103 | 4,106 | 68,776 |
| **Financing Disbursements** | | | | | | | | | | | | | | | |
| DIP Interest Payments | | - | - | - | - | - | - | - | - | - | - | - | 33 | - | 33 |
| Total Financing Disbursements | C | - | - | - | - | - | - | - | - | - | - | - | 33 | - | 33 |
| **Restructuring Professional and Other Fees** | | | | | | | | | | | | | | | |
| Total Restructuring Professional and Other Fees | D | - | - | - | - | - | - | 50 | - | - | 1,405 | - | - | - | 1,455 |
| **Total Disbursements** | B + C + D = E | 3,167 | 3,089 | 7,071 | 2,181 | 6,204 | 5,758 | 4,683 | 6,620 | 6,601 | 9,203 | 4,445 | 7,137 | 4,106 | 70,265 |
| **Net Cash Flow (Outlay)** | A - E = F | (3,167) | (3,089) | (6,157) | (2,181) | 10,750 | (5,758) | (4,369) | (6,034) | 9,259 | (9,203) | (4,132) | (6,546) | 12,849 | (17,779) |
| Beginning Cash | | 17,151 | 13,984 | 10,895 | 4,739 | 2,557 | 13,307 | 7,549 | 3,180 | 1,500 | 10,759 | 1,556 | 1,500 | 1,500 | 17,151 |
| Weekly Net Cash Flow | | (3,167) | (3,089) | (6,157) | (2,181) | 10,750 | (5,758) | (4,369) | (6,034) | 9,259 | (9,203) | (4,132) | (6,546) | 12,849 | (17,779) |
| Prepetition Facility Draw | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Draw | | - | - | - | - | - | - | - | 4,355 | - | - | - | 4,076 | 6,546 | 14,977 |
| **Ending Cash** | | 13,984 | 10,895 | 4,739 | 2,557 | 13,307 | 7,549 | 3,180 | 1,500 | 10,759 | 1,556 | 1,500 | 1,500 | 14,349 | 14,349 |
| **DIP FACILITY** | | | | | | | | | | | | | | | |
| **Balance** | | - | - | - | - | - | - | - | 4,355 | 4,355 | 4,355 | 8,431 | 14,977 | 14,977 | 14,977 |
| **DIP Availability (Interim Limited to $5 million)** | | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 35,645 | 35,645 | 35,645 | 31,569 | 25,023 | 25,023 | 25,023 |
| Dip Carve-Out | | | | | | | | | | | | | | | |
| Ending Cash | | 13,984 | 10,895 | 4,739 | 2,557 | 13,307 | 7,549 | 3,180 | 1,500 | 10,759 | 1,556 | 1,500 | 1,500 | 14,349 | 14,977 |
| **Total Liquidity, net of DIP Carve-Out** | | 53,984 | 50,895 | 44,739 | 42,557 | 53,307 | 47,549 | 43,180 | 37,145 | 46,404 | 37,202 | 33,069 | 26,523 | 39,372 | 39,372 |